Exhibit B



Arch Insurance Group Inc.

1299 Farnam Street
 Suite 500
Omaha, NE  68102-1880

P.O. Box 542033
 Omaha, NE 68154

T:  877.688.2724
F:  866.266.3630

archinsurance.com

October 17, 2023

**CERTIFIED MAIL/RRR**
**ARTICLE # 9207 1902 9562 6590 1603 2636 09**
**& EMAIL:** ddowns@lpsi.com
Danny Downs
Lincoln Property Company
2000 McKinney Ave, Suite 1000
Dallas, TX 75201

**CERTIFIED MAIL/RRR**
**ARTICLE # 9207 1902 9562 6590 1603 2636 30**
**& EMAIL:** jhammerman@thompsonhd.com
Julie L. Hammerman
Thompson Hammerman Davis LLP
1717 K Street NW, Suite 900,
Washington, DC 20006

| | | |
|---|---|---|
| Re: | Insured: | LPC Multifamily Holdco, LLC |
| | Policy Number: | SPL0066403-01 |
| | Policy Period: | 04/01/2022 to 04/01/2023 |
| | Claimant(s)/Matter: | *Jason Goldman, et al. v. RealPage, Inc., et al.,* Case No. 3:23-md-03071, United States District Court, Middle District of Tennessee (Purported Class Action) |
| | Arch Claim No.: | 000013866090 |

Dear Mr. Downs:

Arch Specialty Insurance Company ("Arch") acknowledges receipt of your tender of the above-captioned Class Action Complaint (the "Consolidated Master Complaint") for defense and indemnity. The following sets forth Arch's current coverage position and reservation of rights.

We have reviewed the allegations of the Consolidated Master Complaint in light of the relevant provisions of the AMWINS Real Estate Developer Professional Liability Insurance Policy SPL0066403-01 issued to LPC Multifamily Holdco, LLC ("LPC") for the policy period April 1, 2022 to April 1, 2023 (the

344

"Policy"). We regret to advise you it appears the Policy will not afford coverage for LPC's alleged liability in the Consolidated Master Complaint.

The basis of our current coverage position is set forth below. To the extent you disagree with any of the below or have additional information that may bear on coverage, we request that you immediately advise us of the same.

**FACTS**

The Prior Lawsuits

LPC was named in various lawsuits throughout the country[1] (the "*RealPage* Lawsuits") arising out of, among other things, its alleged use of residential real estate management software developed, sold and maintained RealPage, Inc. ("RealPage") . LPC tended some or all of these lawsuits to Arch, seeking defense and indemnity coverage under the Policy. In response to the tender of each lawsuit, Arch issued detailed position and reservation of rights letters. To the extent you did not receive such correspondence, please advise.

The Master Complaint

We were recently advised the *RealPage* Lawsuits were consolidated and plaintiffs filed the Consolidated Master Complaint in the Middle District of Tennessee. To the extent this is incorrect, please advise.

Class Allegations

The 154-page Consolidated Master Complaint largely follows the *RealPage* Lawsuits. Plaintiffs filed the Consolidated Master Complaint on September 16, 2023. Plaintiffs allege that from at least January 2016, through the present, Defendants (including LPC) engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing across the country. More specifically, Plaintiffs allege:

- RealPage developed an integrated technology platform that provides a host of software solutions for the multifamily rental housing markets, including revenue management software ("RMS") called "AI Revenue Management" and several managers of large-scale multifamily residential apartment buildings that used RealPage's property management software to coordinate and agree upon rental housing pricing and supply.

- Each Lessor Defendant agreed that they would delegate their rental price and supply decisions to a common decision maker, RealPage; share the proprietary data necessary for RealPage to make those decisions; and, then abide by RealPage's price and supply decisions.

- Rather than function as separate economic entities, Lessor Defendants agreed to make key competitive decisions regarding the price and supply of multifamily apartments, collectively.

---

[1] We understand lawsuits were filed in at least Texas, Washington, California, Colorado, Texas, Massachusetts, and Tennessee.

- LPC uses RealPage's revenue management software to manage some or all of its more than 210,000 rental units.

- The Lessor Defendants provide RealPage with vast amounts of non-public proprietary data, including lease transactions, rent prices, and occupancy and inventory levels. Each client's proprietary data is fed into a common data pool, along with additional data collected by RealPage's myriad other data-analytics and rental-management software products. RealPage then trains its machine learning and artificial intelligence across that pool of its clients' proprietary data and uses algorithms to generate rental prices daily for each of RealPage's client's available units. Property managers agree to adopt RealPage's pricing up to 80%-90% of the time, knowing that if they, alongside their co-conspirators, adhere to RealPage's pricing decisions, they will collectively raise market prices and avoid price competition.

- The Lessor Defendants share this proprietary data knowing that RealPage will use it to assist them and their competitors.

- LPC forced leasing managers wishing to deviate from RealPage's prices to submit a request to the corporate office. A former LPC Leasing Consultant in Nashville recalls that these deviation requests were rejected almost 99% of the time, and that LPC corporate would reiterate that RealPage's "rates are what they are."

- As the stated goal of RealPage's software is for its clients to "outperform the market [by] 3% to 7%," the inevitable outcome of Defendants' coordinated price setting was that rents have been pushed above competitive levels.

- Vacancy rates rose because each Lessor Defendant could (and did) allow a larger share of their units to remain vacant, thereby artificially restricting supply, while maintaining higher rental prices across their properties. This behavior is only rational if Lessor Defendants Vacancy rates rose because each Lessor Defendant could (and did) allow a larger share of their units to remain vacant, thereby artificially restricting supply, while maintaining higher rental prices across their properties.

- Not content to limit their conspiracy through indirect contact via RealPage, the Lessor Defendants also pursued direct contacts amongst themselves to facilitate information exchanges and coordinate prices.

- Absent collusion, property managers could not unilaterally raise rents above market rates – any property manager that did so would lose tenants to its competitors who offered rental units at market rates, earning those competitors a higher share of the available profits.

- Defendants' conspiracy avoids the competition-driven race to the bottom.

- By outsourcing their pricing decisions to RealPage, each Lessor Defendant knows that the impact of the ever-rising prices set by RealPage's algorithm will outpace their vacancy losses. In the absence of coordinated behavior, this price-over-volume strategy is economically irrational behavior.

- This irrational behavior was only accomplishable because RealPage allowed Lessors to avoid the prisoner's dilemma that would, absent collusion, dictate that Lessors keep "heads in the beds."

- The RealPage software allows the Lessors Defendants to operate as if they were one company setting prices at the monopoly level, which is the goal of any cartel.

- Property managers who use RealPage's revenue management software do so with the explicit and common goal of increasing rents for all members of the cartel by using coordinated algorithmic pricing.

- RealPage pushes rents higher in a way that would be economically irrational if firms were behaving unilaterally, as opposed to collectively.

- RealPage's software not only facilitates price hikes, but it also allows conspirators to maintain higher prices.

- Defendants' price-fixing conspiracy is a per se unlawful restraint of trade under Section 1 of the Sherman Act. It has resulted in artificially inflated rent prices and a diminished supply of multifamily rental units throughout the United States.

- Plaintiffs bring this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and members of the Class; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. §1).

- Plaintiffs and the Class were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to the following:

    o Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize rent prices for multifamily residential units in the United States;

    o Whether such combination or conspiracy violated the federal antitrust laws;

    o The nature of appropriate injunctive relief to restore competition in the market for the lease of multifamily residential real estate.

Alleged Injury and Causes of Action

Premised on the above allegations, Plaintiffs allege Defendants' anticompetitive conduct had the following effects, among others:

    o Competition among Defendants has been restrained or eliminated with respect to multifamily residential rental units nationwide;

- o The price of residential rental units have been fixed, stabilized, or maintained at artificially high levels;

- o The output of multifamily residential leases has been fixed, stabilized, or maintained at artificially low levels; and

- o Individuals have been deprived of free and open competition.

- Defendants' violations of the antitrust laws have caused Plaintiffs and the Class to pay higher prices for residential rental units in the U.S. than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages in the form of overcharges paid on their rental units.

- This is an injury of the type that the antitrust laws were meant to punish and prevent.

Plaintiffs assert the following causes of action:

1. <u>Price Fixing in Violation of Section 1 of the Sherman Act (15 U.S.C. §1)</u>

    a. Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to unreasonably restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

2. <u>Violation of State Antitrust Statutes</u>

    a. Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, stabilize, or maintain at artificially high levels, the rents they charge for residential units in various states to unreasonably restrain trade and commerce in violation of the various state antitrust laws.

        i. Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, increase, maintain, or stabilize rents at artificially high levels which injured Plaintiffs and members of the Class; exchange of competitively sensitive information between and among Defendants; and participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

        ii. Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of rents for residential units at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class were deprived of free and open competition and paid more to rent their apartments than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

iii. ALABAMA: Defendants entered into an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60, et seq.

iv. ALASKA: Defendants have entered into an unlawful agreement in restraint of trade in violation of ALASKA STAT. §45.50.562 et seq.

v. ARIZONA: Defendants have entered into an unlawful agreement in restraint of trade in violation of ARIZ. REV. STAT. §44-1401, et seq.

vi. CALIFORNIA: Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE §16700, et seq. Each defendant has acted in violation of CAL. BUS. & PROF. CODE §16720 to fix, raise, stabilize, and maintain prices of residential apartment rentals at supracompetitive levels.

vii. DISTRICT OF COLUMBIA: Defendants' actions have violated D.C. CODE §28-4501, et seq. Defendants' combinations or conspiracies had the following effects: (1) competition in the residential rental apartment market was restrained, suppressed, and eliminated throughout the District of Columbia; (2) residential apartment prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and rented an apartment in the District of Columbia, paid supracompetitive, artificially inflated prices for their rentals.

viii. FLORIDA: Defendants have violated the FL. STAT. §542.15 et seq. through their anticompetitive actions.

ix. GEORGIA: Defendants have entered into an unlawful agreement in restraint of trade in violation of GA. CODE §13-8-2.1, et seq.

x. HAWAII: Defendants have violated Haw. Rev. Stat. Ann. §480-1, et seq., through their actions. See HAW. REV. STAT. §480-4, 480-13. Through Defendants' actions and the actions of their co-conspirators, rents of residential units in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class.

xi. IDAHO: Defendants have violated the IDAHO CODE §48-101, et seq. through their anticompetitive actions.

xii. ILLINOIS: Defendants have entered into an unlawful agreement in restraint of trade in violation of Section 740 ILCS 10/1, et seq.

xiii. INDIANA: Defendants violated the IND. CODE §§24-1-1-1, et seq.; 24-1-2-1, et seq.; and 24-1-3-1, et seq. by entering into unlawful agreement in restraint of trade in the State of Indiana.

xiv. IOWA: Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1, et seq.

xv. KANSAS: Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. §50-101, et seq.

xvi. LOUISIANA: Defendants have entered into an unlawful agreement in restraint of trade in violation of LA. STAT. §51:121, et seq.

xvii. MAINE: Defendants have entered into an unlawful agreement in restraint of trade in violation of ME. REV. STAT.ANN. tit. 10, §1101.

xviii. MARYLAND: Defendants violated the MD. CODE ANN., COM. LAW §11-201, et seq. by entering into unlawful agreement in restraint of trade in the State of Maryland.

xix. MASSACHUSETTS: Defendants have entered into an unlawful agreement in restraint of trade in violation of MASS. GEN. LAWS ch. 93, §1, et seq.

xx. MICHIGAN: Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH. COMP. LAWS §445.771, et seq.

xxi. MINNESOTA: Defendants have violated the MINN. STAT. §325D.49, et seq. through their anticompetitive actions.

xxii. MISSISSIPPI: Defendants have entered into an unlawful agreement in restraint of trade in violation of MISS. CODE §75-21-1, et seq.

xxiii. MISSOURI: Defendants have entered into an unlawful agreement in restraint of trade in violation of MO. REV. STAT. § 416.011, et seq.

xxiv. MONTANA: Defendants have entered into an unlawful agreement in restraint of trade in violation of MONT. CODE ANN. §30-14-201, et seq.

xxv. NEBRASKA: Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of NEB. REV. STAT. §59-801, et seq.

xxvi. NEW HAMPSHIRE: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1, et seq.

xxvii. NEW JERSEY: Defendants restrained trade and commerce in the State of New Jersey by entering into an unlawful agreement in violation of N.J. REV. STAT. §56:9-1, et seq.

xxviii. NEW MEXICO: Defendants violated the N.M. STAT. ANN. §57-1-1, et seq. by entering into unlawful agreement in restraint of trade in the State of New Mexico.

xxix. NEW YORK: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW §340, et seq.

xxx. NORTH CAROLINA: Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1, et seq.

xxxi. NORTH DAKOTA: Defendants' actions have violated the N.D.CENT. CODE §51-08.1-01, et seq. through their anticompetitive actions.

xxxii. OHIO: Defendants violated the OHIO REV. CODE §1331:01, et seq. by entering into unlawful agreement in restraint of trade in the State of Ohio.

xxxiii. OKLAHOMA: Defendants have entered into an unlawful agreement in restraint of trade in violation of OKLA. STAT. tit. 79 §201, et seq.

xxxiv. OREGON: Defendants have entered into an unlawful agreement in restraint of trade in violation of OR. REV. STAT. §646.725, et seq.

xxxv. PENNSYLVANIA: Defendants have violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PA. CONS. STAT. §201-1, et seq., through their actions. Defendants engaged in unfair trade practice that artificially raised, fixed, maintained, and stabilized rent prices for residential units in Pennsylvania.

xxxvi. SOUTH CAROLINA: Defendants' have violated the antitrust laws of South Carolina, S.C. CODE ANN. §39-3-10, et seq., through their anticompetitive actions.

xxxvii. SOUTH DAKOTA: Defendants have violated the S.D.CODIFIED LAWS §37-1-3.1, et seq. through their anticompetitive actions.

xxxviii. TENNESSEE: Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101, et seq.

xxxix. UTAH: Defendants violated the UTAH CODE ANN. §76-10-3101, et seq. by entering into unlawful agreement in restraint of trade in the State of Utah.

xl. VERMONT: Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT.ANN. tit 9, §2453, et seq.

xli. VIRGINIA: Defendants have entered into an unlawful agreement in restraint of trade in violation of VA. CODE ANN. §59.1-9.1, et seq.

xlii. WASHINGTON: Defendants have entered into an unlawful agreement in restraint of trade in violation of WASH. REV. CODE ANN. §19.86.010, et seq. See WASH. REV. CODE ANN. §19.86.030.

  xliii. WEST VIRGINIA: Defendants have violated the W. VA. CODE §47-18-3, et seq. through their anticompetitive actions.

  xliv. WISCONSIN: Defendants have entered into an unlawful agreement in restraint of trade in violation of WIS. STAT. §133.01, et seq.

  xlv. WYOMING: Defendants' actions have violated the WY. STAT. ANN. §0-4-101, et seq. through their anticompetitive actions.

## THE POLICY

Arch issued AMWINS Real Estate Developer Professional Liability Insurance Policy SPL0066403-01 to LPC for the policy period April 1, 2022 to April 1, 2023. The Policy has a $5,000,000 per-occurrence and aggregate limit, with a $50,000 retention for each claim. Defense costs erode limits.

The Policy provides, in relevant part:

1. INSURING AGREEMENTS

  **A. REAL ESTATE DEVELOPER PROFESSIONAL LIABILITY**

The **Insurer** shall pay **Loss**, in excess of the Retention, on behalf of any **Insured** resulting from a **Claim** first made against such **Insured** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** committed on or subsequent to the **Retroactive Date**.

The Policy contains the following relevant exclusions:

**6. EXCLUSIONS**

The **Insurer** shall not pay **Loss** or **Non-Party Investigation Expenses**:

A. of an **Insured** for, based upon, arising from, or in any way related to the gaining of any personal profit, remuneration or advantage to which such **Insured** was not legally entitled, if established by any final non-appealable adjudication adverse to such **Insured**; provided this exclusion will not apply to **Defense Costs**…

B. of an **Insured** for, based upon, arising from, or in any way related to any deliberately fraudulent or criminal act or mission or any willful violation of law by such **Insured** if established by any final non-appealable adjudication adverse to such **Insured**; provided this exclusion will not apply to **Defense Costs**…

X. in connection with any **Claim** for, based upon, arising from or in any way related to unfair trade practices or violation of consumer protection laws.

## COVERAGE POSITION

352

The Real Estate Developer Professional Liability Insuring Agreement

As noted above, the insuring agreement in the Policy provides that Arch "shall pay **Loss**, in excess of the Retention…resulting from a **Claim** first made…during the Policy Period…for a **Wrongful Act** committed on or subsequent to the **Retroactive Date**." Section 8.A of the Policy provides that Arch "shall have the right and duty to defend each **Claim** for which the **Insurer** receives notice, even if such **Claim** is groundless, false or fraudulent." Section 8.B of the Policy provides that Arch's "duty to defend any Claim shall end upon exhaustion of any applicable Limit of Liability."

The Policy defines **Loss** as "**Defense Costs**, damages, settlements, judgments, pre- and post-judgment interest, and punitive, exemplary or multiple damages to the extent such damages are insurable under applicable law." **Loss** (other than **Defense Costs**) excludes, in relevant part, taxes, fines, or penalties imposed by law, as well as non-monetary or injunctive relief. The Policy defines **Claim**, in relevant part, as a civil proceeding against any **Insured** for monetary or non-monetary relief commenced by the receipt by, or the service upon, any **Insured** of a complaint or similar pleading. The term **Wrongful Act** is defined as "any actual or alleged negligent act, error or omission, misstatement, misleading statement, breach of duty or neglect or Personal Injury committed by any **Insured**; or by any other person for whom the Insured Organization is legally responsible, solely in the performance of or failure to perform **Real Estate Development Services**."

The Policy also provides that "all **Claims** arising out of the same **Wrongful Act** or any **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the earliest date that: (1) any of such **Claims** was commenced, even if such date is before the **Policy Period**; (2) notice of such **Wrongful Act** or any **Interrelated Wrongful Act** was given to the **Insurer** pursuant to Section 9.B; or (3) notice of any fact, circumstance, or situation including such **Wrongful Act** or any **Interrelated Wrongful Act** was given under any prior policy of which this Policy is a renewal or replacement." **Interrelated Wrongful Acts** is defined in the Policy as **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations events, transactions or causes."

In the Consolidated Master Complaint, Plaintiffs seek a determination that Defendants' conduct is a violation of Section 1 of the Sherman Act (15 U.S.C. §1) and other state-specific antitrust laws; an order permanently enjoining and restraining Defendants from continuing any similar conduct; and treble damages. However, the definition of **Loss** <u>excludes</u> non-monetary or injunctive relief as well as fines and penalties imposed by law. Further, we highlight that the Consolidated Master Complaint represents what we understand to be the consolidation of various purported class action lawsuits against LPC premised on the same alleged acts and omissions, which, if coverage were to attach, appear to stem from a single **Wrongful Act**.

To the extent LPC does not face liability for Loss resulting from a Claim first made against LPC during the Policy Period or Extended Reporting Period for a Wrongful Act committed on or subsequent to the Retroactive Date, the insuring agreement will not be triggered. Arch reserves all rights and defenses.

It Appears Exclusion X Precludes Coverage for the Consolidated Master Complaint

As set forth above, Exclusion X precludes coverage for any **Loss** or **Non-Party Investigation Expenses** "in connection with any **Claim** for, based upon, arising from or in any way related to unfair trade practices or violation of consumer protection laws."

In the Consolidated Master Complaint, Plaintiffs allege LPC conspired to fix rental housing prices through use of RealPage's software and that such conspiracy is a *per se* unlawful restraint of trade, resulting in artificially inflated rent prices, as well as a diminished supply of rental units. Plaintiffs assert one cause of action for Agreement in Restraint of Trade in Violation of Section I of the Sherman Act and seek injunctive relief as a result of that alleged Sherman Act violation. Plaintiffs assert a second cause of action premised on the same conduct under the antitrust laws of various individual states. Plaintiffs allege LPC and the other defendants carried out unlawful agreements to fix, increase, maintain, or stabilize prices of rents for residential units at artificially high levels depriving Plaintiffs of free and open competition. Plaintiffs also seek treble damages.

Plaintiffs' allegations appear to fall directly within the scope of Exclusion X as (1) Plaintiffs claim LPC engaged in the unlawful restraint of trade which artificially inflated rental prices, (2) The Sherman Act is a law enacted to prevent unfair trade practices and to promote fair competition for the benefit of consumers, and (3) Plaintiffs' state law claims are premised on the same conduct and asserted under state-specific antitrust and consumer protection laws. Accordingly, it appears coverage for the Crook Class Action is therefore precluded under Exclusion X.

Additional Terms and Conditions in the Policy May Serve to Further Limit or Preclude Coverage

As set forth above, it appears Exclusion X precludes coverage for the Consolidated Master Complaint. We nonetheless highlight that other Policy terms, conditions and exclusions may further limit or preclude coverage.

Exclusion A excludes coverage for any **Loss** based upon, arising from, or in any way related to the gaining of any personal profit, remuneration or advantage to which such Insured was not legally entitled, provided that this exclusion does not apply to **Defense Costs**. Here, Plaintiffs allege LPC engaged in a conspiracy to fix prices and charge higher rent than the market otherwise would have supported without the illegal agreement between LPC and its co-Defendants. To the extent it is determined LPC gained an advantage to which it was not legally entitled—namely, the ability to charge higher rent—as a result of its alleged agreement to restrain trade, indemnity coverage will be further precluded.

Exclusion B precludes coverage for any **Loss** based upon, arising from, or in any way related to any deliberately fraudulent or criminal act or mission or any willful violation of law by LPC, provided that such exclusion does not apply to **Defense Costs**. Plaintiffs allege LPC engaged in an unlawful price-fixing conspiracy and Defendants' anticompetitive acts were knowing and willful. To the extent it is determined LPC intentionally violated the Sherman Act or any other similar or related state of federal law, indemnity coverage may be further precluded.

LPC is advised that other insurance may apply and recommends that LPC tender to all potentially responsive insurance carriers.

**CONCLUSION – ONGOING RESERVATION OF RIGHTS**

As set forth above, it appears Exclusion X precludes coverage for the Consolidated Master Complaint. LPC is advised that the above is not an exhaustive list of all potentially applicable policy provisions and limitations. Arch reserves all rights with regard to the above referenced provisions, as well as all other rights, remedies, and defenses under the Policy, at law, and in equity. These reservations include, but are not limited to, the right to amend this letter to address additional coverage

issues as they may arise, based upon the Policy and/or any additional facts that may come to Arch's attention. Nothing contained in this letter, and no action on our part in investigating these matters, should be construed as an admission of coverage or as a waiver of any right, remedy, or defense that may be available to Arch.

To the extent LPC disagrees with any aspect of the above or has additional information for Arch's consideration, please immediately advise the undersigned. Arch will review any new or additional information provided and evaluate its impact on its potential coverage obligations.

If you have any questions or concerns, please do not hesitate to contact me at 214-438-4023 or by email at cjensen@archinsurance.com.

Very truly yours,

Christine Jensen
Senior Claims Examiner – Professional Liability Claims


/cmd


cc:     Phil Educate          via email: phil.educate@marsh.com
        Chris Pitcher         via email: cpitcher@archinsurance.com