IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| WILLOW BRIDGE PROPERTY COMPANY LLC, | § § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Civil Action No. 3:24-cv-00029-D |
| ARCH SPECIALTY INSURANCE COMPANY, | § § § § | |
| *Defendant.* | § | |

**APPENDIX TO PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT**

| EXHIBIT | DOCUMENT | APPENDIX PAGE NO. |
|---|---|---|
| Exhibit A | Certified Copy of Amended Complaint, *Avenue5 Partners LLC, et al. v. Endurance Am. Specialty Ins. Co.*, No. 23-2-11110-9 SEA (Wash. Super. Ct.), filed July 18, 2023 | Appx. 00001-00105 |
| Exhibit B | Certified Copy of Defendant's Motion for Summary Judgment, *Avenue5 Partners LLC, et al. v. Endurance Am. Specialty Ins. Co.*, No. 23-2-11110-9 SEA (Wash. Super. Ct.), filed Oct. 20, 2023 | Appx. 00106-00129 |
| Exhibit C | Certified Copy of Order Granting Defendant's Motion for Summary Judgment and Denying Plaintiffs' Motion for Partial Summary Judgment, *Avenue5 Partners LLC, et al. v. Endurance Am. Specialty Ins. Co.*, No. 23-2-11110-9 SEA (Wash. Super. Ct.), dated Feb. 12, 2024 | Appx. 00130-00137 |

Dated: August 30, 2024

Respectfully submitted,

*/s/ Julie Hammerman [8/30/2024]*
J Mark Chevallier (TX Bar No. 04189170)
**McGuire, Craddock & Strother, P.C.**
500 N. Akard Street, Suite 2200
Dallas, Texas 75201
Telephone:  214.954.6800
Facsimile:   214.954.6868
Email: mchevallier@mcslaw.com

Julie L. Hammerman (*Pro Hac Vice*)
**Thompson Hammerman Davis LLP**
1717 K St., NW, Suite 900
Washington, D.C. 20006
Telephone: 202.536.7529
Facsimile: 202.318.5356
E-Mail: jhammerman@thompsonhd.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Julie Hammerman, certify that on August 30, 2024, I served a true and correct copy of the foregoing document via electronic service on:

Robert J. Witmeyer (TX Bar No. 24091174)
rwitmeyer@mayerllp.com
Summer L. Frederick (TX Bar No. 24067764)
sfrederick@mayerllp.com
Mayer LLP
750 N. Saint Paul Street, Suite 700
Dallas, Texas 75201
Telephone: 214.379.6900
Facsimile: 214.379.6939

*Counsel for Defendant Arch Specialty Insurance Company*

*/s/ Julie Hammerman [8/30/2024]*
Julie Hammerman

Case Number: 23-2-11110-9
Date: August 29, 2024
Serial ID: 24-493273-6303550W5Q
Certified By: Catherine Cornwall
King County Clerk, Washington

HONORABLE BRIAN MCDONALD

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

| | |
|---|---|
| AVENUE5 PARTNERS LLC, a Delaware limited liability company, and AVENUE5 RESIDENTIAL LLC, a Delaware limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY, a Delaware corporation, <br><br> Defendant. | NO. 23-2-11110-9 SEA <br><br> **AMENDED COMPLAINT FOR:** <br> **(1) BREACH OF CONTRACT;** <br> **(2) INSURANCE BAD FAITH;** <br> **(3) VIOLATIONS OF THE CONSUMER PROTECTION ACT;** <br> **(4) VIOLATIONS OF THE INSURANCE FAIR CONDUCT ACT; AND** <br> **(5) DECLARATORY RELIEF** |

Avenue5 Partners LLC and Avenue5 Residential LLC, by and through their attorneys, allege on knowledge, information and belief as follows:

## I.    PARTIES, JURISDICTION AND VENUE

1.    PLAINTIFF AVENUE5 PARTNERS LLC is a limited liability company formed in the state of Delaware with its home office located in Seattle, Washington.

2.    PLAINTIFF AVENUE5 RESIDENTIAL LLC, a wholly owned subsidiary of Avenue5 Partners LLC, is a limited liability company formed in the state of Delaware with its home office located in Seattle, Washington. Avenue5 Partners LLC and Avenue5 Residential LLC are herein collectively referred to as "AVENUE5." Some of the AVENUE5 LLC members are domiciled in New York.

AMENDED COMPLAINT - 1

**Ashbaugh Beal**
701 FIFTH AVE., SUITE 4400
SEATTLE, WA 98104
T. 206.386.5900  F. 206.344.7400

5479.101 / 15195865.2

00001

3.    DEFENDANT ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY ("ENDURANCE"), a member of the Sompo International Companies, is a Delaware corporation with its principal place of business in New York.  ENDURANCE conducts business and places insurance policies throughout Washington, including Seattle, Washington.

4.    Venue in this Court is proper because AVENUE5's principal place of business is in Seattle, Washington, ENDURANCE does business there, the ENDURANCE Policy identified below was delivered to AVENUE5 there, and a substantial portion of events and omissions giving rise to AVENUE5's claims against ENDURANCE occurred there.

## II.    FACTUAL BACKGROUND

5.    AVENUE5 provides multifamily and single-family property management services throughout the United States, including Seattle, Washington.

6.    AVENUE5 purchased a Premier Professional Liability and Network Risk Insurance Policy from ENDURANCE, policy number MPC30015690200, for the policy period February 1, 2022 to February 1, 2023, with a retroactive date of February 1, 2016 (the "Policy").  The Policy is a "claims made and reported" policy that has a $5M claim and aggregate limit, with a $50,000 Self-Insured Retention.  A true and correct copy of the Policy is attached hereto as **Exhibit "A."**

7.    The Policy covers, among other things, losses from the performance of or failure to perform "Professional Services," as defined in the Policy, including, but not limited to, property management, real estate agent, broker and tenant relation services.

8.    Between October 18, 2022 and January 24, 2023, at least twenty-seven (27) federal class action complaints were filed in the United States, including Washington.  As of the time of this filing, there were approximately thirty-eight (38) such class action complaints.  Some of the class action complaints have been dismissed and the remaining were transferred on or about April 26, 2023, to the Middle District of Tennessee as part of MDL consolidation:  Master Case No. 3:23-md-3071 (the "MDL").  The class action

AMENDED COMPLAINT - 2

Ashbaugh Beal
701 FIFTH AVE., SUITE 4400
SEATTLE, WA 98104
T. 206.386.5900  F. 206.344.7400

5479.101 / 15195865.2

00002

1    complaints and the MDL are collectively referred to as the "Underlying Complaints."

2        9.    The Underlying Complaints alleged and inferred that various real estate and

3    property management companies, including AVENUE5, among other things: a) violated

4    federal and state statutes, rules and laws, including, but not limited to, federal antitrust and

5    state privacy protection laws; and b) received profit, remuneration and advantage to which

6    they were not legally entitled and did so by collecting and sharing, without authorization,

7    personal information not available to the general public and otherwise violated federal and

8    state privacy protection laws or regulations (collectively, the "Claims").

9        10.    The Underlying Complaints were filed and the Claims therein were made and

10    reported within the effective periods of the Policy and trigger coverage under the Policy.

11        11.    On or about October 24, 2022, AVENUE5 tendered its defense and indemnity

12    in writing under the Policy to ENDURANCE as to the first of the Underlying Complaints.

13        12.    In response to the tender, ENDURANCE was required to investigate the

14    Claim.  Among other things, ENDURANCE owed a duty to AVENUE5 to be fair and

15    reasonable in the investigation of the Claim, as well as to be a neutral arbiter when resolving

16    issues of coverage.  ENDURANCE unreasonably breached these obligations.

17        13.    On or about November 2, 2022, ENDURANCE issued a written coverage

18    determination denying a defense to and indemnity for the Claims made in the first of the

19    Underlying Complaints.  Its refusal to defend and provide coverage for the Claim was an

20    unreasonable denial of the benefits owed to AVENUE5 under the Policy.

21        14.    On or about February 24, 2023, AVENUE5 requested in writing that

22    ENDURANCE reconsider its previous unreasonable denial of benefits as to the first of the

23    Underlying Complaints and agree to immediately defend and indemnify AVENUE5 against

24    not just the first of the Underlying Complaints but also an additional twenty-six (26)

25    Underlying Complaints.

26        15.    In response, ENDURANCE was required to reconsider its denial and to

27    investigate the Claims made in the Underlying Complaints.  Among other things,

AMENDED COMPLAINT - 3

**Ashbaugh Beal**
701 FIFTH AVE., SUITE 4400
SEATTLE, WA 98104
T. 206.386.5900  F. 206.344.7400

1    ENDURANCE again owed a duty to AVENUE5 to be fair and reasonable in the

2    investigation of the Claim, as well as to be neutral arbiters when resolving issues of

3    coverage. ENDURANCE again unreasonably breached these obligations.

4        16.    On or about May 17, 2023, ENDURANCE issued another written coverage

5    determination to AVENUE5 refusing to withdraw its previous coverage denial and denying a

6    defense to and indemnity for each and every one of the Underlying Complaints and Claims

7    therein tendered to it by AVENUE5 and otherwise reported to it.

8        17.    By refusing to accept AVENUE5's defense and indemnity, ENDURANCE

9    unreasonably refused to afford AVENUE5 the benefits owed to it under the Policy, and in so

10    doing ENDURANCE, among other things, unreasonably, without foundation or justification,

11    and/or frivolously:

12        a.    Failed to resolve ambiguities in the Policy in favor of AVENUE5;

13        b.    Failed to construe exceptions to exclusionary language in the Policy

14              strictly and against itself;

15        c.    Construed exclusionary language in the Policy beyond its clear and

16              unequivocal meaning;

17        d.    Failed to give force and effect to language and clauses in the Policy that

18              favored defense and coverage for the Claims;

19        e.    Acknowledged only allegations in the Underlying Complaints it believed

20              to be excluded and ignored allegations made and inferred that required a

21              defense and indemnity under the Policy; and

22        f.    Violated unfair claims practices set out in § 284-30-330 of the Washington

23              Administrative Code, including, but not necessarily limited to,

24              subparts (1), (2) and (13).

25        **III.    CAUSES OF ACTION**

26        18.    AVENUE5 repeats and re-alleges each and every preceding paragraph as

27    though fully set forth herein.

AMENDED COMPLAINT - 4

**Ashbaugh Beal**
701 FIFTH AVE., SUITE 4400
SEATTLE, WA 98104
T. 206.386.5900  F. 206.344.7400

5479.101 / 15195865.2

00004

**A.**    ***Cause of Action 1: Breach of Contract***

19.    The Policy is a valid and enforceable contract between AVENUE5 and ENDURANCE.

20.    ENDURANCE agreed, among other things, to cover AVENUE5 against losses from any wrongful act, error or omission or breach of duty in the performance of or failure to perform "Professional Services," as defined in the Policy, including, but not limited to, property management, real estate agent, broker and tenant relation services.

21.    The Policy exclusions do not bar a defense or indemnity as to the Underlying Complaints or Claims therein.

22.    AVENUE5 has complied with all of its obligations under the Policy, including providing timely notice as to the Underlying Complaints and the Claims therein.

23.    Even though AVENUE5 has complied with its obligations under the Policy, ENDURANCE has denied all coverage as to the Underlying Complaints and the Claims therein.

24.    ENDURANCE's denials of coverage constitute breaches of the Policy.

25.    As a direct and proximate result of ENDURANCE's breaches, AVENUE5 has been damaged in excess of five million dollars ($5,000,000.00), according to proof at trial, and ENDURANCE is, therefore, liable for all damages arising out of its breaches.

**B.**    ***Cause of Action 2: Bad Faith***

26.    An insurer owes its insured an independent duty of good faith under Washington State law, including to deal fairly with the insured and to not engage in any action that demonstrates a greater concern for its own financial interest than the insured's financial risk.  See, e.g., Revised Code of Washington ("RCW") 48.01.030 ("The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance.").

AMENDED COMPLAINT - 5

**Ashbaugh Beal**
701 FIFTH AVE., SUITE 4400
SEATTLE, WA 98104
T. 206.386.5900  F. 206.344.7400

5479.101 / 15195865.2

00005

27.    The duty of good faith requires an insurer to conduct a reasonable investigation before refusing to pay a claim submitted by its insured.  An insurer must also have a reasonable justification before refusing to pay a claim.  An insurer who refuses to pay a claim, without conducting a reasonable investigation or without having a reasonable justification, fails to act in good faith.

28.    ENDURANCE had a duty to investigate, evaluate, and decide AVENUE5's Claims in good faith.  ENDURANCE breached its duty by unreasonably investigating, evaluating, and/or unreasonably, without foundation or justification, and/or frivolously denying the Claims by, among other things, refusing to defend and indemnify AVENUE5 as to the Underlying Complaints and the Claims.

29.    The Policy issued by ENDURANCE provides coverage to AVENUE5 for, among other things, losses from any wrongful act, error or omission or breach of duty in the performance of or failure to perform "Professional Services," as defined in the Policy, including, but not limited to, property management, real estate agent, broker and tenant relation services.  In denying coverage, ENDURANCE unreasonably, without foundation or justification and/or frivolously failed to abide the standards and law applicable to insurers in Washington for the investigation and adjustment of insurance claims.

30.    ENDURANCE's actions and/or inactions are unreasonable, unfounded, unjustified and/or frivolous.  As such, ENDURANCE is liable for its bad-faith conduct and for all damages sustained by AVENUE5 as a result thereof, including, but not limited to, the defense fees and costs expended by AVENUE5 in defending the Underlying Complaints and Claims and in bringing this action, any amounts paid by AVENUE5 to the Underlying Complaints and Claims by settlement or judgment, regardless of the Policy limits, and regardless of any coverage defenses ENDURANCE may have had, according to proof at trial.

**C.    _Cause of Action 3: Breach of Consumer Protection Act (RCW 19.86 et seq.)_**

31.    The Policy issued by ENDURANCE provides coverage against, among other things, losses from the wrongful performance of or failure to perform "Professional

AMENDED COMPLAINT - 6

**Ashbaugh Beal**
701 FIFTH AVE., SUITE 4400
SEATTLE, WA 98104
T. 206.386.5900  F. 206.344.7400

1   Services," as defined in the Policy, including, but not limited to, property management, real

2   estate agent, broker and tenant relation services.

3       32.     In denying coverage, ENDURANCE failed to abide the standards and law

4   applicable to insurers in Washington for the investigation and adjustment of insurance

5   claims.

6       33.     AVENUE5 is a consumer who is informed and believes, and based thereon

7   alleges, that ENDURANCE's conduct was deceptive, impacted the public, and had the

8   capacity to deceive.

9       34.     ENDURANCE's actions and/or inactions constitute per se and non-per se

10  unfair and deceptive acts or practices as defined in Washington's Consumer Protection Act

11  (RCW 19.86 et seq.).  AVENUE5 has been damaged by this conduct, and is continuing to

12  suffer damages, in an amount to be proved at time of trial as a proximate result of such unfair

13  and deceptive acts or practices.  AVENUE5's damages include, but are not limited to, actual

14  damages, including as to the coverage owed under the Policy that ENDURANCE

15  unreasonably refused to provide,  attorneys' fees and costs, according to proof at trial, as well

16  as treble damages of up to $25,000 per violation.

17  **D.**      ***Cause of Action 4: Violation of the Insurance Fair Conduct Act (RCW 48.30.015)***

18      35.     The Policy issued by ENDURANCE provides coverage against, among other

19  things, losses from the wrongful performance of or failure to perform "Professional

20  Services," as defined in the Policy, including, but not limited to, property management, real

21  estate agent, broker and tenant relation services.

22      36.     In unreasonably denying the above coverage, ENDURANCE violated the

23  Insurance Fair Conduct Act and failed to abide the standards and law applicable to insurers in

24  Washington for the investigation, defense and adjustment of claims and suits.

25      37.     AVENUE5 sent a notices to ENDURANCE pursuant to RCW 48.30.015 by

26  certified mail.  More than twenty (20) days have passed since those notices were sent, and

27  ENDURANCE failed to resolve the basis of the claim.

AMENDED COMPLAINT - 7

**Ashbaugh Beal**
701 FIFTH AVE., SUITE 4400
SEATTLE, WA 98104
T. 206.386.5900  F. 206.344.7400

38.     Given that ENDURANCE unreasonably denied a claim for coverage, AVENUE5 has been damaged.  AVENUE5 is entitled to all damages available under RCW 48.30.015, including, but not limited to, actual damages (including as to the coverage owed under the Policy that ENDURANCE refused to provide), attorneys' and expert witness fees and costs, according to proof at trial, as well as a multiplication of such damages of up to three times.

**E.     _Cause of Action 5: Declaratory Relief_**

39.     AVENUE5 seeks the Court's declaration of the parties' rights and duties under the Policy.  An actual controversy exists between AVENUE5 and ENDURANCE concerning the availability of coverage under the Policy for the Claims.

40.     The controversy between AVENUE5 and ENDURANCE is ripe for judicial review, including for at least the following reasons:

a.     The Underlying Complaints were filed and the Claims therein made during the effective period of the Policy.

b.     AVENUE5 tendered to ENDURANCE and/or ENDURANCE otherwise obtained notice of the Underlying Complaints and Claims therein within the period of the Policy.

c.     ENDURANCE denied AVENUE5's tenders and all coverage for the Underlying Complaints and Claims therein and, in doing so, failed to immediately defend and agree to indemnify AVENUE5 against the Claims.

41.     AVENUE5 now seeks a declaration from the Court that:

a.     The Underlying Complaints and Claims therein triggered ENDURANCE's duty to fairly and reasonably investigate same and to be a neutral arbiter when resolving issues of coverage;

b.     No exclusions in the Policy apply to bar a defense or indemnity of the Underlying Complaints or Claims therein under the Policy;

AMENDED COMPLAINT - 8

**Ashbaugh Beal**
701 FIFTH AVE., SUITE 4400
SEATTLE, WA 98104
T. 206.386.5900  F. 206.344.7400

1      c.   The Policy covers the Underlying Complaints and Claims therein;

2      d.   ENDURANCE has an obligation to defend and indemnify AVENUE5;

3      e.   ENDURANCE's coverage denial was unreasonable, without foundation or

4          justification, and/or frivolous and in bad faith;

5      f.   ENDURANCE, as a result of its bad faith conduct, cannot dispute

6          coverage; and

7      g.   ENDURANCE must pay any settlement by AVENUE5 of the Underlying

8          Complaints and Claims or any judgments issued against it in or as to such

9          Underlying Complaints or Claims notwithstanding any limits set forth in

10          the Policy.

11

## IV.    CAUSES OF ACTION

12      WHEREFORE, AVENUE5 prays for judgment in its favor against ENDURANCE as

13 follows:

14      1.   For monetary damages in excess of five million dollars ($5,000,000.00),

15 according to proof at trial;

16      2.   For actual and enhanced damages, penalties, attorneys' and expert witness

17 fees and costs as allowed under RCW 19.86 et. seq. in excess of five million dollars

18 ($5,000,000.00), according to proof at trial, as well as treble damages of up to $25,000 for

19 each violation;

20      3.   For pre- and post-judgment interest, according to proof at trial;

21      4.   For actual attorneys' fees and costs, pursuant to *Olympic Steamship v.*

22 *Centennial*, *McGreevy v. Oregon Mutual*, or other applicable law, according to proof at trial;

23      5.   For actual and enhanced damages, attorneys' and expert witness fees and costs

24 as allowed under the Insurance Fair Conduct Act (RCW 48.30.015) in excess of five million

25 dollars ($5,000,000.00), according to proof at trial, as well as up to three times such

26 damages;

27      6.   For declaratory relief consistent with the pleadings herein; and

AMENDED COMPLAINT - 9

**Ashbaugh Beal**
701 FIFTH AVE., SUITE 4400
SEATTLE, WA 98104
T. 206.386.5900  F. 206.344.7400

1    7.    For such other and further relief as the Court may deem just and equitable.

2

3    DATED this 17th day of July, 2023.

4                                          ASHBAUGH BEAL

5
                                           By:    *s/ Zachary O. McIsaac*
6                                                 Joseph M. Campos, WSBA #25344
                                                  jcampos@ashbaughbeal.com
7                                                 Zachary O. McIsaac, WSBA #35833
                                                  zmcisaac@ashbaughbeal.com
8                                                 701 Fifth Avenue, Suite 4400
                                                  Seattle, WA  98104
9                                                 Telephone: (206) 386-5900
                                                  Attorneys for Plaintiffs
10

11    DATED this 17th day of July, 2023.

12                                         NEWMEYER & DILLION LLP

13
                                           By:    *s/ Gregory L. Dillion*
14                                                Gregory L. Dillion
                                                  Greg.Dillion@ndlf.com
15                                                Daniel S. Schneider
                                                  Daniel.Schneider@ndlf.com
16                                                895 Dove Street, Second Floor
                                                  Newport Beach, CA  92660
17                                                Telephone: (949) 854-7000
                                                  Facsimile: (949) 854-7099
18                                                Co-Counsel for Plaintiffs

19

20

21

22

23

24

25

26

27

AMENDED COMPLAINT - 10

5479.101 / 15195865.2

**Exhibit A**

# S U R P L U S   L I N E S   N O T I C E

## WASHINGTON

THIS CONTRACT IS REGISTERED AND DELIVERED AS A SURPLUS LINE COVERAGE UNDER THE INSURANCE CODE OF THE STATE OF WASHINGTON, TITLE 48RCW. IT IS NOT PROTECTED BY ANY WASHINGTON STATE GUARANTY ASSOCIATION LAW.

**SOMPO INTERNATIONAL**

# NOTICE TO POLICYHOLDERS
# SOMPO INTERNATIONAL BREACH ASSIST HOTLINE

This Notice shall be construed to be a part of your policy, but no coverage is provided by this Notice, and it cannot be construed to replace any provisions of your policy.

If you know or suspect that your organization has suffered a data breach, or if you have been notified by a third party that you have suffered a breach, please contact the Sompo International Breach Assist Hotline below as soon as possible for immediate assistance.

| |
|---|
| **Sompo International**<br>**Breach Assist Hotline**<br>+1 844 347 7077<br>Mullen Coughlin LLC |

The Sompo International Breach Assist Hotline is an actively monitored voicemail box. Under normal circumstances, you will be contacted by Sompo International Breach Assist counsel between two and four business hours from the time you leave your message, which should include your organization's name, your Sompo International policy number (if available), and the name and contact information of an individual authorized to discuss the suspected breach.

Your initial call will include a discussion of the Sompo International Breach Assist counsel's role as well as an overview of the incident response process.

Information requested on the initial call typically includes:
- some general information about your organization;
- details, to the extent known, regarding the data exposure event (e.g. what happened, when the event occurred, when was the event discovered);
- how the event was discovered (e.g. internal discovery or contact from a customer, regulator or credit card company);
- whether the event has been contained or is potentially ongoing;
- the type of data involved and the number of known or potentially affected individuals;
- whether or not there has been any contact with law enforcement; and
- whether any party other than Sompo International has been notified.

PLEASE NOTE: PROMPT REPORTING OF A BREACH IS CRITICAL. EVEN IF YOU DO NOT YET HAVE ALL OF THE INFORMATION LISTED ABOVE, PLEASE CONTACT THE SOMPO INTERNATIONAL BREACH ASSIST HOTLINE IMMEDIATELY IF A BREACH IS SUSPECTED

Sompo International makes no representation, guarantee or warranty, express or implied, concerning the services or products of any vendors, including any warranty of fitness for a particular purpose, accuracy, reliability, or efficiency of such services or products. The vendors identified by Sompo International in this Notice or in any other materials relating to your policy are independent contractors, and Sompo International has no control over the services rendered or products provided. Your use of the vendors is at your sole risk, and under no circumstances shall Sompo International be liable for any damages arising from any services rendered or failed to be rendered or any products provided by any vendor identified in this Notice or any other materials.

00013

SOMPO INTERNATIONAL

# SOMPO INTERNATIONAL CYBER RISK PORTAL AND
# RISK MANAGEMENT RESOURCES
# NOTICE TO POLICYHOLDERS

This Notice shall be construed to be a part of your policy, but no coverage is provided by this Notice, and it cannot be construed to replace any provisions of your policy.

This Notice provides general information regarding access to and the use of Sompo International's proprietary 24/7 Cyber Risk Portal. The Cyber Risk Portal is a secure, web-based tool provided with your Sompo International policy to help your organization manage network risk and privacy exposures, and to provide information regarding what to do in the event of a privacy incident or network attack. Hosted by NetDiligence, a network security and privacy consulting organization, the Cyber Risk Portal contains network security and data management news, tools, and vendor information.

Once registered, Sompo International insureds have immediate access to risk management resources allowing you to better understand the current state of your organization's network security controls and identify immediate threats to both your network and your company. Many of these services are provided by vendors at no charge to you.

In addition, this site contains contact information for the breach assist experts, who can be retained through the Breach Assist Counsel immediately in the event of a known or suspected privacy incident, ransomware or other network event. Please note that these services are provided by a third-party legal services firm and in most cases any legal advice provided will be subject to that firm's billable rates per hour.

**The Cyber Risk Portal is a proprietary service for Sompo International customers only. It contains information regarding a variety of network security and privacy consultants and service providers.  Access credentials should not be shared with anyone outside of your organization.**

To register for Sompo International's Cyber Risk Portal:
1.   Go to https://somposecure.com
2.   Complete the registration form using your one time access code: 13177

Once registered, you can access the portal immediately.

If you experience issues using the Cyber Risk Portal or have any related questions, please contact Sompo International directly at: cyberportal@sompo-intl.com.

**00014**

 SOMPO INTERNATIONAL

## Sompo International Ransomware and Breach Response Management Resources

Sompo International identifies the leading providers of legal, forensic, and response vendors to assist our clients in the event of a ransomware or data breach incident and offers their services at the most competitive rates. Your first call after learning of an actual or potential breach should be to Sompo International Breach Assist Counsel, who will coordinate the engagement of these firms after consultation with you and Sompo International.

| Breach Assist Counsel | Credit Monitoring/Mail and Call Center |
|---|---|
| Mullen Coughlin LLC | Kroll |
| McDonald Hopkins LLC | Experian |
| | NPC |
| | TransUnion |

| Forensic Investigations | Legal/Defense |
|---|---|
| Ankura | Baker Hostetler LLP |
| Charles River Associates | Ballard Spahr LLP |
| Crypsis | Davis Wright Tremaine LLP |
| Kivu | Holland & Knight LLP |
| Stroz Friedberg | Mullen Coughlin LLC |
| Tracepoint | McDonald Hopkins LLC |
| Verizon Enterprise Solutions | Norton Rose Fulbright LLP |
| Kroll | |

## Sompo International Risk Management Resources

Sompo International is pleased to provide risk management resources to our insureds to enable you to better understand your current risks and to provide actionable information allowing you to secure network and data resources. The below services are **offered free of charge** and ordered through the Sompo International Cyber Risk Portal.

| | |
|---|---|
| **Bait and Phish Social Engineering Testing and Phishing Campaign**  | Bait and Phish performs a social engineering test of your organization, including a comprehensive email spoofing and phishing campaign. Bait and Phish sends bogus emails with attachments and embedded hyperlinks to ascertain the rates at which employees open these emails and click on links and attachments. In addition, Bait and Phish performs pretext phone-based testing of users in an attempt to gain confidential information such as username and passwords from a defined set of users in the organization. Insureds are provided summary reports at the end of the campaign. |

**00015**



| | |
|---|---|
| **Email Security Reviews** ![SecurIT360 logo] ![CRYPSIS logo] | Sompo Pro clients may engage SecurIT360's U.S.-based consultants for customized reviews of their email security configurations to reduce risks related to the top attack vector for cyber criminals. Each live consultation includes best practice recommendations following the Center for Internet Security (CIS) guidelines and other relevant standards for a full range of security and deployment processes including: multi-factor authentication for web-based services, password and access controls, spam and antivirus protection, external banner messages and application connections, system log and alert configurations, and mobile device access. Confidential consultations can be arranged by calling +1 (866) 887-0988. |
| **Sompo 'Virtual Chief Information Security Officer' (vCISO) Service** ![CRYPSIS logo] | Sompo International insureds have access to a dedicated (800) number staffed with CISO's, computer forensic and crisis management experts available to provide general network security management and guidance.  The service is provided by Crypsis, a leading cyber security consulting firm. |
| **BitSight Security Risk Rating Report** ![BITSIGHT logo] | Sompo International insureds can obtain a detailed Data Analytics Risk Rating Report of their organization which identifies key strengths and weaknesses of the insured's information security posture.  The report, which can be accessed annually, includes an overview of the company's Security Rating history and overall performance, along with comparisons to the industry average and an in-depth analysis of company-observed events and current security standards on its servers. |
| **Quiet Audit- Common Vulnerabilities and Exposures Survey** ![NetDiligence logo] | Sompo International has partnered with NetDiligence ® to provide an easy- to-use online self-assessment that will enable insureds to confirm that their organizations have addressed the most common critical vulnerabilities. |
| **Breach Plan Connect®** ![NetDiligence logo] | The NetDiligence® solution guides organizations through an online process to develop a data breach-focused Incident Response Plan. Net Diligence hosts the plan providing your organization anytime, anywhere access from any device. |

Sompo International makes no representation, guarantee or warranty, express or implied, concerning the services or products of any vendors, including any warranty of fitness for a particular purpose, accuracy, reliability, or efficiency of such services or products. The vendors identified in this Notice and at https://somposecure.com are independent contractors, and Sompo International has no control over the services rendered or products provided. Your use of the vendors is at your sole risk, and under no circumstances shall Sompo International be liable for any damages arising from any services rendered or failed to be rendered or any products provided by any vendor identified in this Notice and at  https://somposecure.com.

 

# Best Practice Microsoft Office Configuration to Minimize Phishing Risks

Sompo International has partnered with The Crypsis Group, a leading cyber security consulting firm, to provide breach readiness reviews for our Sompo Premier Professional insureds.

With an increase in the number of cyber security compromises as a result of phishing attacks, The Crypsis Group identified best practices which companies using Microsoft Office 365 can follow to prevent or mitigate the damage from these incidents. Common phishing attacks rely on email system vulnerabilities to obtain sensitive information such as email credentials which can then be used to maliciously alter messages or redirect payments.

We recommend enabling as many of the following Microsoft tools as practical to configure your Office 365 environment to minimize risk. Note that many of the tools referenced below are available at no cost; however, some tools may require a subscription.

| | |
|---|---|
| **Enable multi-factor authentication (MFA)** | In conjunction with a strong password policy (password complexity enabled, password rotation etc.) multi-factor authentication adds an extra layer of protection by requiring users to acknowledge an additional challenge to access their account. This lessens the likelihood of a compromise even if a password has been stolen and/or compromised.<br><br>Details on MFA and an implementation guide are found here:<br>https://support.office.com/en-us/article/set-up-multifactor-authentication-for-office-365-users-8f0454b2-f51a-4d9c-bcde-2c48e41621c6 |
| **Enable the unified audit log and mailbox audit logging** | The Office 365 unified audit log provides a centralized logging facility that includes activities from Azure Active Directory, Exchange Online, SharePoint Online, OneDrive for Business, and other applications.<br>Note that the unified audit log is not currently enabled by default and needs to be manually enabled.<br>Details on enabling the unified audit log and an implementation guide are found here: ttps://support.office.com/en-us/article/Search-the-audit-log-in-the-Office-365-Security-Compliance-Center-0d4d0f35-390b-4518-800e-0c7ec95e946c<br><br>Mailbox auditing generates additional logs that include mailbox activities performed by the owner, a delegated user, or an administrator. Note that mailbox auditing is not currently enabled by default and needs to be manually enabled.<br>Details on the mailbox activities tracked by mailbox auditing are found here:<br>https://docs.microsoft.com/en-us/exchange/policy-and-compliance/mailbox-audit-logging/mailboxaudit-logging<br><br>Details on enabling mailbox auditing and an implementation guide are found here: https://go.microsoft.com/fwlink/p/?LinkID=626109 |

 SOMPO INTERNATIONAL          

| Configure and enable Data Loss Prevention (DLP) | Data Loss Prevention allows an administrator to identify and create policies to prevent users from accidentally or intentionally sharing sensitive information. DLP can be implemented across all Office 365 applications, SharePoint, and OneDrive.<br><br>Details on enabling DLP and an implementation guide are found here:<br>https://support.office.com/en-us/article/overview-of-data-loss-prevention-policies-1966b2a7-d1e2-4d92-ab61-42efbb137f5e |
|---|---|
| Enable Office 365 Cloud Application Security | Microsoft's Cloud Application Security enables an administrator to investigate suspicious activities. Office 365 consists of multiple tools that enable an organization to track a number of suspicious activities from unauthorized users, track ransomware activity, and much more.<br><br>Note: Office 365 Cloud Application Security is only available to Enterprises Licensees.<br><br>Details on Office 365 Cloud Application can be found here:<br>https://support.office.com/en-us/article/overview-of-office-365-cloud-app-security-81f0ee9a-9645-45ab-ba56-de9cbccab475?ui=en-US&rs=en-US&ad=US |
| Enable Secure Score | Microsoft's Secure Score is a security analytics score that analyzes an Office 365 settings and activities and compares them to a baseline. A score is calculated which shows whether an organization is aligned with best security practices. Secure Score requires an Enterprise subscription and an administrator account.<br>Details on obtaining, enabling Secure Score and an implementation guide are found here:<br>https://support.office.com/en-us/article/introducing-the-office-365-secure-score-c9e7160f-2c34-4bd0-a548-5ddcc862eaef |

## About The Crypsis Group

The Crypsis Group is a cyber security consulting firm. Our consultants are information security experts with a diverse set of information security skills and experience. We are security engineers, digital forensic experts, malware reversers, penetration testers, and data breach incident responders. We work with organizations to proactively identify and mitigate enterprise risk and to respond to sophisticated network intrusions. We have responded to and managed investigations of complex data breach incidents for global organizations, including attacks by nation-state actors, insiders, and cyber criminals looking to steal confidential, sensitive or proprietary data. In all of our engagements our findings and conclusions are measured against industry best practice, rooted in fact, and designed to withstand opposing party scrutiny.


SOMPO INTERNATIONAL

# PREMIER PROFESSIONAL LIABILITY AND NETWORK RISK INSURANCE POLICY DECLARATIONS

CERTAIN INSURING AGREEMENTS OF THIS POLICY PROVIDE COVERAGE ON A CLAIMS-MADE BASIS. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE. THE LIMITS OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY CLAIM EXPENSES.  PLEASE READ THIS POLICY CAREFULLY.

POLICY NUMBER:            MPC30015690200

PRIOR POLICY NUMBER:

INSURER:                  Endurance American Specialty Insurance Company

Item 1.  Named Insured:   Avenue5 Partners, LLC
         Address:         901 5th Avenue
                          Suite 3000
                          Seattle, WA 98164

Item 2.  Policy Period:   From:  February 01, 2022        To:  February 01, 2023
                          (Both dates at 12:01 AM at the address of the Named Insured)

Item 3.  Coverage Schedule:

| Third-Party Coverage | | Each Claim Limit | Insuring Agreement Aggregate Limit | Retention | Retroactive Date |
|---|---|---|---|---|---|
| A. | Professional Services Liability | $5,000,000 | $5,000,000 | $50,000 | 02/01/2016 |
| B. | Technology Services Liability | $5,000,000 | $5,000,000 | $50,000 | 02/01/2022 |
| C. | Media Liability | $5,000,000 | $5,000,000 | $50,000 | Full Prior Acts |
| D. | Privacy and Network Security Liability | $5,000,000 | $5,000,000 | $50,000 | Full Prior Act |
| First-Party Coverage | | Each Cyber Event Limit | Insuring Agreement Aggregate Limit | Retention | |
| E. | Privacy and Network Security Breach Costs | $5,000,000 | $5,000,000 | $50,000 | |
| F. | Direct Business Interruption Loss | $5,000,000 | $5,000,000 | $50,000 | |
| G. | Contingent Business Interruption Loss | $5,000,000 | $5,000,000 | $50,000 | |
| H. | Digital Asset Loss | $5,000,000 | $5,000,000 | $50,000 | |
| I. | Cyber Extortion Threat | $5,000,000 | $5,000,000 | $50,000 | |

If no Limit is specified for an Insuring Agreement, then no coverage is provided for that Insuring Agreement.

Policy Issuance Date:    March 07, 2022          Endurance American Specialty Insurance Company
Policy Issuance Office:  Dallas, TX                                              SPP 1001 0119

00019

Item 4.   PCI Fines and Penalties Limit: $5,000,000

Item 5.   Reward Payments Limit: $50,000

Item 6.   Maximum Aggregate Limit of Liability: $5,000,000

Item 7.   Continuity Date: 02/01/2020

Item 8.   Waiting Period:
          A. Direct Business Interruption Loss:          8 Hours
          B. Contingent Business Interruption Loss:       8 Hours

Item 9.   Optional Extended Reporting Period:

          Additional Period:          Additional Premium (Percent of Annual Premium):
          1 Year                      100%

Item 10.  Professional Services:

          Solely in the performance of or failure to perform property management services, real estate
          agent/broker services, agency construction management services, real estate advisory
          services, tenant credit screening services, compliance services, due diligence and physical
          condition assessments, and insurance agency services limited to renters insurance products
          provided in conjunction with property management services.

Item 11.  Total Premium:

Item 12.  Producer:          Alliant Insurance Services, Inc

          Address:           5444 Westheimer
                             Suite 900
                             Houston, TX 77056

Item 13.  Notice:

          A. Claims, Circumstances,        Sompo Pro
             Cyber Events, and Proof of Loss:   Attn:  Claims Department
                                            1221 Avenue of The Americas
                                            New York, NY 10020
                                            Insuranceclaims@sompo-intl.com
                                            1-877-676-7575

          B. Breach Assist Hotline:        (844) 347-7077

          C. All Other Notices:            Sompo Pro
                                            Attn:  Professional Lines Underwriting Department
                                            1221 Avenue of The Americas
                                            New York, NY 10020

Item 14.  Forms and Endorsements Effective at Inception:
          See attached Forms and Endorsements Schedule.

| Policy Issuance Date: | March 07, 2022 | Endurance American Specialty Insurance Company |
| Policy Issuance Office: | Dallas, TX | SPP 1001 0119 |

00020

**NOTE: SEE ENCLOSED NOTICE FOR SURPLUS LINES NOTIFICATION**

This Policy shall constitute the contract between the Insureds and the Insurer.

The Insurer hereby causes this Policy to be signed on the Declarations page by a duly authorized representative of the Insurer.

_Christopher Sparus_
_____

Authorized Representative

March 07, 2022
_____

Date

Policy Issuance Date:      March 07, 2022                      Endurance American Specialty Insurance Company
Policy Issuance Office:    Dallas, TX                          SPP 1001 0119
                              Page 3 of 3

                                                              **00021**

# FORMS AND ENDORSEMENT SCHEDULE

## PREMIER PROFESSIONAL LIABILITY AND NETWORK RISK INSURANCE

| End. No. | Title | Number |
|---|---|---|
|  | SN - WASHINGTON | SN 9044 0914 WA |
|  | Premier Professional Liability and Network Risk Insurance Policy Declarations | SPP 1001 0119 |
|  | Forms and Endorsement Schedule | IL 0101 0712 |
| 1 | Construction Management Exclusions | IL 1001 0712 |
| 2 | Automatic Extended Reporting Period Amended Endorsement | SPP 3010 0119 |
| 3 | Breach Costs Amended - Credit Monitoring for Specified Time Period Endorsement | SPP 3012 0119 |
| 4 | Cancellation By Insurer Only For Nonpayment of Premium Endorsement | SPP 3016 0119 |
| 5 | Computer Property Damage Endorsement | SPP 3024 0119 |
| 6 | Conduct Exclusion Trigger Amended Endorsement | SPP 3025 0119 |
| 7 | Consequential Reputational Loss Coverage Endorsement | SPP 3027 0119 |
| 8 | Contingent Business Interruption System Failure Coverage Endorsement | SPP 3031 0119 |
| 9 | Insurance Services Exclusions Endorsement | SPP 3057 0119 |
| 10 | Interruption of Service Amended - Voluntary Shutdown Endorsement | SPP 3059 0119 |
| 11 | Invoice Fraud Coverage Endorsement | SPP 3121 0119 |
| 12 | Legal Services Exclusion Endorsement | SPP 3061 0119 |
| 13 | New Subsidiaries Amended Endorsement | SPP 3072 0119 |
| 14 | Notice and Proof of Loss Amended - Control Group Endorsement | SPP 3073 0119 |
| 15 | Nuclear Energy Liability Exclusion Endorsement | SPP 3076 0119 |
| 16 | Ransomware Support Endorsement | SPP 3153 0121 |
| 17 | Real Estate Agents and Property Managers Coverage Endorsement | SPP 3141 0720 |
| 18 | Retroactive Date Amended For Specific Professional Services Endorsement | SPP 3087 0119 |
| 19 | Service of Suit | IL 1301 0712 |

# FORMS AND ENDORSEMENT SCHEDULE

| End. No. | Title | Number |
|----------|-------|--------|
| 20 | Settlement Provision Amended Endorsement | SPP 3092 0119 |
| 21 | Side-A Directors and Officers Cyber Liability Endorsement | SPP 3120 0119 |
| 22 | Social Engineering Fraud Coverage Endorsement | SPP 3094 0119 |
| 23 | Telecommunications Fraud Coverage Endorsement | SPP 3104 0119 |
| 24 | Unintentional Breach of Contract Coverage Endorsement | SPP 3111 0119 |
| 25 | Waiver of Subrogation Pursuant to Contract Endorsement | SPP 3115 0119 |
| | Premier Professional Liability and Network Risk Insurance Policy | SPP 2001 0119 |
| | Signature Page | IL 1008 0114 |
| | U.S. Treasury Department's Office of Foreign Assets Control (OFAC) | PN 0001 0712 |

*The titles of the endorsements listed above are solely for convenience and form no part of the terms and conditions of coverage.*

# E N D O R S E M E N T

| | | | |
|---|---|---|---|
| **Named Insured:** | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 1 |

12:01 AM Standard Time at the address of the **Named Insured** as shown in the Declarations.

## GENERAL CHANGE
## (CONSTRUCTION MANAGEMENT EXCLUSIONS)

It is agreed that:

I.   Subsection C. of Section IV. EXCLUSIONS is amended by the addition of the following:

The Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or attributable to the failure of any **Insured** or any entity for whom the **Insured** is legally liable to complete any project or **Professional Services** on schedule while acting as an **At-Risk Construction Manager**.

The Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or attributable to construction, fabrication, manufacturing, assembly, or erection activities, including the supply of any products, materials, or equipment.

The Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or attributable to the cost to repair or replace any faulty workmanship, assembly, construction, erection, fabrication, installation, or remediation.

The Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or attributable to the design, manufacture, sale, supply, or distribution of any goods or products by any **Insured**, any **Subsidiary**, any entity that wholly or partially owns, operates, or manages the **Insured** or any **Subsidiary** of such entity, or any natural person or entity under license from the **Insured**.

The Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or attributable to the acquisition of any real estate or the securing of financing for the acquisition of any real estate.

The Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or attributable to the advice or requirement of, the failure to advise or require, or the failure to maintain or procure any financing or monies for the payment of any portion of any project or services of labor in connection with any such project.

The Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or attributable to estimates of construction costs or construction time being exceeded or the exceeding of any budget or other cost limitations.

Date of Issuance: March 07, 2022                                                          Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 1 of 2          Endorsement Form: IL 1001 0712

**00024**

**E N D O R S E M E N T**

The Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or attributable to the preparation of or the failure to prepare any safety precautions or procedures in connection with any project.

The Insurer shall not be liable for **Loss** on account of any **Claim** based upon, arising from, or attributable to the preparation of or the failure to prepare quantity surveys.

II.  Solely for purposes of this Endorsement, **At-Risk Construction Manager** means any **Insured** or any entity for whom the **Insured** is legally liable that directly contracts to perform any construction, erection, assembly, fabrication, installation, or remediation by itself or through any construction subcontractor at any tier.

_Christopher Sparrs_

Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                                                      Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company            Page 2 of 2            Endorsement Form: IL 1001 0712

00025

ENDORSEMENT

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 2 |
| | 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | | |

## AUTOMATIC EXTENDED REPORTING PERIOD AMENDED ENDORSEMENT

It is agreed that:

Paragraph II.B.1. Automatic Extended Reporting Period is replaced with the following:

1. Automatic Extended Reporting Period

   If the Insurer cancels or nonrenews this Policy for reasons other than fraud or non-payment of premium or the Named Insured cancels or nonrenews this Policy, then the Insurer shall provide the Insureds with an automatic Extended Reporting Period of ninety (90) days to immediately follow the end of the Policy Period. The automatic Extended Reporting Period shall not apply to any Claim covered under any policy of insurance that the Insured has purchased to replace the insurance provided by this Policy, or that would be covered under any such policy of insurance but for the application of a retention or the exhaustion of the limit of liability of such insurance.


_____
Authorized Representative


This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company          Page 1 of 1          Policy Form: SPP 2001 0119
Endorsement Form: SPP 3010 0119

00026

# E N D O R S E M E N T

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |

Endorsement
Effective Date: February 01, 2022

12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations.

Endorsement
Number: 3

## BREACH COSTS AMENDED - CREDIT MONITORING FOR SPECIFIED TIME PERIOD ENDORSEMENT

It is agreed that:

Paragraph 7. of the Definition of Breach Costs is replaced with the following:

7. provide credit monitoring or identity monitoring and restoration services and related call center services for the individuals affected by the Privacy Event or Network Security Event for a period of twenty-four (24) months after such Privacy Event or Network Security Event is Discovered, including, without limitation, credit monitoring or identity monitoring and restoration services purchased voluntarily by the Company to prevent or mitigate potential liability on account of such Privacy Event or Network Security Event; or

_Christopher Sparro_

Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

# ENDORSEMENT

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 4 |
| | 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | | |

## CANCELLATION BY INSURER ONLY FOR NONPAYMENT OF PREMIUM ENDORSEMENT

It is agreed that:

Paragraph 2. of Subsection X.A. Cancellation is replaced with the following:

2.  The Insurer may cancel this Policy only for nonpayment of premium, by providing notice of cancellation to the Named Insured at least ten (10) days before the effective time of cancellation. Notice of cancellation shall state the reason for cancellation and the effective date of cancellation.

_Christopher Spanos_

_____

Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                                    Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company      Page 1 of 1      Endorsement Form: SPP 3016 0119

**00028**

E N D O R S E M E N T

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |

| | | | |
|---|---|---|---|
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 5 |
| | 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | | |

## COMPUTER PROPERTY DAMAGE
## ENDORSEMENT

It is agreed that:

I.   Item 3. of the Declarations is amended by the addition of the following:

Computer System Property Damage Each Cyber Event Limit: $1,000,000
Computer System Property Damage Insuring Agreement Aggregate Limit: $1,000,000

Computer System Property Damage Retention: $50,000

II.  Section I. INSURING AGREEMENTS is amended by the addition of the following:

Computer System Property Damage Insuring Agreement

The Insurer shall pay the Company for Computer System Property Damage that is directly attributable to a Computer System Property Damage Event first Discovered during the Policy Period.

III. Section III. DEFINITIONS is amended as follows:

A.   The Definition of Cyber Event is amended by the addition of the following:

Cyber Event also means a Computer System Property Damage Event.

B.   The Definition of Loss is amended by the addition of the following:

Solely with respect to the Computer System Property Damage Insuring Agreement, Loss means only Computer System Property Damage.

C.   The following Definitions are added:

Computer System Property Damage means the reasonable and necessary costs to repair or replace a Computer System or a component of a Computer System resulting from a Computer System Property Damage Event.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company          Page 1 of 2          Policy Form: SPP 2001 0119
Endorsement Form: SPP 3024 0119

00029

Computer System Property Damage Event means injury to, or loss or destruction of, a Computer System owned and managed by the Insured if such injury or loss or destruction is caused by the Unauthorized Access or Use of, or the transmission of Malicious Code to, such Computer System.

IV.  Exclusion IV.A.1. Bodily Injury and Property Damage is amended by the addition of the following:

Solely with respect to the Computer System Property Damage Insuring Agreement, Paragraph b. of this Exclusion shall not apply to Computer System Property Damage.

V.  Subsection VI.C. Cooperation with respect to Cyber Events is amended by the addition of the following:

The Insured agrees to take all reasonable steps and measures to limit or mitigate Computer System Property Damage.

VI.  Section VII. NOTICE AND PROOF OF LOSS is amended by the addition of the following:

Notice of a Computer System Property Damage Event

As a condition precedent to coverage for Computer System Property Damage, the Insured shall provide written notice to the Insurer of the Computer System Property Damage Event giving rise to such Computer System Property Damage as soon as practicable after such Computer System Property Damage Event is Discovered.

VII.  Section XI. GENERAL CONDITIONS is amended by the addition of the following:

Calculation of Computer System Property Damage

For purposes of determining Computer System Property Damage, the amount of Computer System Property Damage the Insurer shall pay shall be the lesser of either the cost to repair or the cost to replace a Computer System or a component of a Computer System that is affected by a Computer System Property Damage Event. Any such Computer System or component shall be valued at actual cash value as of the time of the Computer System Property Damage Event, and shall not include any costs or expenses incurred to update, restore, replace, or otherwise improve the Computer System to a level of functionality beyond that which existed prior to the Computer System Property Damage Event.

_Christopher Spano_

_____
Authorized Representative


This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                                                                 Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company           Page 2 of 2           Endorsement Form: SPP 3024 0119

00030

E N D O R S E M E N T

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |

| | | | |
|---|---|---|---|
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 6 |

12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations.

## CONDUCT EXCLUSION TRIGGER AMENDED ENDORSEMENT

It is agreed that:

Exclusion IV.A.2. Conduct is replaced with the following:

    2.   Conduct

        The Insurer shall not be liable for Loss based upon, arising from, or attributable to any actual or alleged dishonest, criminal, malicious, or fraudulent act, error, or omission, or any willful violation of any statute, rule, or law by any Insured; provided that this Exclusion shall not apply to Claims unless a final and non-appealable judgment or adjudication in any proceeding not brought by the Insurer establishes such conduct, in which case the Insured shall reimburse the Insurer for any Claim Expenses paid by the Insurer prior to such judgment or adjudication. For purposes of determining the applicability of this Exclusion, the conduct of one Insured Person shall not be imputed to any other Insured Person, and only the conduct of a Control Group Member of a Company shall be imputed to the Company.

_Christopher Sparis_
_____

Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                               Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company       Page 1 of 1       Endorsement Form: SPP 3025 0119

00031

E N D O R S E M E N T

| | |
|---|---|
| Named Insured:  Avenue5 Partners, LLC | Policy Number:  MPC30015690200 |

| | |
|---|---|
| Endorsement<br>Effective Date:  February 01, 2022<br>12:01 AM Standard Time at the address of the  Named<br>Insured as shown in the Declarations. | Endorsement<br>Number:          7 |

## CONSEQUENTIAL REPUTATIONAL LOSS COVERAGE ENDORSEMENT

It is agreed that:

I.    The Declarations is amended by the addition of the following:

Consequential Reputational Loss Insuring Agreement Aggregate Limit: $1,000,000
Consequential Reputational Loss Each Cyber Event Limit: $1,000,000
Consequential Reputational Loss Retention: $50,000
Reputational Loss Waiting Period: Fourteen (14) Days

II.   Section I. INSURING AGREEMENTS is amended by the addition of the following:

Consequential Reputational Loss Insuring Agreement

The Insurer shall pay the Company for Consequential Reputational Loss, incurred during the Reputational Loss Coverage Period, that is directly attributable to a Privacy Event or Network Security Event first Discovered during the Policy Period.

III.  Section III. DEFINITIONS is amended as follows:

A.   The Definition of Loss is amended by the addition of the following:

Solely with respect to the Consequential Reputational Loss Insuring Agreement, Loss means only Consequential Reputational Loss.

B.   The following Definitions are added:

Adverse Media means any report or communication published or broadcast in any medium to the general public concerning a Privacy Event or Network Security Event of the Company that is first Discovered during the Policy Period.

Consequential Reputational Loss means the net profit before taxes that the Insured does not realize as a direct result of reputational harm to the Company that is directly attributable to Adverse Media first published or broadcast during the Policy Period.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company          Page 1 of 3          Policy Form: SPP 2001 0119
Endorsement Form: SPP 3027 0119

00032

Consequential Reputational Loss does not include:

1.  Breach Costs;

2.  any loss arising out of any liability to any third party;

3.  any legal costs or legal expenses of any type;

4.  any regular or overtime wages, salaries, fees, or benefits of the Insured Persons of, or overhead expenses of, the Company; or

5.  any loss incurred as a result of unfavorable business conditions, loss of market, or any other consequential loss.

Reputational Loss Coverage Period means the thirty (30) day period beginning the date and time that the Reputational Loss Waiting Period concludes.

Reputational Loss Waiting Period means the period of time set forth in the Declarations beginning the date and time that Adverse Media is first published or broadcast.

IV.  Subsection V.C. Related Claims and Cyber Events is amended by the addition of the following:

All Adverse Media in connection with the same Network Security Event or Privacy Event or any Interrelated matters shall be deemed to have been first published or broadcast at the time the first of such Adverse Media is published or broadcast.

V.  Section VII. NOTICE AND PROOF OF LOSS is amended by the addition of the following:

Notice of Consequential Reputational Loss

As a condition precedent to coverage under this Policy for Consequential Reputational Loss, the Insured shall:

1.  provide the Insurer written notice of the Network Security Event or Privacy Event giving rise to such Consequential Reputational Loss as soon as practicable , but in no event later than sixty (60) days, after the Insured first becomes aware of such Network Security Event or Privacy Event;

2.  furnish affirmative proof of the Consequential Reputational Loss with full particulars to the Insurer as soon as practicable, but in no event later than sixty (60) days, after the Insured incurs the Consequential Reputational Loss;

3.  submit to examination under oath at the Insurer's request;

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company          Page 2 of 3          Policy Form: SPP 2001 0119
                                                                              Endorsement Form: SPP 3027 0119

00033

4.  produce all pertinent records at such reasonable times and places as the Insurer shall designate; and

5.  provide full cooperation with the Insurer in all matters pertaining to the Consequential Reputational Loss.

VI.  Section XI. GENERAL CONDITIONS is amended by the addition of the following:

Consequential Reputational Loss Valuation

In determining the amount of Consequential Reputational Loss covered under the Consequential Reputational Loss Insuring Agreement, the Insurer shall give due consideration to the net profit or loss of the Company prior to the Reputational Loss Coverage Period and the probable net profit or loss of the Company if the Network Security Event or Privacy Event had not occurred. Such net profit or loss calculations shall not include any net income that would likely have been earned as a result of an increase in the volume of the Company's business due to favorable business conditions caused by the impact of any event similar to such Network Security Event or Privacy Event suffered by other businesses. The Company shall provide the Insurer with access to all relevant sources of information, including, but not limited to:

1.  the Company's financial records, tax returns, and accounting procedures;

2.  bills, invoices, and other vouchers; and

3.  deeds, liens, and contracts;

within ninety (90) days of the end of the Reputational Loss Coverage Period.

_____
Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                                                    Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 3 of 3          Endorsement Form: SPP 3027 0119

00034

<div align="center">E N D O R S E M E N T</div>

| | |
|---|---|
| Named Insured: Avenue5 Partners, LLC | Policy Number: MPC30015690200 |

| | |
|---|---|
| Endorsement Effective Date: February 01, 2022 | Endorsement Number: 8 |
| 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | |

## CONTINGENT BUSINESS INTERRUPTION SYSTEM FAILURE COVERAGE ENDORSEMENT

It is agreed that:

I.   The Declarations is amended by the addition of the following:

Contingent Business Interruption System Failure Sublimit: $5,000,000
Contingent Business Interruption System Failure Each Event Limit: $5,000,000

II.   Section III. DEFINITIONS is amended as follows:

A.   The Definition of Contingent Business Income Loss is replaced with the following:

Contingent Business Income Loss means Business Income Loss incurred by the Company as a result of an Interruption of Service caused solely and directly by:

1.   a network security event impacting the Computer System of a Qualified Service Provider, but only if such network security event would have been covered under this Policy had such network security event directly impacted the Insured's Computer System; or

2.   a System Failure Event.

B.   The Definition of System Failure Event is amended by the addition of the following:

Solely for purposes of Insuring Agreement G., System Failure Event means only an error or omission committed by a Qualified Service Provider in the management of the Computer System of a Qualified Service Provider that gives rise to an Interruption of Service.

III.   Subsection V.A. Limits of Liability is amended by the addition of the following:

Contingent Business Interruption System Failure Sublimit

The Insurer's maximum liability for all Contingent Business Income Loss on account of all System Failure Events shall be limited to the amount set forth in the Declarations as the Contingent Business Interruption System Failure Sublimit, which is part of, and not in addition to, the Insuring Agreement Aggregate Limit applicable to Insuring Agreement G. set forth in Item 3. of the Declarations. If the Contingent Business Interruption System Failure Sublimit is exhausted, then the

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company
Page 1 of 2
Policy Form: SPP 2001 0119
Endorsement Form: SPP 3031 0119

00035

Insurer's obligations with respect to the payment of any and all Contingent Business Income Loss on account of all System Failure Events shall be completely fulfilled and extinguished.

Contingent Business Interruption System Failure Each Event Limit

Notwithstanding anything to the contrary in this Policy, the Insurer's maximum liability for all Contingent Business Income Loss on account of each Interruption of Service caused by a System Failure Event under Insuring Agreement G. shall not exceed the Contingent Business Interruption System Failure Each Event Limit set forth in the Declarations, which is part of, and not in addition to, the Contingent Business Interruption System Failure Sublimit.

_____
Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                          Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company       Page 2 of 2       Endorsement Form: SPP 3031 0119

00036

ENDORSEMENT

| | |
|---|---|
| Named Insured: Avenue5 Partners, LLC | Policy Number: MPC30015690200 |
| Endorsement Effective Date: February 01, 2022 | Endorsement Number: 9 |

12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations.

## INSURANCE SERVICES EXCLUSIONS ENDORSEMENT

It is agreed that:

Subsection C. of Section IV. EXCLUSIONS is amended by the addition of the following:

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any breach of duty, obligation, or responsibility assumed by any Insured as an insurer, self-insurer, or reinsurer.

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any insolvency, receivership, bankruptcy, liquidation, financial impairment, or financial inability to pay of the Insured or any insurer, self-insurer, trust, insurance plan, or other vehicle or instrumentality which provides coverage or benefits.

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any breach of underwriting authority by the Insured, the Insured's management of any insurance company's underwriting office, underwriting department, or separate underwriting division, whether in the capacity as a managing general agent, manager, or similar capacity.

_Christopher Spans_
_____
Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company    Page 1 of 1    Policy Form: SPP 2001 0119
Endorsement Form: SPP 3057 0119

00037

ENDORSEMENT

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |

| | | | |
|---|---|---|---|
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 10 |
| | 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | | |

## INTERRUPTION OF SERVICE AMENDED - VOLUNTARY SHUTDOWN ENDORSEMENT

It is agreed that:

The Definition of Interruption of Service is amended by the addition of the following:

> Solely with respect to Insuring Agreement F., Interruption of Service also means any reasonable and necessary voluntary shutdown of the Insured's Computer System to prevent or mitigate the effects of a Network Security Event.

_Christopher Spanos_

_____

Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

ENDORSEMENT

| | |
|---|---|
| Named Insured: Avenue5 Partners, LLC | Policy Number: MPC30015690200 |

Endorsement
Effective Date: February 01, 2022

12:01 AM Standard Time at the address of the Named
Insured as shown in the Declarations.

Endorsement
Number:    11

## INVOICE FRAUD COVERAGE
## ENDORSEMENT

It is agreed that:

I.    The Declarations is amended by the addition of the following:

Invoice Fraud Insuring Agreement Aggregate Limit: $100,000
Invoice Fraud Each Cyber Event Limit: $100,000
Invoice Fraud Retention: $50,000

II.    Section I. INSURING AGREEMENTS is amended by the addition of the following:

Invoice Fraud

The Insurer shall pay the Company for Invoice Fraud Loss that is directly attributable to the Company's inability to collect Payment for any goods, products, or services after such goods, products, or services have been transferred to a Third Party, as a result of an Invoice Fraud that the Insured first discovers during the Policy Period.

III.    Section III. DEFINITIONS is amended as follows:

A.    The Definition of Cyber Event is amended by the addition of the following:

Cyber Event also means Invoice Fraud.

B.    The Definition of Loss is amended by the addition of the following:

Solely with respect to the Invoice Fraud Insuring Agreement, Loss means only Invoice Fraud Loss.

C.    The following Definitions are added:

Invoice Fraud means the release or distribution to a Third Party of any fraudulent invoice or fraudulent payment instruction, instructing that Third Party to make payment to someone other than the Company, as a direct result of a Network Security Event.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company
Page 1 of 3
Policy Form: SPP 2001 0119
Endorsement Form: SPP 3121 0119

00039

Invoice Fraud Loss means the direct cost to the Company to provide goods, products, or services to a Third Party for which the Company does not receive Payment due to an Invoice Fraud. Invoice Fraud Loss does not include:

1. any indirect or consequential loss of any kind;

2. income not realized as a result of the transfer of goods, products, or services in connection with an Invoice Fraud;

3. fees, costs, or expenses incurred or paid by the Insured in proving or establishing the existence of Invoice Fraud Loss;

4. fees, costs, or expenses incurred or paid by the Insured in defending or prosecuting any legal proceeding or claim; or

5. damages of any type for which the Insured is legally liable to a Third Party.

Payment means currency, coins, or bank notes in current use and having a face value.

Third Party means any natural person or entity other than an Insured.

IV.  Section IV. EXCLUSIONS is amended by the addition of the following:

Subsection IV.A. shall not apply to the Invoice Fraud Insuring Agreement.

Exclusions Applicable to the Invoice Fraud Insuring Agreement

1. The Insurer shall not be liable for Invoice Fraud Loss based upon, arising from, or attributable to any actual or alleged dishonest, criminal, or fraudulent act by an Insured Person either acting alone or in collusion with another Insured or a Third Party.

2. The Insurer shall not be liable for Invoice Fraud Loss if the person perpetrating such Invoice Fraud is authorized to use the Insured's Computer System, except if such person uses the Insured's Computer System in an unauthorized manner.

3. The Insurer shall not be liable for Invoice Fraud Loss based upon, arising from, or attributable to any actual or alleged use of credit, debit, charge, access, convenience, or other cards or the information contained on such cards.

4. The Insurer shall not be liable for Invoice Fraud Loss based upon, arising from, or attributable to the theft, disappearance, destruction of, or unauthorized access to confidential information; except that this Exclusion will not apply to Invoice Fraud Loss directly resulting from the use of such confidential information.

5. No coverage shall be available under this Policy for Invoice Fraud Loss unless sustained by an Insured during the Policy Period.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company        Page 2 of 3        Policy Form: SPP 2001 0119
Endorsement Form: SPP 3121 0119

00040

V.   Section VII. NOTICE AND PROOF OF LOSS is amended by the addition of the following:

Notice of an Invoice Fraud and Proof of Loss

As a condition precedent to coverage under this Policy for Invoice Fraud Loss, the Insured shall:

1.   inform, or permit the Insurer to inform, the appropriate law enforcement authorities if the Insured believes that an Invoice Fraud Loss involves a violation of law;

2.   provide the Insurer written notice of the Invoice Fraud Loss as soon as practicable, but in no event later than sixty (60) days, after the Insured first Discovers such Invoice Fraud Loss;

3.   furnish affirmative proof of the Invoice Fraud Loss with full particulars, including documentation of any fraudulent instructions and any steps taken to verify or authenticate the instructions, to the Insurer as soon as practicable, but in no event later than one hundred twenty (120) days, after the Insured first Discovers the Invoice Fraud Loss;

4.   submit to examination under oath at the Insurer's request;

5.   produce all pertinent records at such reasonable times and places as the Insurer shall designate; and

6.   provide full cooperation with the Insurer in all matters pertaining to the Invoice Fraud Loss.

VI.   Subsection XI.H. Other Insurance is amended by the addition of the following:

Coverage under the Invoice Fraud Insuring Agreement shall expressly be excess of any financial institution bond or commercial crime coverage maintained by the Insured that also provides coverage for a Funds Transfer Loss covered under the Invoice Fraud Insuring Agreement.

_Christopher Spears_

_____
Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                                                                              Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 3 of 3                  Endorsement Form: SPP 3121 0119

00041

# ENDORSEMENT

| | |
|---|---|
| Named Insured: Avenue5 Partners, LLC | Policy Number: MPC30015690200 |
| Endorsement Effective Date: February 01, 2022 | Endorsement Number: 12 |
| 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | |

## LEGAL SERVICES EXCLUSION ENDORSEMENT

It is agreed that:

Subsection C. of Section IV. EXCLUSIONS is amended by the addition of the following:

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the performance of or failure to perform legal services or the practice of law.

*Christopher Sparus*

_____

Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

E N D O R S E M E N T

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |

| | | | |
|---|---|---|---|
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 13 |
| | 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | | |

## NEW SUBSIDIARIES AMENDED
## ENDORSEMENT

It is agreed that:

The second paragraph of Subsection VIII.B. New Subsidiaries is replaced with the following:

Notwithstanding the foregoing, if the total annual revenues of such organization exceed twenty percent (20%) of the total consolidated annual revenues of the Named Insured and the Subsidiaries for the twelve (12) months immediately preceding the inception of the Policy Period, then coverage for such organization and its Insured Persons shall not extend beyond ninety (90) days following creation or acquisition of such organization, unless the Named Insured provides the Insurer with written notice thereof, provides any additional information, agrees to any additional terms and conditions, and pays any additional premium reasonably required by the Insurer, and the Insurer has agreed in writing to insure such organization.

_Christopher Spann_

_____
Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                                                    Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 1 of 1          Endorsement Form: SPP 3072 0119

00043

E N D O R S E M E N T

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 14 |
| | 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | | |

## NOTICE AND PROOF OF LOSS AMENDED - CONTROL GROUP ENDORSEMENT

It is agreed that:

The Definition of Control Group Member is amended by the addition of the following:

Solely for the purposes of determining when a Claim or Cyber Event is first Discovered with respect to Section VII. NOTICE AND PROOF OF LOSS, Control Group Member means only President, CEO, CFO, General Counsel, and Risk Manager or the functional equivalent of any of the foregoing positions in an organization. or the functional equivalent of any of the foregoing positions in an organization.

_Christopher Spano_
_____

Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company     Page 1 of 1     Policy Form: SPP 2001 0119
Endorsement Form: SPP 3073 0119

**00044**

# E N D O R S E M E N T

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 15 |
| | 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | | |

## NUCLEAR ENERGY LIABILITY EXCLUSION
## ENDORSEMENT

It is agreed that:

Section IV. EXCLUSIONS is amended by the addition of the following:

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any radioactive, toxic, explosive, or other hazardous properties of any nuclear material, nuclear assembly, or nuclear component thereof.

_Christopher Sparn_

_____

Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company    Page 1 of 1    Policy Form: SPP 2001 0119
Endorsement Form: SPP 3076 0119

00045

ENDORSEMENT

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |

Endorsement
Effective Date:    February 01, 2022

     12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations.

Endorsement
Number:    16

## RANSOMWARE SUPPORT
## ENDORSEMENT

It is agreed that:

I.    Section III. DEFINITIONS is amended as follows:

    A.    The Definition of Cyber Extortion Threat is amended by the addition of the following:

    Cyber Extortion Threat also means a Ransomware Event.

    B.    The Definition of Digital Asset Replacement Expenses is amended by the addition of the following:

    Notwithstanding any provision of this Policy to the contrary, when incurred in connection with a Digital Asset Loss Event caused by a Ransomware Event, Digital Asset Replacement Expenses must be incurred through a Breach Response Vendor with the prior consent of the Insurer, which shall not be unreasonably withheld.

    C.    The Definition of Extortion Expenses is replaced with the following:

    Extortion Expenses means reasonable and necessary expenses, other than Extortion Payments or Reward Payments:

        1.    with respect to Cyber Extortion Threats other than Ransomware Events, incurred by the Company and resulting directly from such Cyber Extortion Threat;

        2.    with respect to Ransomware Events, incurred by the Company through a Breach Response Vendor solely in order to obtain or to electronically transact an Extortion Payment resulting directly from a Ransomware Event;

    and incurred with the prior consent of the Insurer, which shall not be unreasonably withheld.

    D.    The Definition of Extortion Payments is replaced with the following:

    Extortion Payments means monies or digital currency paid by the Company, with the prior consent of the Insurer, to a third party whom the Company reasonably believes to be responsible for a Cyber Extortion Threat, in order to terminate the Cyber Extortion Threat; provided that the Insurer shall not be liable to reimburse the Company for any Extortion Payment if in the opinion of the Insurer such payment could violate any applicable law or regulation.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company       Page 1 of 2       Policy Form: SPP 2001 0119
Endorsement Form: SPP 3153 0121

00046

E.  The Definition of Extra Expenses is amended by the addition of the following:

Notwithstanding any provision of this Policy to the contrary, when incurred in connection with an Interruption of Service caused by a Ransomware Event or by Ransomware that impacts a Computer System of a Qualified Service Provider, Extra Expenses must be incurred through a Breach Response Vendor with the prior consent of the Insurer, which shall not be unreasonably withheld.

F.  The following Definitions are added:

Ransomware means malware incorporating cryptography that is used to threaten to publish data accessed through a Computer System or to prevent access to data or a Computer System unless a ransom is paid.

Ransomware Event means the introduction of Ransomware into the Insured's Computer System without the active assistance or participation of a Control Group Member of a Company.

II.  Section XI. GENERAL CONDITIONS is amended by the addition of the following:

Notwithstanding any provision of this Policy to the contrary, the Insurer shall not be liable to reimburse the Company for any Extortion Payment if in the opinion of the Insurer such payment could violate any applicable law or regulation.

_Christopher Sparro_
_____
Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in  this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                                                                    Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 2 of 2          Endorsement Form: SPP 3153 0121

00047

ENDORSEMENT

| | |
|---|---|
| Named Insured: Avenue5 Partners, LLC | Policy Number: MPC30015690200 |
| Endorsement Effective Date: February 01, 2022 | Endorsement Number: 17 |

12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations.

## REAL ESTATE AGENTS AND PROPERTY MANAGERS COVERAGE ENDORSEMENT

It is agreed that:

I.   The Declarations is amended as follows:

A.  Item 10. Professional Services is amended to include the following:

Professional Services means, in addition to any other services listed, Real Estate Agent Services and Property Manager Services.

B.  The following is added:

Lock Box Claim Sublimit: $100,000
Open House Claim Sublimit: $100,000
Tenant Discrimination Claim Sublimit: $5,000,000

II.  Section III. DEFINITIONS is amended as follows:

A.  The Definition of Pollutant is amended by the addition of the following:

Pollutant also means any mold, mildew, fungus, or spore.

B.  The following Definitions are added:

Lock Box means a keyless entry system or similar device used to gain access when showing properties.

Lock Box Claim means a Claim for a Professional Services Wrongful Act alleging Property Damage arising out of the Insured's maintenance, operation, or use of a Lock Box in the course of providing Professional Services related to property not owned, occupied by, or leased to the Insured.

Open House means an advertised designated time period where multiple potential buyers have the opportunity to view a specific property that is listed for sale by the Insured while such property is in the care, custody, or control of the Insured.

Open House Claim means a Claim for a Professional Services Wrongful Act alleging that Property Damage occurred as a result of an act or omission during an Open House.

Date of Issuance: March 07, 2022                                          Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company        Page 1 of 7        Endorsement Form: SPP 3141 0720

00048

Property Improvement Services means the following services provided by an Insured to others in connection with the renovation and reconstruction of real property:

1.  managing facility renovation and reconstruction plans;

2.  developing and managing renovation and reconstruction contracts and subcontracts; and

3.  developing loss control and risk management plans in connection with reconstruction or renovation.

Property Manager Services means the following services provided by an Insured to others in connection with the management of real property pursuant to a written contract:

1.  developing management plans and budgets;

2.  overseeing the physical maintenance of real property;

3.  tenant relation services, including, but not limited to, the collection of rent and processing evictions;

4.  soliciting and negotiating contracts for the sale or leasing of real property;

5.  developing, implementing, and managing contracts and subcontracts necessary to the daily functioning of real property; and

6.  record keeping.

Property Manager Services does not include:

    a.  Property Improvement Services;

    b.  analyzing, evaluating, or making recommendations concerning environmental hazards or exposures; or

    c.  obtaining, maintaining, or negotiating property and liability insurance contracts.

Real Estate Agent Services means the following services provided by an Insured to others as a real estate agent or broker, provided such Insured, if required, is appropriately licensed by the state in which such Insured is doing business:

1.  real estate agent, real estate broker, real estate personal assistant, and leasing agent services;

2.  real estate consultant or expert witness services provided in connection with the services set forth in Paragraph 1. of this Definition;

3.  notary public services; and

Date of Issuance: March 07, 2022                                                                 Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 2 of 7          Endorsement Form: SPP 3141 0720

00049

4.  pro bono services performed as a member of a real estate accreditation, standards review, or similar real estate board or committee, but only to the extent that such board or committee is identified by Endorsement to this Policy.

**Sexual Misconduct** means any actual or attempted verbal or non-verbal act, communication, contact, or other conduct that constitutes or is perceived as sexual discrimination, intimidation, molestation, harassment, abuse, or lewdness.

**Tenant Discrimination Claim** means a Claim for a Professional Services Wrongful Act alleging discrimination against a tenant, legal occupant, or any applicant for tenancy in violation of the Fair Housing Act of 1968, as amended, or any similar federal, state, or local law.

III.  Section IV. EXCLUSIONS is amended as follows:

A.  Exclusion A.1. Bodily Injury and Property Damage is amended by the addition of the following:

Paragraph b. of this Exclusion A.1. shall also not apply to:

i.  a Lock Box Claim; or

ii.  an Open House Claim.

This Exclusion A.1. shall also not apply to an otherwise covered Claim for a Professional Services Wrongful Act in connection with the performance of or the failure to perform Property Manager Services, if such Professional Services Wrongful Act was not the direct immediate cause of Bodily Injury or Property Damage; provided that in all events the Insurer shall not be liable for Loss on account of any Claim for Bodily Injury or Property Damage:

(a)  based upon, arising from, or involving in any way the ownership, maintenance, operation, use, or loading or unloading, by, on behalf of, or at the direction of any Insured of watercraft, automobiles, motor vehicles, aircraft, or mobile vehicles of any kind;

(b)  for which coverage would be afforded under a standard premises/operations liability policy, a standard commercial general liability policy, or a standard products/completed operations liability policy, whether or not such coverage has been purchased; or

(c)  based upon, arising from, or attributable to the Insured's ownership, rental, leasing, operation, maintenance, use, or repair of any real or personal property owned by the Insured, or occupied by, rented by, or leased to, the Insured.

B.  Exclusion B.4. Employment Practices and Discrimination is amended by the addition of the following:

Notwithstanding the foregoing, Paragraph b. of this Exclusion B.4. shall not apply to Claim Expenses on account of a Tenant Discrimination Claim unless such Tenant Discrimination Claim is established either by admission by the Insured, or by a finding, determination, ruling, order, or judgment in a judicial, administrative, or arbitration proceeding, in which case the Insured

Date of Issuance: March 07, 2022                                                                Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company              Page 3 of 7              Endorsement Form: SPP 3141 0720

**00050**

shall

reimburse the Insurer for any Claim Expenses paid by the Insurer in connection with such Tenant Discrimination Claim.

C. Solely for purposes of the coverage provided by this Endorsement, Subsection C. is amended by the addition of the following Exclusions:

**Abuse and Sexual Misconduct**

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to, in whole or in part, any actual or alleged:

1. abuse, including, but not limited to, sexual abuse, of a minor or adult, including any assault or battery;

2. Sexual Misconduct by an Insured; or

3. Sexual Misconduct committed against a person in the care or custody of an Insured or for whom an Insured is otherwise responsible.

**Architecture and Engineering**

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any design or change in design of any structure or plan requiring the stamp of an architect or engineer.

**Construction Defect**

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any faulty construction workmanship performed or failure to have been performed by the Insured or the Insured's contractors or subcontractors, including materials, parts, or equipment furnished or supplied by any of the foregoing.

**Construction Liability**

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any construction means, methods, techniques, sequences, or procedures or for safety precautions and programs in connection with any projects and construction support activities including, but not limited to, first aid stations, temporary utilities, fencing, signs, scaffolding, barricades, and project cleanup.

**Coverage Provided by Other Types of Insurance**

The Insurer shall not be liable for Loss on account of any Claim for which coverage would be afforded under a standard premises/operations liability policy, standard commercial general liability policy, or standard products/completed operations liability policy.

Date of Issuance: March 07, 2022                                    Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company    Page 4 of 7    Endorsement Form: SPP 3141 0720

00051

Failure to Maintain Insurance

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the failure to effect or maintain any insurance or bond.

Improper Notarization

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the notarized certification or acknowledgment of a signature without the physical appearance at the time of the notarization before a notary public of the person who is or claims to be the person signing.

Insured's Failure to Pay

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the Insured's failure or inability to pay money held for others.

Mortgage Banker or Broker

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the failure to perform services as a mortgage banker or mortgage broker.

Ownership, Maintenance, Operation, or Use of Motor Vehicles

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the ownership, maintenance, operation, use, loading, or unloading by, on behalf of, or at the direction of any Insured of watercraft, automobiles, motor vehicles, aircraft, or mobile vehicles of any kind.

Project Finance

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the requiring, maintaining, procuring, or providing advice relating to, or the failure to require, maintain, procure, or provide advice relating to, any financing or monies for the payment of any portion of any project, or for the services or labor associated with such project.

Property Development

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the failure to perform services as a property developer or builder.

Property Owned, Constructed, or Developed by Related Parties

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from or attributable to any actual, alleged, or attempted purchase, sale, lease, or appraisal of property developed, constructed, or owned by:

Date of Issuance: March 07, 2022                                                    Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company            Page 5 of 7            Endorsement Form: SPP 3141 0720

00052

a.  any Insured;

b.  any entity in which the Insured has or had a financial interest or a contemplated financial interest;

c.  any entity with a financial interest or contemplated financial interest in the Named Insured; or

d.  any entity under the same financial control as the Named Insured;

provided that such financial interest, contemplated financial interest, or financial control existed at the time of the act or omission resulting in the Claim; except that this Exclusion shall not apply to an actual or attempted sale of real property that the Insured did not construct or develop and in which the combined ownership interest of all Insureds at the time of such sale was less than fifteen percent (15%).

Real Estate Investments

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the formation, syndication, operation, or administration of any property syndication, real estate investment trust, or any other form of corporation, general or limited partnership, or joint venture formed for the purpose of investing in, buying, selling, or maintaining real property, including those syndications, trusts, corporations, partnerships, or joint ventures in which an Insured has, had, or intended to have a participating interest directly or indirectly in the profits or losses thereof.

Title and Escrow Services

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the failure to perform services as an escrow agent, title agent, or title abstractor.

IV.  Subsection A. Limits of Liability is amended by the addition of the following:

Lock Box Claim Sublimit

The Insurer's liability for all Loss on account of all Lock Box Claims shall be limited to the amount set forth in the Declarations as the Lock Box Claim Sublimit, which is part of, and not in addition to, the Insuring Agreement Aggregate Limit applicable to Insuring Agreement A. set forth in Item 3. of the Declarations. If the Lock Box Claim Sublimit is exhausted, then the Insurer's obligations with respect to the payment of any and all Loss on account of all Lock Box Claims shall be completely fulfilled and extinguished.

Open House Claim Sublimit

The Insurer's liability for all Loss on account of all Open House Claims shall be limited to the amount set forth in the Declarations as the Open House Claim Sublimit, which is part of, and not in addition to, the Insuring Agreement Aggregate Limit applicable to Insuring Agreement A. set forth in Item 3.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company

Page 6 of 7

Policy Form: SPP 2001 0119
Endorsement Form: SPP 3141 0720

00053

of

the Declarations. If the Open House Claim Sublimit is exhausted, then the Insurer's obligations with respect to the payment of any and all Loss on account of all Open House Claims shall be completely fulfilled and extinguished.

Tenant Discrimination Claim Sublimit

The Insurer's liability for all Claim Expenses on account of all Tenant Discrimination Claims shall be limited to the amount set forth in the Declarations as the Tenant Discrimination Claim Sublimit, which is part of, and not in addition to, the Insuring Agreement Aggregate Limit applicable to Insuring Agreement A. set forth in Item 3. of the Declarations. If the Tenant Discrimination Claim Sublimit is exhausted, then the Insurer's obligations with respect to the payment of any and all Claim Expenses on account of all Tenant Discrimination Claims shall be completely fulfilled and extinguished.

_____

Authorized Representative


This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                                    Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 7 of 7          Endorsement Form: SPP 3141 0720

00054

# ENDORSEMENT

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |

| | | | |
|---|---|---|---|
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 18 |
| | 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | | |

## RETROACTIVE DATE AMENDED FOR SPECIFIC PROFESSIONAL SERVICES ENDORSEMENT

It is agreed that:

I.  Solely with respect to Claims for Professional Services Wrongful Acts in connection with Specified Services, the Retroactive Date applicable to Insuring Agreement A. set forth in Item 3. of the Declarations is replaced with the following:

05/30/2018

II.  Solely for purposes of this endorsement, Specified Services means:

Agency Construction Management Services

_Christopher Spanos_

_____
Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

# ENDORSEMENT

| | |
|---|---|
| Named Insured:  Avenue5 Partners, LLC | Policy Number:  MPC30015690200 |
| Endorsement<br>Effective Date:  February 01, 2022<br>12:01 AM Standard Time at the address of the<br>Named Insured as shown in the Declarations | Endorsement<br>Number:  19 |

## SERVICE OF SUIT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

It is agreed that:

In the event of failure of the Insurer to pay any amount claimed to be due under the terms of this Policy, the Insurer, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this condition constitutes or should be understood to constitute a waiver of the Insurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. In any suit instituted against the Insurer upon this policy, the Insurer will abide by the final decision of such court or of any appellate court in the event of appeal.

It is further agreed that service of process in such suit may be made upon the Senior Vice President - Claims, Endurance American Speciality Insurance Company, 1221 Avenue of the Americas, 18th Floor, New York, NY 10020.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefore, the Insurer hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, as its true and lawful attorney upon whom service may be made of any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this Policy of insurance and hereby designates the above named Senior Vice President - Claims as the person to whom the said officer is authorized to mail such process or a true copy thereof.

_____
                    Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

ENDORSEMENT

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 20 |
| | 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | | |

## SETTLEMENT PROVISION AMENDED ENDORSEMENT

It is agreed that:

The third paragraph of Subsection VI.A. Defense and Settlement of Claims is replaced with the following:

> The Insurer shall have the right to make any investigation it deems necessary and, with the written consent of the Insured, make any settlement of a Claim covered by this Policy. If the Insurer recommends settlement of a Claim, the claimant is willing to agree to such settlement, and the Insured refuses to give written consent to settlement as recommended by the Insurer, then the Insured thereafter shall negotiate or defend such Claim independently of the Insurer and on the Insured's own behalf. In such event, the Insurer's liability for any such Claim shall be limited to the amount of the proposed settlement, Claim Expenses incurred until the time that the Insured refused to settle the Claim, plus seventy percent (70%) of all Loss, including Claim Expenses, incurred over such amount.

_Christopher Spans_
_____
Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

ENDORSEMENT

| Named Insured: | Avenue5 Partners, LLC | | Policy Number: | MPC30015690200 |
|---|---|---|---|---|

| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 21 |
|---|---|---|---|

12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations.

## SIDE-A DIRECTORS AND OFFICERS CYBER LIABILITY ENDORSEMENT

It is agreed that:

I.   The Declarations is amended by the addition of the following:

Side-A Directors and Officers Cyber Liability Insuring Agreement:

A.   Aggregate Limit: $250,000
B.   Each Claim Limit: $250,000
C.   Retroactive Date: 02/01/2017

II.   Section I. INSURING AGREEMENTS is amended by the addition of the following:

Side-A Directors and Officers Cyber Liability Insuring Agreement

The Insurer shall pay Loss on behalf of an Insured Person for which such Insured Person is not indemnified by the Company on account of a Securities Claim first made against such Insured Person during the Policy Period or the Extended Reporting Period, if applicable, for a Wrongful Act that takes place on or after the Retroactive Date and before the end of the Policy Period, but only if such Loss is not paid by any other insurance or indemnification available from any other source.

III.   Section III. DEFINITIONS is amended by the addition of the following:

A.   The Definition of Claim is amended by the addition of the following:

Solely with respect to the Side-A Directors and Officers Cyber Liability Insuring Agreement, Claim also means:

a.   a criminal proceeding commenced by:

i.   the return of an indictment, information, or similar document;

ii.   the arrest of, or the issuance of an arrest warrant for, an Insured Person; or

iii.   a request for the extradition of an Insured Person;

b.   a formal administrative or regulatory proceeding commenced by the filing of a notice of charges or similar document; or

Date of Issuance: March 07, 2022                                    Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company        Page 1 of 6        Endorsement Form: SPP 3120 0119

00058

c. a formal criminal, administrative, or regulatory investigation of an Insured Person commenced by the receipt of a formal investigative order, written notice, target letter, or subpoena from an investigating authority that identifies such Insured Person as an individual against whom a formal proceeding may be commenced;

including an appeal from any of the foregoing.

B. The Definition of Insured Person is amended by the addition of the following:

Solely with respect to the Side-A Directors and Officers Cyber Liability Insuring Agreement, Insured Person means only:

1. an Executive of the Company in his her or capacity as such; or

2. an Employee of the Company, but only to the extent that the Company has agreed to indemnify such Employee to the same extent as an Executive of the Company, and only while a Claim is also brought and maintained against an Executive of a Company.

C. The Definition of Loss is amended by the addition of the following:

Solely with respect to the Side-A Directors and Officers Cyber Liability Insuring Agreement, Loss means only Damages and Claim Expenses.

D. The Definition of Wrongful Act is amended by the addition of the following:

Solely with respect to the Side-A Directors and Officers Cyber Liability Insuring Agreement, Wrongful Act means only a Cyber D&O Wrongful Act.

E. The following Definitions are added:

Cyber D&O Wrongful Act means any matter claimed against an Insured Person solely by reason of serving in his or her capacity as such, and only in connection with a Privacy Event or Network Security Event of the Company.

Financial Impairment means the status of an organization resulting from:

1. the appointment by any state or federal official, agency, or court of any receiver, conservator, liquidator, trustee, rehabilitator, or similar official to take control of, supervise, manage, or liquidate such organization; or

2. such organization becoming a debtor-in-possession under United States bankruptcy law, or equivalent status under foreign law.

Independent Director means a natural person who is, was, or shall be a corporate director or the functional equivalent of a Company who is not, and has never been, an officer or employee of the Company.

Date of Issuance: March 07, 2022                                                     Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 2 of 6          Endorsement Form: SPP 3120 0119

**00059**

Non-Indemnifiable Loss means Loss for which the Company has not indemnified an Insured Person because either the Company is not permitted by law to indemnify such Insured Person, or the Company is unable to indemnify such Insured Person due to Financial Impairment.

Securities Claim means a Claim:

1. alleging a violation of any federal, state, local, or foreign law, regulation, or rule, regulating securities, that is:

   a. brought by any person or entity alleging, or in connection with, the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of the Company; or

   b. brought by a security holder of the Company with respect to such security holder's interest in any security issued by the Company; or

2. a derivative lawsuit brought by a security holder of the Company on behalf of the Company.

IV.  Section IV. EXCLUSIONS is amended as follows:

A.  Subsection A. is amended as follows:

   1. Exclusion A.2. Conduct is amended by the addition of the following:

      Solely with respect to a Securities Claim under the Side-A Directors and Officers Cyber Liability Insuring Agreement, this Exclusion A.2. shall not apply to Claim Expenses or to Claims against Independent Directors.

   2. Exclusion A.3. Improper Profit is amended by the addition of the following:

      Solely with respect to a Securities Claim under the Side-A Directors and Officers Cyber Liability Insuring Agreement, this Exclusion A.3. shall not apply to Claim Expenses or to Claims against Independent Directors.

B.  Subsection B. is amended as follows:

   1. The lead-in clause is replaced with the following:

      The following Exclusions apply only to Insuring Agreements A., B., C., D., and the Side-A Directors and Officers Cyber Liability Insuring Agreement only:

   2. Exclusion B.8. Securities Law is amended by the addition of the following:

      This Exclusion B.8. shall not apply to a Securities Claim under the Side-A Directors and Officers Cyber Liability Insuring Agreement.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company                Page 3 of 6                Policy Form: SPP 2001 0119
                                                                                 Endorsement Form: SPP 3120 0119

00060

V.   Subsection V. LIMITS OF LIABILITY AND RETENTIONS is amended as follows:

    A.   Subsection A. Limits of Liability is amended by the addition of the following:

       The Insuring Agreement Aggregate Limit set forth in the Declarations applicable to the Side-A Directors and Officers Cyber Liability Insuring Agreement shall be part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in the Declarations.

    B.   Subsection B. Retentions is amended by the addition of the following:

       No Retention shall apply to the Side-A Directors and Officers Cyber Liability Insuring Agreement.

       If in any Claim under the Side-A Directors and Officers Cyber Liability Insuring Agreement, the Company is permitted or required by law to indemnify an Insured Person for Loss, and does not in fact do so, then the Insurer shall pay otherwise covered Loss, including Claim Expenses, on behalf of such Insured Person. However, if the failure of the Company to indemnify the Insured Person is due to reasons other than Financial Impairment, then the Company shall have an obligation to reimburse the Insurer for such Loss. No such payment by the Insurer shall relieve the Company of any duty it may have to indemnify an Insured Person.

VI.   Subsection VI.A. Defense and Settlement of Claims is amended as follows:

    A.   Solely for purposes of the Side-A Directors and Officers Cyber Liability Insuring Agreement, the third paragraph is replaced with the following:

       The Insurer shall have the right and shall be given the opportunity to effectively associate with the Insureds in the investigation, defense, and settlement of any Securities Claim.

    B.   The following is added:

       No Duty to Defend Securities Claims

       Notwithstanding any provision of this Subsection VI.A. to the contrary, the Insured and not the Insurer shall have the duty to defend all Securities Claims under the Side-A Directors and Officers Cyber Liability Insuring Agreement.

       The Insurer shall have the right and shall be given the opportunity to effectively associate with the Insureds in the investigation, defense, and settlement of any such Securities Claim.

       Subject to the Subsection entitled Allocation of this Subsection VI.A., the Insurer shall advance Claim Expenses on a current basis, but no later than forty-five (45) days after receipt by the insured of properly itemized invoices. Notwithstanding the foregoing, if it is ultimately established that any such Claim Expenses are not covered, then the Insureds, severally according to their interests, shall repay such Claim Expenses to the Insurer.

Date of Issuance: March 07, 2022                                                                 Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 4 of 6          Endorsement Form: SPP 3120 0119

00061

Allocation

With respect to Securities Claims under the Side-A Directors and Officers Cyber Liability Insuring Agreement, the Insurer's obligation to pay Loss shall apply only to those amounts allocated to Insureds that are covered under this Policy and only to matters that are covered under this Policy.

If an Insured who is afforded coverage for a Securities Claim incurs Loss together with others (including other Insureds) who are not afforded coverage for such Securities Claim, then the Insured and the Insurer agree to use their best efforts to determine a fair and reasonable allocation of Loss to the Insureds who are afforded coverage for such Securities Claim, based on the relative legal and financial exposures of the parties to the Securities Claim.

If in any Securities Claim under the Side-A Directors and Officers Cyber Liability Insuring Agreement an Insured incurs Loss covered by this Policy and loss not covered by this Policy because such Securities Claim includes both covered and uncovered matters, then the Insureds and the Insurer agree to use their best efforts to determine a fair and reasonable allocation of such amounts to covered and uncovered Loss, based on the relative legal and financial exposures of the Insured to covered and uncovered matters. If the Insured and the Insurer cannot agree on an allocation of Claim Expenses, then the Insurer will advance Claim Expenses that it believes to be covered until a different allocation is negotiated or judicially determined. Any such allocation will be applied retroactively to all Claim Expenses on account of such Securities Claim, but shall not apply to, or create any presumption with respect to, the allocation of any other Loss arising from such Securities Claim or any other Securities Claim.

VII.  Section XI. GENERAL CONDITIONS is amended as follows:

A.  Subsection H. Other Insurance is amended by the addition of the following:

The coverage provided by the Side-A Directors and Officers Cyber Liability Insuring Agreement shall be specifically excess over, and shall not contribute with any indemnification available to the Insured Persons from any source, or any other valid and collectible insurance, including, without limitation, any directors and officers liability insurance, maintained by the Company or any other entity, whether such other insurance is stated to be primary, contributory, excess, or otherwise, unless such other insurance is expressly excess of this Policy by specific reference in such other policy to this Policy.

If Loss that is otherwise covered under the Side-A Directors and Officers Cyber Liability Insuring Agreement is not paid by such other insurance or indemnification, then the Insurer will pay such Loss, subject to all of the terms, conditions and limitations of this Policy and subject to the Insurer's excess position or subrogation rights against the insurer of such other insurance or the source of such indemnification.

B.  The following Subsection is added:

The Company agrees to indemnify the Insured Persons to the fullest extent permitted by law. If the Insurer pays Loss under this Policy for which the Company is legally permitted and

Date of Issuance: March 07, 2022                                                        Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 5 of 6          Endorsement Form: SPP 3120 0119

00062

financially able to pay, then the Company shall reimburse the Insurer for such amounts, and such amounts shall become immediately due and payable as a direct obligation of the Company to the Insurer.

_Christopher Sparro_

---

Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                                                    Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 6 of 6          Endorsement Form: SPP 3120 0119

00063

E N D O R S E M E N T

| | |
|---|---|
| Named Insured: Avenue5 Partners, LLC | Policy Number: MPC30015690200 |

Endorsement
Effective Date:    February 01, 2022

Endorsement
Number:    22

12:01 AM Standard Time at the address of the Named
Insured as shown in the Declarations.

## SOCIAL ENGINEERING FRAUD COVERAGE
## ENDORSEMENT

It is agreed that:

I.    The Declarations is amended by the addition of the following:

Social Engineering Fraud Insuring Agreement Aggregate Limit: $250,000
Social Engineering Fraud Each Cyber Event Limit: $250,000
Social Engineering Fraud Retention: $50,000

II.    Section I. INSURING AGREEMENTS is amended by the addition of the following:

Social Engineering Fraud Insuring Agreement

The Insurer shall pay the Company for Social Engineering Loss:

1.    first sustained by the Company during the Policy Period; and

2.    Discovered and reported to the Insurer no later than sixty (60) days after the termination of the
Policy Period.

III.    Section III. DEFINITIONS is amended by the addition of the following:

A.    The Definition of Cyber Event is amended by the addition of the following:

Solely with respect to the Social Engineering Fraud Insuring Agreement, Cyber Event means only
a Social Engineering Fraud.

B.    The Definition of Discovered is amended by the addition of the following:

Solely with respect to the Social Engineering Fraud Insuring Agreement, Discovered means a
Control Group Member of a Company becoming aware of facts which would cause a reasonable
person to believe that the Company has sustained a Social Engineering Loss.

C.    The Definition of Loss is amended by the addition of the following:

Solely with respect to the Social Engineering Fraud Insuring Agreement, Loss means only Social
Engineering Loss.

D.  Solely for purposes of the Social Engineering Fraud Insuring Agreement, the following Definitions are added:

Out-of-Band Authentication means a method of challenge and response to the requestor of a transfer, payment, or delivery of funds by an Insured, via a method other than the original means of request, to verify the authenticity or validity of the request.

Social Engineering Fraud means an unauthorized electronic funds transfer due to the actions of an Insured relying in good faith on a fraudulent instruction of a Third Party who purports to be a person or entity authorized to give an instruction for an electronic transfer of funds, where such fraudulent instruction contains a misrepresentation of material fact.

Social Engineering Loss means any funds actually paid by an Insured and not subsequently recovered that are directly attributable to a Social Engineering Fraud.

Social Engineering Loss does not include:

1.  any indirect or consequential loss of any kind;

2.  the giving or surrendering of any funds in any exchange or for any purchase, whether fraudulent or not;

3.  fees, costs, or expenses incurred or paid by the Insured in proving or establishing the existence of any loss of funds;

4.  fees, costs, or expenses incurred or paid by the Insured in defending or prosecuting any legal proceeding or claim;

5.  damages of any type for which the Insured is legally liable to a Third Party; or

6.  costs or expenses incurred by a customer or client of the Insured.

Third Party means any natural person or entity other than an Insured.

IV. Section IV. EXCLUSIONS is amended by the addition of the following:

Subsection A. shall not apply to the Social Engineering Fraud Insuring Agreement.

Exclusions Applicable to the Social Engineering Fraud Insuring Agreement

1.  The Insurer shall not be liable for Social Engineering Loss based upon, arising from, or attributable to any actual or alleged dishonest, criminal, or fraudulent act by an Insured Person either acting alone or in collusion with another Insured or a Third Party.

Date of Issuance: March 07, 2022                                                                 Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company            Page 2 of 4            Endorsement Form: SPP 3094 0119

00065

2.   The Insurer shall not be liable for Social Engineering Loss based upon, arising from, or attributable to any fraudulent instruction if the sender, or anyone acting in collusion with the sender, ever had access to the Insured's authentication mechanism.

3.   The Insurer shall not be liable for Social Engineering Loss based upon, arising from, or attributable to any forged, altered, or fraudulent negotiable instruments, securities, documents, or instructions.

4.   The Insurer shall not be liable for Social Engineering Loss based upon, arising from, or attributable to any actual or alleged use of credit, debit, charge, access, convenience, or other cards or the information contained on such cards.

5.   The Insurer shall not be liable for Social Engineering Loss based upon, arising from, or attributable to the theft, disappearance, destruction of, or unauthorized access to confidential information, including, but not limited to, trade secrets, customer lists, and intellectual property.

6.   The Insurer shall not be liable for Social Engineering Loss caused by a Third Party if such Social Engineering Loss is sustained by an Insured sixty (60) days or more after an Insured becomes aware of a fraudulent, dishonest, or criminal act committed by such Third Party.

7.   The Insurer shall not be liable for Social Engineering Loss on account of any transfer, payment, or delivery of funds by the Insured that was not verified with the requestor using an Out-of-Band Authentication.

8.   No coverage shall be available under this Policy for Social Engineering Loss unless sustained by an Insured during the Policy Period.

V.   Section VII. NOTICE AND PROOF OF LOSS is amended by the addition of the following:

Notice of a Social Engineering Fraud and Proof of Loss

As a condition precedent to coverage under this Policy for Social Engineering Loss, the Insured shall:

1.   provide the Insurer written notice of the Social Engineering Loss as soon as practicable, but in no event later than sixty (60) days, after the Insured first Discovers such Social Engineering Loss;

2.   furnish affirmative proof of the Social Engineering Loss with full particulars, including documentation of any fraudulent instructions and any steps taken to verify or authenticate the instructions, to the Insurer as soon as practicable, but in no event later than sixty (60) days, after the Insured first Discovers the Social Engineering Loss;

3.   submit to examination under oath at the Insurer's request;

4.   produce all pertinent records at such reasonable times and places as the Insurer shall designate; and

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company     Page 3 of 4     Policy Form: SPP 2001 0119
Endorsement Form: SPP 3094 0119

00066

5. provide full cooperation with the Insurer in all matters pertaining to the Social Engineering Loss.

VI. Subsection XI.H. Other Insurance is amended by the addition of the following:

Coverage under the Social Engineering Fraud Insuring Agreement shall expressly be excess of any financial institution bond or commercial crime coverage maintained by the Insured that also provides coverage for a Social Engineering Loss covered under the Social Engineering Fraud Insuring Agreement.



Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                                          Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company        Page 4 of 4        Endorsement Form: SPP 3094 0119

00067

ENDORSEMENT

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |

Endorsement
Effective Date: February 01, 2022

Endorsement
Number: 23

12:01 AM Standard Time at the address of the Named
Insured as shown in the Declarations.

## TELECOMMUNICATIONS FRAUD COVERAGE
## ENDORSEMENT

It is agreed that:

I.   The Declarations is amended by the addition of the following:

Telecommunications Fraud Insuring Agreement Aggregate Limit: $250,000
Telecommunications Fraud Each Cyber Event Limit: $250,000
Telecommunications Fraud Retention: $50,000

II.   Section I. INSURING AGREEMENTS is amended by the addition of the following:

Telecommunications Fraud Insuring Agreement

The Insurer shall pay the Company for any Telecommunications Fraud Loss:

1.   first sustained by the Company during the Policy Period; and

2.   Discovered and reported to the Insurer no later than sixty (60) days after the termination of the
Policy Period.

III.   Section III. DEFINITIONS is amended by the addition of the following:

A.   The Definition of Cyber Event is amended by the addition of the following:

Solely with respect to the Telecommunications Fraud Insuring Agreement, Cyber Event means
only a Telecommunications Fraud.

B.   The Definition of Discovered is amended by the addition of the following:

Solely with respect to the Telecommunications Fraud Insuring Agreement, Discovered means a
Control Group Member of a Company or any director, trustee, officer, administrator, manager,
partner, or insurance representative of the Company first becoming aware of facts which would
cause a reasonable person to believe that an Insured has sustained a Telecommunications
Fraud Loss.

Date of Issuance: March 07, 2022                                                    Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 1 of 3          Endorsement Form: SPP 3104 0119

00068

C. The Definition of Loss is amended by the addition of the following:

Solely with respect to the Telecommunications Fraud Insuring Agreement, Loss means only Telecommunications Fraud Loss.

D. The following Definitions are added:

Telecommunications Fraud means a Third Party's access to and use of a telephone system under the operational control of the Company in an unauthorized manner.

Telecommunications Fraud Loss means toll and line charges directly incurred by the Company and not subsequently recovered as a direct result of a Telecommunications Fraud.

Telecommunications Fraud Loss does not include:

1. any indirect or consequential loss of any kind;

2. fees, costs, or expenses incurred or paid by the Insured in proving or establishing the existence of any Telecommunications Fraud Loss;

3. fees, costs, or expenses incurred or paid by the Insured in defending or prosecuting any legal proceeding or claim; or

4. damages of any type for which the Insured is legally liable to a Third Party.

Third Party means any natural person or entity other than an Insured.

IV. Section IV. EXCLUSIONS is amended by the addition of the following:

Subsection A. shall not apply to the Telecommunications Fraud Insuring Agreement.

Exclusions Applicable to the Telecommunications Fraud Insuring Agreement:

1. The Insurer shall not be liable for Telecommunications Fraud Loss based upon, arising from, or attributable to any actual or alleged dishonest, criminal, or fraudulent act by an Insured Person either acting alone or in collusion with another Insured or a Third Party.

2. No coverage shall be available under this Policy for Telecommunications Fraud Loss unless sustained by the Company during the Policy Period.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company    Page 2 of 3    Policy Form: SPP 2001 0119
Endorsement Form: SPP 3104 0119

00069

V.  Section VII. NOTICE AND PROOF OF LOSS is amended by the addition of the following:

Notice of a Telecommunications Fraud and Proof of Loss

As a condition precedent to coverage under this Policy for Telecommunications Fraud Loss, the Insured shall:

1.  provide the Insurer written notice of the Telecommunications Fraud giving rise to the Telecommunications Fraud Loss as soon as practicable, but in no event later sixty (60) days, after the Insured first Discovers such Telecommunications Fraud;

2.  furnish affirmative proof of the Telecommunications Fraud Loss with full particulars to the Insurer as soon as practicable, but in no event later sixty (60) days, after the Insured first Discovers the Telecommunications Fraud giving rise to such Telecommunications Fraud Loss;

3.  submit to examination under oath at the Insurer's request;

4.  produce all pertinent records at such reasonable times and places as the Insurer shall designate; and

5.  provide full cooperation with the Insurer in all matters pertaining to the Telecommunications Fraud Loss.

VI.  Subsection XI.H. Other Insurance is amended by the addition of the following:

Coverage under the Telecommunications Fraud Insuring Agreement shall expressly be excess of any financial institution bond or commercial crime coverage maintained by the Insured that also provides coverage for a Telecommunications Fraud Loss covered under the Telecommunications Fraud Insuring Agreement.

_Christopher Spears_
_____
Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                                                           Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company        Page 3 of 3        Endorsement Form: SPP 3104 0119

**00070**

# ENDORSEMENT

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |

| | | | |
|---|---|---|---|
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 24 |
| | 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | | |

## UNINTENTIONAL BREACH OF CONTRACT COVERAGE ENDORSEMENT

It is agreed that:

I.  Section III. DEFINITIONS is amended by the addition of the following:

Unintentional Breach of Contract means the unintentional breach of a written contract to perform Professional Services or Technology Services because of:

1.  negligence in the performance of such Professional Services or Technology Services; or

2.  the failure of such Professional Services or Technology Services to meet an implied statutory term with respect to quality, safety, or fitness for a particular purpose, or failing to meet an implied duty to exercise that degree of care consistent with applicable industry standards.

II. Exclusion IV.B.2. Contractual Liability is amended by the addition of the following:

This Exclusion B.2. shall also not apply to a Claim brought by or on behalf of a customer or client of the Insured for an Unintentional Breach of Contract in the performance of Professional Services or Technology Services.

*Christopher Spans*

_____

Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022
Endurance American Specialty Insurance Company    Page 1 of 1    Policy Form: SPP 2001 0119
Endorsement Form: SPP 3111 0119

00071

E N D O R S E M E N T

| | | | |
|---|---|---|---|
| Named Insured: | Avenue5 Partners, LLC | Policy Number: | MPC30015690200 |
| Endorsement Effective Date: | February 01, 2022 | Endorsement Number: | 25 |
| | 12:01 AM Standard Time at the address of the Named Insured as shown in the Declarations. | | |

## WAIVER OF SUBROGATION PURSUANT TO CONTRACT ENDORSEMENT

It is agreed that:

Subsection XI.I. Subrogation is amended by the addition of the following;

Notwithstanding the foregoing and solely with respect to Loss resulting from a Claim for a Professional Services Wrongful Act, Technology Wrongful Act, or Media Wrongful Act, the Insurer specifically waives its rights of subrogation against any of the Insured's customers or clients, but only to the extent that the Insured agreed pursuant to a written contract, prior to the occurrence of such Professional Services Wrongful Act, Technology Wrongful Act, or Media Wrongful Act, to waive its rights of recovery against such customer or client.

_Christopher Sparn_
_____
Authorized Representative

This endorsement does not change any other provision of the Policy. The title and any headings in this endorsement are solely for convenience and do not affect its meaning.

Date of Issuance: March 07, 2022                                        Policy Form: SPP 2001 0119
Endurance American Specialty Insurance Company          Page 1 of 1          Endorsement Form: SPP 3115 0119

00072

## PREMIER PROFESSIONAL LIABILITY AND NETWORK RISK INSURANCE POLICY

In consideration of the payment of premium and subject to all provisions of this Policy, including the Application and all forms attached hereto, the Insureds and the Insurer agree as follows:

I.  **INSURING AGREEMENTS**

A.  Professional Services Liability

If Insuring Agreement A. is purchased, the Insurer shall pay Loss on behalf of an Insured on account of a Claim first made against such Insured during the Policy Period or the Extended Reporting Period, if applicable, for a Professional Services Wrongful Act that first takes place on or after the Retroactive Date and before the end of the Policy Period.

B.  Technology Services Liability

If Insuring Agreement B. is purchased, the Insurer shall pay Loss on behalf of an Insured on account of a Claim first made against such Insured during the Policy Period or the Extended Reporting Period, if applicable, for a Technology Wrongful Act that first takes place on or after the Retroactive Date and before the end of the Policy Period.

C.  Media Liability

If Insuring Agreement C. is purchased, the Insurer shall pay Loss on behalf of an Insured on account of a Claim first made against such Insured during the Policy Period or the Extended Reporting Period, if applicable, for a Media Wrongful Act that takes place on or after the Retroactive Date and before the end of the Policy Period.

D.  Privacy and Network Security Liability

If Insuring Agreement D. is purchased, the Insurer shall pay Loss on behalf of an Insured on account of a Claim first made against such Insured during the Policy Period or the Extended Reporting Period, if applicable, for a Privacy Event or Network Security Event that takes place on or after the Retroactive Date and before the end of the Policy Period.

E.  Privacy and Network Security Breach Costs

If Insuring Agreement E. is purchased, the Insurer shall pay the Company for Breach Costs that are directly attributable to a Privacy Event or Network Security Event first Discovered during the Policy Period.

F.  Direct Business Interruption Loss

If Insuring Agreement F. is purchased, the Insurer shall pay the Company for Direct Business Income Loss and Extra Expenses incurred during the Period of Restoration due to an Interruption of Service that first occurs during the Policy Period, if the length of the Interruption of Service exceeds the Waiting Period set forth in the Declarations.

G. Contingent Business Interruption Loss

If Insuring Agreement G. is purchased, the Insurer shall pay the Company for Contingent Business Income Loss and Extra Expenses incurred during the Period of Restoration due to an Interruption of Service that first occurs during the Policy Period, if the length of the Interruption of Service exceeds the Waiting Period set forth in the Declarations.

H. Digital Asset Loss

If Insuring Agreement H. is purchased, the Insurer shall pay the Company for Digital Asset Replacement Expenses that are directly attributable to a Digital Asset Loss Event first Discovered during the Policy Period.

I. Cyber Extortion Threat

If Insuring Agreement I. is purchased, the Insurer shall pay the Company for Extortion Expenses, Extortion Payments, and Reward Payments that are directly attributable to a Cyber Extortion Threat first received by the Company during the Policy Period.

## II.    EXTENSIONS

A. Spouses, Domestic Partners, Estates, Heirs, Assigns and Legal Representatives

Subject to all other terms and conditions of this Policy, coverage under this Policy extends to a Claim made against:

1.  the lawful spouse or Domestic Partner of an Insured Person, but only for a Claim against that spouse or Domestic Partner due to his or her status as such, or due to such spouse's or Domestic Partner's ownership interest in property from which the claimant seeks recovery; or

2.  the estates, heirs, legal representatives, or assigns of an Insured Person who is deceased, legally incompetent, bankrupt, or insolvent;

but only for a Wrongful Act of, or a Privacy Event or Network Security Event directly involving, an Insured Person. This extension of coverage shall not apply to Loss attributable to any act, error, or omission of a spouse, Domestic Partner, estate, heir, legal representative, or assignee of any Insured Person. Each Claim to which this extension of coverage applies shall be treated as a Claim against an Insured Person for purposes of applying the provisions of this Policy.

B. Extended Reporting Periods

1. Automatic Extended Reporting Period

If the Insurer cancels or nonrenews this Policy for reasons other than fraud or non-payment of premium or the Named Insured cancels or nonrenews this Policy, then the Insurer shall provide the Insureds with an automatic Extended Reporting Period of sixty (60) days to immediately follow the end of the Policy Period. The automatic Extended Reporting Period shall not apply to any Claim covered under any policy of insurance that the Insured has purchased to replace the insurance provided by this Policy, or that would be covered under any such policy of insurance but for the application of a retention or the exhaustion of the limit of liability of such insurance.

2. Optional Extended Reporting Period

   a. If the Insurer cancels or nonrenews this Policy for reasons other than fraud or non-payment of premium or the Named Insured cancels or nonrenews this Policy, then the Named Insured shall have the right to purchase an optional Extended Reporting Period to immediately follow the end of the Policy Period.

   b. The right to purchase the optional Extended Reporting Period will lapse unless, within thirty (30) days following the end of the Policy Period, the Insurer receives written notice of the Extended Reporting Period option elected along with payment of the additional premium for such optional Extended Reporting Period, as set forth in the Declarations.

   c. If purchased, the optional Extended Reporting Period cannot be canceled by the Insured and cannot be canceled by the Insurer, except for non-payment of premium.

   d. As a condition precedent to the Named Insured's option to elect the optional Extended Reporting Period, any and all premiums and Retentions that are due must have been paid and the Named Insured must have complied with all other terms and conditions of this Policy.

   e. If the optional Extended Reporting Period is purchased, it shall run concurrently with the automatic Extended Reporting Period.

3.  Coverage under any Extended Reporting Period applies only to Claims first made during the Extended Reporting Period, and only for Wrongful Acts, Privacy Events, or Network Security Events actually or allegedly taking place on or after the Retroactive Date and before the end of the Policy Period. Any such Claim will be deemed to have been made during the Policy Period.

4. The Extended Reporting Periods shall be subject to all other terms and conditions of this Policy.

## III.  DEFINITIONS

Whether in the singular or plural:

**Additional Insured** means any person or entity that a Company is required by written contract to add as an Insured to this Policy.

**Application** means all applications, including any written application and all attachments, and all other materials and information provided by or on behalf of the Insured to the Insurer for purposes of underwriting this Policy or any policy of which this Policy is a direct or indirect renewal or replacement.

**Bodily Injury** means physical injury, sickness, disease, or death of any person, and emotional distress or mental anguish arising out of the foregoing.

**Breach Costs** means reasonable and necessary fees, costs, charges, and expenses, charged by a Breach Response Vendor and incurred by the Company within twelve (12) months after a Privacy Event or Network Security Event is Discovered, to:

1. conduct any investigation, including a computer forensic investigation, and analysis of the Insured's Computer System to determine the cause and extent of such Privacy Event or Network Security Event;

2. determine indemnification obligations of any third party to the Company, or of the Company to any third party, under any written contract in connection with a Privacy Event or Network Security Event;

3. determine if the Company is obligated to notify those affected or applicable regulatory agencies of such Privacy Event or Network Security Event;

4. respond to the Privacy Event or Network Security Event in a way that complies with the applicable Privacy Regulation that is most favorable to those affected;

5. notify and consult with those affected by the Privacy Event or Network Security Event or applicable regulatory agencies of such Privacy Event or Network Security Event, including, without limitation, mailing list development, mailing list cleansing, postage fees, and related call center services, including any of the foregoing undertaken voluntarily by the Company to prevent or mitigate potential liability on account of a Privacy Event or Network Security Event;

6. plan, implement, execute, and manage a public relations campaign to counter or mitigate any actual or anticipated adverse effects of negative publicity from such Privacy Event or Network Security Event or to protect the Company's business reputation in response to negative publicity following such Privacy Event or Network Security Event;

7. provide credit monitoring or identity monitoring and restoration services and related call center services for the individuals affected by the Privacy Event or Network Security Event, including, without limitation, credit monitoring or identity monitoring and restoration services purchased voluntarily by the Company to prevent or mitigate potential liability on account of such Privacy Event or Network Security Event; or

8. provide any other services not included in 1.-7. above in connection with such Privacy Event or Network Security Event with the prior consent of the Insurer.

Breach Costs do not include:

a. regular or overtime wages, salaries, fees, or other compensation of the Executives or Employees of a Company, or any overhead of the Company;

b. the cost to comply with any injunctive or other non-monetary relief; or

c. taxes, fines, sanctions, or penalties.

Breach Response Vendor means a vendor on the Insurer's pre-approved panel of breach response vendors.

Business Income Loss means, if incurred during the Period of Restoration as a result of an Interruption of Service, the sum of:

1. net profit or loss before taxes that the Company does not realize due to such Interruption of Service; and

2. any normal operating expenses incurred by the Company, including payroll, but only if such operating expenses must continue during the Period of Restoration.

SPP 2001 0119

Business Income Loss does not include any increase in the amount of the foregoing due to an increase in the length of an Interruption of Service or the Period of Restoration resulting from the enforcement of any law, ordinance, or regulation.

Claim means:

1. a written demand received by an Insured for monetary or non-monetary relief, including a demand for injunctive relief, commenced by receipt of such demand;

2. a civil proceeding commenced by the service of a complaint or similar pleading on an Insured;

3. an arbitration, mediation, or other formal alternative dispute resolution proceeding commenced by receipt by an Insured of a written demand or similar document;

or an appeal of any of the foregoing;

4. a written request received by an Insured to toll or waive a statute of limitations with respect to a Wrongful Act or a Privacy Event or Network Security Event; or

5. solely with respect to Insuring Agreement D., a Regulatory Proceeding commenced by receipt by an Insured of a written request for information, subpoena, investigative demand, complaint, or similar document.

Claim Expenses means reasonable and necessary costs, fees (including, without limitation, attorneys' fees and experts' fees), and expenses (other than compensation or benefits of any Executives or Employees of, or any overhead expenses of, the Company) incurred by or on behalf of an Insured in investigating defending, settling, or appealing Claims, and the premiums for appeal, attachment, or similar bonds. However the Insurer has no obligation to furnish any such bonds. Claim Expenses do not include any amount incurred by an Insured in any matter that is not at that time a Claim.

Company means the Named Insured and any Subsidiaries, including any of the foregoing as a debtor-in-possession under the United States bankruptcy law or an equivalent status under foreign law, and solely for purposes of Insuring Agreements A., B., C., and D., any Additional Insured that is not a natural person, but only for Wrongful Acts of an Insured other than an Additional Insured, or acts or omissions of an Insured, other than an Additional Insured, that give rise to a Cyber Event.

Computer System means computers, wireless and mobile communications devices, and associated software, input and output devices, data storage devices and the data stored on such devices, networking equipment, telecommunications equipment, closed circuit television equipment, and back up facilities.

Consumer Redress Funds means money the Company is legally required to deposit in a fund established and administered solely for the payment of consumer claims due to a settlement of, or an adverse judgment in, a Regulatory Proceeding.

Contingent Business Income Loss means Business Income Loss incurred by the Company as a result of an Interruption of Service caused solely and directly by a network security event impacting the Computer System of a Qualified Service Provider, but only if such network security event would have been covered under this Policy had such network security event directly impacted the Insured's Computer System.

Control Group Member means a principal, partner, member of the board of directors, corporate officer, in-house general counsel, risk manager, or the functional equivalent of any of the foregoing positions in an organization.

Cyber Event means a Network Security Event, a Privacy Event, an Interruption of Service, a System Failure Event, a Digital Asset Loss Event, and a Cyber Extortion Threat.

Cyber Extortion Threat means:

1. a credible threat or connected series of threats to cause a Privacy Event, Network Security Event, Digital Asset Loss Event, or the unauthorized disclosure of Digital Assets of the Company; or

2. a credible threat or connected series of threats to prevent, or an attack that prevents, access by the Insured to its Digital Assets;

made by someone other than a Control Group Member of a Company.

Cyber Terrorist Attack means a network-based attack against an Insured's Computer System by a person or group of people, known or unknown, for the purposes of influencing the government of any nation or political division thereof (whether such government is *de jure* or *de facto*), or in pursuit of political, religious, ideological, social, or economic objectives.

Damages means compensatory sums, monetary judgments or settlements, punitive, exemplary, or multiple damages, and pre-judgment and post-judgment interest, that the Insured is legally obligated to pay on account of a Claim.

Damages do not include:

1. amounts for which the Insureds are legally absolved from payment;

2. taxes, sanctions, fines, or penalties levied against the Insured, whether imposed by law or otherwise, except punitive or exemplary damages as described in this Definition;

3. the costs to comply with orders granting equitable relief, including, without limitation, injunctions, temporary restraining orders, specific performance, or any agreement to provide such relief;

4. the return, reduction, or restitution of fees, commissions, royalties, expenses, or costs, or the offset of any future fees to be charged by or owed to an Insured;

5. disgorgement of any profit, remuneration, or financial advantage to which the Insured was not legally entitled;

6. liquidated damages or penalties of any nature pursuant to a contract or agreement of any kind, except to the extent that the Insured would have been liable for such damages in the absence of such contract or agreement;

7. the Insured's cost of correcting, re-printing, or completing Media Material, including any media or products containing such Media Material, or correcting, re-performing, or completing Professional Services, Technology Services, or Media Communications;

8.  future profits, future royalties, or costs of licensing; or

9.  amounts uninsurable under the law pursuant to which this Policy is construed.

In determining the insurability of punitive, exemplary, or multiple damages, the law of an applicable jurisdiction most favorable to the insurability of such amounts shall apply, provided that such jurisdiction has a substantial relationship to the Insured, the Insurer, this Policy, or the Claim.

Digital Asset means software and data in electronic form stored on a Computer System.

Digital Asset Loss Event means the alteration, corruption, or destruction of Digital Assets stored on the Insured's Computer System resulting from a Network Security Event.

Digital Asset Replacement Expenses means reasonable and necessary costs and expenses incurred by the Company to restore or recollect Digital Assets from written records or partially or fully matching electronic data due to a Digital Asset Loss Event, including costs and expenses incurred in disaster recovery or computer forensic investigation efforts. If Digital Assets cannot be restored or recollected from written records or partially or fully matching electronic data, then Digital Asset Replacement Expenses shall be limited to the reasonable and necessary costs incurred to make that determination.

Digital Asset Replacement Expenses do not include:

1.  any cost or expense incurred to update, replace, restore, or improve Digital Assets to a level beyond that which existed immediately prior to the Digital Asset Loss Event;

2.  any cost or expense incurred to identify or remediate software program errors or vulnerabilities, or costs to update, replace, upgrade, restore, maintain, or improve any Computer System;

3.  any cost or expense incurred to research or develop Digital Assets;

4.  the economic or market value of Digital Assets, including trade secrets; or

5.  other consequential loss or damages.

Direct Business Income Loss means Business Income Loss incurred by the Company as a result of an Interruption of Service caused solely and directly by a Network Security Event or System Failure Event impacting the Insured's Computer System.

Discovered means a Control Group Member of a Company becoming aware of a Claim or Cyber Event, as applicable.

Domestic Partner means any natural person recognized by federal, state, local, or foreign law, or by the Company, as a domestic partner or a party to a civil union.

Employee means a natural person other than an Executive whose labor or service an organization has the right to direct and control, including any employee, intern, or volunteer.

Executive means a director, officer, trustee, principal, partner, risk manager, in-house general counsel, or the functional equivalent of any of the foregoing in an organization.

Extortion Expenses means the reasonable and necessary expenses, other than Extortion Payments or Reward Payments, incurred by the Company with the prior consent of the Insurer, which shall not be unreasonably withheld, resulting directly from a Cyber Extortion Threat.

Extortion Payments means monies or digital currency paid by the Company with the prior consent of the Insurer, which shall not be unreasonably withheld, to a third party whom the Company reasonably believes to be responsible for a Cyber Extortion Threat, in order to terminate the Cyber Extortion Threat.

Extra Expenses means reasonable and necessary expenses incurred by the Company to minimize, avoid, or reduce an Interruption of Service or a Period of Restoration, including, without limitation, computer forensic investigation expenses, and forensic accounting expenses to determine the amount of Business Income Loss, but only to the extent that such expenses are over and above the Company's normal operating and payroll expenses.

Extra Expenses does not include:

1.  any costs or expenses to prevent a future loss;

2.  any costs or expenses to correct any deficiencies or problems with any Computer System that might cause or contribute to a Claim;

3.  any costs or expenses to remediate software errors or vulnerabilities;

4.  any costs or expenses to update, restore, or replace any Computer System, or improve any Computer System to a level beyond that which existed immediately before the Interruption of Service; or

5.  any contractual penalties.

Insured means the Company and each Insured Person.

Insured Person means any natural person who was, now is, or will become:

1.  an Executive or Employee of the Company in his or her capacity as such;

2.  a leased employee of the Company but only while acting under the direct supervision and exclusively on behalf of the Company or an Executive or Employee of the Company;

3.  an independent contractor of the Company but only in the performance of services on behalf of and at the direction of the Company or an Executive or Employee of the Company; and

4.  solely for purposes of Insuring Agreements A., B., C., and D., an Additional Insured, but only for Wrongful Acts of an Insured other than an Additional Insured, or acts or omissions of an Insured other than an Additional Insured that give rise to a Cyber Event.

Insured's Computer System means a Computer System:

1.  operated by, and either owned by or leased to, the Company; or

2.  operated by an IT Service Provider for or on behalf of the Company;

in either case including the websites of the Company and the Media Material stored thereon; or

3. that is a wireless or mobile communication device owned by an Executive or Employee of the Company and that:

   a. is approved by the Company for use in the performance of the regularly assigned duties of such Executive or Employee; and

   b. complies with the Company's policy with respect to the use of such devices.

Interrelated means having as a common nexus any fact, circumstance, situation, event, transaction, or cause, or series of causally or logically connected facts, circumstances, situations, events, transactions, or causes.

Interruption of Service means the actual and measurable interruption, suspension, failure, degradation, or delay in the performance of:

1. with respect to Insuring Agreement F., the Insured's Computer System; and

2. with respect to Insuring Agreement G., a Computer System of a Qualified Service Provider.

IT Service Provider means a business that the Company does not own, operate, or control, but that the Company hires pursuant to a written contract to perform the following computer-related services for the Company:

1. maintaining, managing, or controlling the Insured's Computer System;

2. hosting or facilitating the Insured's internet website; or

3. providing network infrastructure, including, without limitation, cloud-based software applications, platforms, and storage.

IT Service Provider shall not include any provider of services as an internet service provider (including, without limitation, any provider of internet connectivity), any public utility (including, without limitation, a provider of electric, gas, water, or telecommunication services), or any securities exchange or market.

Loss means:

1. with respect to Insuring Agreements A., B., and C., only Damages and Claim Expenses;

2. with respect to Insuring Agreement D., only Damages, Claim Expenses, Consumer Redress Funds, Regulatory Fines and Penalties, and PCI Fines and Penalties;

3. with respect to Insuring Agreement E., only Breach Costs;

4. with respect to Insuring Agreement F., only Direct Business Income Loss and Extra Expenses;

5. with respect to Insuring Agreement G., only Contingent Business Income Loss and Extra Expenses;

6. with respect to Insuring Agreement H., only Digital Asset Replacement Expenses; and

7. with respect to Insuring Agreement I., only Extortion Payments, Extortion Expenses, and Reward Payments.

**Malicious Code** means unauthorized, corrupting, or harmful software code, including, without limitation, computer viruses, Trojan horses, keystroke loggers, spyware, adware, worms, and logic bombs.

**Management Control** means:

1. ownership of more than fifty percent (50%) of the ownership interests representing the voting, appointment, or designation power for the selection of the directors of a corporation, the management committee members of a joint venture or partnership, or the members of the board of managers of a limited liability company; or

2. possession of the right, pursuant to written contract, or the by-laws, charter, operating agreement, or similar document of an organization, to elect, appoint, or designate a majority of the board of directors of a corporation, the management committee members of a joint venture or partnership, or the members of the board of managers of a limited liability company.

**Media Communications** means the display, broadcast, dissemination, distribution, or release of Media Material, including, without limitation, the dissemination of Media Material over the internet.

**Media Material** means any data, text, sounds, graphics, images, or similar matter, including advertisements. Media Material does not include computer software, software technology, or products, goods, or services, including those depicted or described in the foregoing Media Material, or any name, image, or mark associated with, or intended to identify or distinguish, the Company or its products, goods, or services.

**Media Wrongful Act** means any act, error, omission, misstatement, misleading statement, misrepresentation, neglect, or breach of duty actually or allegedly committed or attempted by an Insured in connection with the rendering or failure to render Media Communications. Media Wrongful Acts include, but are not limited to:

1. Personal Injury Torts;

2. plagiarism, piracy, or the misappropriation, theft, or unauthorized use of ideas or information, advertising material, titles, literary or artistic formats, styles, performances, names, or likenesses;

3. the infringement of any copyright, domain name, trademark, trade name, trade dress, title, slogan, service mark, or service name;

4. improper deep linking or framing;

5. wrongful publication, product or service disparagement, or trade libel;

6. unfair competition or unfair trade practices, solely when alleged in connection with any of the foregoing; or

7. negligent or intentional infliction of emotional distress, outrage, or *prima facie* tort in connection with Media Communications.

Named Insured means the entity identified as such in the Declarations.

Network Security means measures taken to protect against Unauthorized Access or Use of, a denial of service attack directed against, or the transmission of Malicious Code to or from, a Computer System.

Network Security Event means an actual or suspected failure of the Network Security of the Company that results in or does not prevent:

1.  the theft, alteration, or destruction of electronic data or software on the Insured's Computer System;

2.  the Unauthorized Access or Use of the Insured's Computer System;

3.  a denial of service attack against, or restriction or inhibition of access to, the Insured's Computer System;

4.  the participation by the Insured's Computer System in a denial of service attack directed against a third party's Computer System; or

5.  the transmission of Malicious Code to the Insured's Computer System, or from the Insured's Computer System to a third party's Computer System.

PCI Fines and Penalties means monetary amounts owed by, or assessments against, an Insured under the terms of a Payment Card Industry Merchant Services Agreement between a Company and a financial institution, credit or debit card company, credit or debit card processor, or independent service operator that enables a Company to accept credit cards, debit cards, or other payment cards for payments or donations, where such amounts directly result from a Privacy Event or a Network Security Event. PCI Fines and Penalties do not include chargebacks, interchange fees, discount fees, or other fees not related to a Privacy Event or Network Security Event.

Period of Restoration means the period from the date and time that a Computer System first suffers an Interruption of Service to the date and time such Computer System was restored, or could have been restored with reasonable diligence, to substantially the level of operation that had existed immediately prior to such Interruption of Service; provided that in no event shall such period exceed one hundred eighty (180) days.

Personal Information means:

1.  an individual's name, social security number, medical or healthcare data, biometric data, driver's license number, state identification number, credit card number, debit card number, address, e-mail address, IP address, geolocation tag, telephone number, bank or other financial institution account number, account history, account password, or any other legally protected personal information, in any format; and

2.  other nonpublic personal information, in any format, subject to protection under Privacy Regulations.

Personal Injury Tort means:

1.  libel, slander, defamation, or other tort related to the disparagement of, or harm to the reputation or character of, any person or organization;

SPP 2001 0119

00083

2.   wrongful entry or eviction, trespass, or eavesdropping;

3.   false arrest or false imprisonment;

4.   malicious prosecution; or

5.   invasion, infringement, or interference with the right to privacy, including false light, public disclosure of private facts, intrusion upon seclusion, or commercial appropriation of name or likeness.

Policy Period means the period designated as such in the Declarations, subject to prior termination in accordance with the terms of this Policy.

Pollutant means any solid, liquid, or gaseous irritant or contaminant, including, without limitation, smoke, vapors, soot, fumes, acids, alkalis, chemicals, odors, waste materials, infectious or medical waste, asbestos or asbestos-containing products, biological materials, organisms or viruses, and nuclear or radiological irritants or contaminants.

Privacy Event means an actual or suspected:

1.   unauthorized disclosure, loss, or theft of:

    a.   Personal Information for which the Insured is legally responsible that is in the care, custody, or control of any Insured or a third-party service provider; or

    b.   other information of a third party that is not available to the general public, that the Insured is legally responsible to maintain the confidentiality of, and that is in the care, custody, or control of any Insured or a third-party service provider;

2.   unauthorized collection of Personal Information; or

3.   violation of any Privacy Regulation.

Privacy Regulation means the provisions of any federal, state, local, or foreign identity theft or privacy protection law or regulation that require commercial entities that collect Personal Information or other confidential information, to post privacy policies, adopt specific privacy or security controls, provide notice as to how Personal Information or other confidential information is used, or notify individuals in the event that Personal Information or other confidential information is compromised or is potentially compromised, and any amendments thereto, including, without limitation, the following:

1.   the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) and the Health Information Technology for Economic and Clinical Health Act;

2.   the Gramm-Leach-Bliley Act of 1999;

3.   the California Security Breach Notification Act (CA SB 1386) and Massachusetts 201 CMR 17;

4.   the California Consumer Privacy Act of 2018 (CA AB 375);

5.   Identity Theft Red Flags under the Fair and Accurate Credit Transactions Act of 2003;

6.  Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), but solely for alleged unfair or deceptive acts or practices in or affecting commerce; and

7.  EU General Data Protection Regulation (GDPR) (Regulation (EU) 2016/679).

**Professional Services** means those services defined as Professional Services in the Declarations that are provided by an Insured to others.

**Professional Services Wrongful Act** means any act, error, omission, misstatement, misleading statement, neglect, breach of duty, or Personal Injury Tort actually or allegedly committed or attempted by an Insured in the performance of or failure to perform Professional Services.

**Property Damage** means:

1.  physical injury to or destruction of any tangible property, or the loss of use thereof; or

2.  loss of use of tangible property which has not been physically injured or destroyed;

provided that tangible property does not include electronic data or software.

**Qualified Service Provider** means a business the Company does not own, operate, or control, but that the Company hires pursuant to a written contract to perform services related to the conduct of the Company's business. Qualified Service Provider does not include an IT Service Provider.

**Regulatory Fines and Penalties** means any civil monetary fine or penalty imposed by a federal, state, local, or foreign governmental entity in such entity's administrative, regulatory, or other similar official capacity in connection with a Regulatory Proceeding. Regulatory Fines and Penalties do not include any criminal fines, disgorgement of profits, punitive, exemplary, or multiple damages, or civil monetary fines or penalties where such civil monetary fines or penalties are not insurable by law.

**Regulatory Proceeding** means:

1.  a request for information or investigation of an Insured by a federal, state, local, or foreign governmental administrative or regulatory agency or body concerning a Privacy Event or Network Security Event; or

2.  an administrative adjudicative proceeding against an Insured by a federal, state, local, or foreign governmental administrative or regulatory agency or body for a Privacy Event or Network Security Event, including an appeal thereof.

**Related Entity** means any organization:

1.  in which any Company owns or controls fifteen percent (15%) or more of the issued and outstanding shares, units, or other portions of the equity of such organization;

2.  that owns more than fifteen percent (15%) of the Named Insured; or

3.  that is under common ownership or control with the Named Insured.

**Retroactive Date** means the applicable date set forth in the Declarations.

Reward Payment means any reward the Company pays to any person or entity for information leading to the arrest and conviction of any person who is making or has made any Cyber Extortion Threat, provided that the Company obtains the consent of the Insurer, which shall not be unreasonably withheld, prior to offering any such reward.

Subsidiary means an organization during the time that the Named Insured directly or indirectly has or had Management Control of such organization.

System Failure Event means any error or omission committed by the Insured or an IT Service Provider in the management of the Insured's Computer System that gives rise to an Interruption of Service.

Technology Products means computer or telecommunications hardware, software, firmware, or related electronic equipment, and the associated design, development, manufacturing, assembly, distribution, licensing, leasing, sale, installation, repair, or maintenance thereof.

Technology Services means any electronic or computer-based network services, including:

1. analysis, design, development, integration, installation, programming, conversion, service, Network Security, support, maintenance, repair, sale, or resale of computer systems, computer networks, computer software, computer hardware, input and output devices, storage devices or computer firmware, and related electronic systems;

2. database design and the collection, compilation, processing, warehousing, mining, storage, management, or analysis of electronic data;

3. provision of network infrastructure, including, without limitation, cloud-based software applications, platforms, and storage;

4. information technology consulting, management, education, or training;

5. Telecommunications Services; and

6. internet services, including, without limitation, the design, programming, hosting, management, or maintenance of websites and e-commerce platforms.

Technology Wrongful Act means any act, error, omission, misstatement, misleading statement, neglect, or breach of duty actually or allegedly committed or attempted by an Insured in connection with:

1. the Insured's performance of or the failure to perform Technology Services for others; or

2. the failure of the Insured's Technology Products to perform the function or serve the purpose for which they are intended;

including, without limitation, copyright infringement of software resulting from 1. or 2. above, but only if such infringement arises out of the Insured's performance of or failure to perform Technology Services, or software developed or created by the Insured.

Telecommunications Services means local, regional, and long distance wireline and wireless dial tone access and switching services, toll free services, voicemail, call forwarding, call waiting and caller ID; ground based satellite communication services; DSL, ISDN and VoIP services; video conferencing services;

paging services; basic wire maintenance; 911 emergency services; directory services and operator assistance; analysis, design, integration and conversion of telecommunications systems; directory publishing; or project management or consulting services related to any matter described in this Definition.

Unauthorized Access or Use means:

1.  access to a Computer System by an unauthorized person or persons, or by an authorized person or persons in an unauthorized manner; or

2.  use of a Computer System by an unauthorized person or persons, or by an authorized person or persons for a purpose that was not intended.

Waiting Hours Retention means the dollar amount of Business Income Loss and Extra Expenses incurred by the Company during the Waiting Period set forth in the Declarations.

Wrongful Act means:

1.  with respect only to Insuring Agreement A., a Professional Services Wrongful Act;

2.  with respect only to Insuring Agreement B., a Technology Wrongful Act; and

3.  with respect only to Insuring Agreement C., a Media Wrongful Act.

## IV. EXCLUSIONS

A.  The following Exclusions apply to all Insuring Agreements:

1.  Bodily Injury and Property Damage

    The Insurer shall not be liable for Loss based upon, arising from, or attributable to any actual or alleged:

    a.  Bodily Injury; or

    b.  Property Damage;

    except that Subparagraph a. of this Exclusion shall not apply to a Claim for a Technology Wrongful Act in the performance of or the failure to perform 911 emergency services.

2.  Conduct

    The Insurer shall not be liable for Loss based upon, arising from, or attributable to any actual or alleged dishonest, criminal, malicious, or fraudulent act, error, or omission, or any willful violation of any statute, rule, or law by any Insured; provided that this Exclusion shall not apply to Claims unless a final and non-appealable judgment or adjudication adverse to such Insured establishes such conduct, in which case the Insured shall reimburse the Insurer for any Claim Expenses paid by the Insurer prior to such judgment or adjudication. For purposes of determining the applicability of this Exclusion, the conduct of one Insured Person shall not be imputed to any other Insured

Person, and only the conduct of a Control Group Member of a Company shall be imputed to the Company.

3. **Improper Profit**

The Insurer shall not be liable for Loss based upon, arising from, or attributable to any Insured actually or allegedly gaining any profit, remuneration, or advantage to which such Insured was not legally entitled; except that this Exclusion shall not apply to Claims unless a final and non-appealable judgment or adjudication adverse to such Insured establishes that the Insured was not entitled to such profit, remuneration, or advantage, in which case the Insured shall reimburse the Insurer for any Claim Expenses paid by the Insurer prior to such judgment or adjudication. For purposes of determining the applicability of this Exclusion, the conduct of one Insured Person shall not be imputed to any other Insured Person, and only the conduct of a Control Group Member of a Company shall be imputed to the Company.

4. **Infrastructure Failure and Physical Perils**

The Insurer shall not be liable for Loss based upon, arising from, or attributable to any:

   a. failure or malfunction of any securities exchange or financial market, or gas, water, electrical, telecommunications, internet, cable, or satellite service or utility, however caused, including without limitation, any electrical power interruption, short-circuit, surge, brownout, or blackout; or

   b. fire, flood, volcanic eruption, tornado, explosion, lightning, wind, hail, tidal wave, landslide, solar storm, act of God, or other physical event;

except that Subparagraph a. of this Exclusion shall not apply to any such failure or malfunction if such exchange, market, service, or utility is under the operational control of the Insured.

5. **Intellectual Property**

The Insurer shall not be liable for Loss based upon, arising from, or attributable to any actual or alleged infringement, misappropriation, or violation of any intellectual property rights, including, without limitation, copyright, patent, trademark, service mark, trade name, trade dress, trade secret, or idea; except that this Exclusion shall not apply to:

   a. a Claim for a Media Wrongful Act other than a Claim alleging infringement, misappropriation, or violation of intellectual property rights in patents or trade secrets;

   b. a Claim for a Technology Wrongful Act arising from the infringement of any copyright relating to software; or

   c. the disclosure, loss, or theft of a trade secret or idea resulting from a Privacy Event.

6. **Prior Knowledge**

The Insurer shall not be liable for Loss based upon, arising from, or attributable to a Wrongful Act or Cyber Event of which a Control Group Member of a Company had knowledge before the date set forth in the Declarations as the Continuity Date, and, solely with respect to Insuring

Agreements A., B., C., and D., that, as of the Continuity Date, such Control Group Member knew, or reasonably could have foreseen, that such Wrongful Act or Cyber Event could lead to a Claim.

7. Prior Notice

The Insurer shall not be liable for Loss based upon, arising from, or attributable to any fact, circumstance, or situation that was the subject of any notice given under any policy of insurance before the inception of the Policy Period.

8. Theft and Funds Transfer

The Insurer shall not be liable for Loss based upon, arising from, or attributable to:

a.  loss, transfer, or theft of money, digital currencies or cryptocurrencies, or securities of the Insured, or of others in the care, custody, and control of the Insured; or

b.  the monetary value of an electronic fund transfer or transaction by an Insured or on an Insured's behalf, which is lost or diminished during transfer into, out of, or between accounts.

9. Unlawful Collection of Personal Information

The Insurer shall not be liable for Loss based upon, arising from, or attributable to the actual or alleged unlawful collection of Personal Information by the Insured; except that this Exclusion shall apply to Insuring Agreements D. and E. only if a Control Group Member of a Company was aware of such unlawful collection of Personal Information.

10. War

The Insurer shall not be liable for Loss based upon, arising from, or attributable to war, including undeclared or civil war; warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these; except that this Exclusion shall not apply to a Cyber Terrorist Attack.

B.  The following Exclusions apply to Insuring Agreements A., B., C., and D. only:

1. Claims by Affiliated Persons or Entities

The Insurer shall not be liable for Loss on account of any Claim brought by, on behalf of, or in the right of:

a.  any Insured; or

b.  any Related Entity;

except that Subparagraph a. of this Exclusion shall not apply to a Claim brought by an Additional Insured or a Claim by or on behalf of an Insured Person for a Privacy Event involving the Personal Information of such Insured Person.

2.   Contractual Liability

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to breach of contract, warranty, guarantee, or promise, or any actual or alleged liability assumed by the Insured in any contract; except that this Exclusion shall not apply to:

a.   liability of the Insured that would exist in the absence of such contract, warranty, guarantee, or promise;

b.   liability assumed by the Insured under a written hold harmless or indemnity agreement regarding the content of Media Material used in Media Communications if such agreement exists before the Wrongful Act giving rise to such liability occurs;

c.   liability of the Insured for PCI Fines and Penalties; or

d.   breach of confidentiality of a third party arising from a Privacy Event.

3.   Employee Benefits Law

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any actual or alleged violation of the Employee Retirement Income Security Act of 1974, any amendments thereto, or any similar federal, state, local, or foreign statute or common law relating to an employee welfare or benefit plan established for the benefit of the Company or its employees; except that this Exclusion shall not apply to a Claim for a Privacy Event involving the Personal Information of an Insured Person.

4.   Employment Practices and Discrimination

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to:

a.   the employment or prospective employment of any person, or any employment practice, or any employment-related tort, including, without limitation, wrongful termination, dismissal or discharge, employment discrimination, employment-related harassment or defamation, or breach of employment contract, except that this Subparagraph shall not apply to a Claim for a Privacy Event involving the Personal Information of an Insured Person; or

b.   any actual or alleged discrimination against any person or entity.

5.   Fee Disputes

The Insurer shall not be liable for Loss on account of any Claim for any actual or alleged fees, expenses, or costs paid to or charged by the Insured.

6.   Product Recall

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the recall, repair, replacement, upgrade, supplement, or removal of any of the Insured's products, including products which incorporate the Insured's products or services, from the marketplace.

7. RICO

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as the Racketeer Influenced and Corrupt Organizations Act, or "RICO"), as amended, or any regulation promulgated thereunder, or any federal, state, or local law similar to the foregoing, whether such law is statutory, regulatory, or common law.

8. Securities Law

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment Advisers Act of 1940, any state blue sky securities law, each as amended, or any other federal, state, local, or foreign securities law, any rules or regulations promulgated thereunder, or any common law used to impose liability in connection with the purchase or sale or offer to purchase or sell securities.

9. Unfair Business Practices and Antitrust

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any actual or alleged:

a. false, deceptive, or unfair business practices, unfair trade practices, or unfair competition other than unfair trade practices or unfair competition as part of a Media Wrongful Act;

b. violation of consumer protection laws; or

c. price fixing, restraint of trade, monopolization, or any violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, each as amended, or any other federal, state, local, or foreign laws, regulations, or common law pertaining to antitrust, monopoly, price fixing, price discrimination, predatory pricing, or restraint of trade, or that otherwise protect competition;

except that this Exclusion shall not apply to a Claim for a Privacy Event or a Network Security Event.

10. Unsolicited Communications

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any actual or alleged unsolicited e-mail, unsolicited telephone calls, unsolicited text messages, or other unsolicited communication, distribution, publication, or transmission, including, without limitation, actual or alleged violations of the Telephone Consumer Protection Act of 1991, the U.S. CAN-SPAM Act of 2003, or any other federal state, local, or foreign law, any amendment thereto, any regulations promulgated thereunder, or violation of any order or ruling issued pursuant to any such law or regulation that regulates such communications; except that this Exclusion shall not apply to a Claim for a Network Security Event.

C.   The following Exclusions apply to Insuring Agreements A., B., and C. only:

1.   Actuarial Services

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the performance of or the failure to perform actuarial services.

2.   Bankruptcy or Cease and Desist Order

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the insolvency, bankruptcy, receivership, or liquidation of any person or entity, any loss of license, or any cease and desist order.

3.   Contests, Sweepstakes, and Lotteries

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to lotteries, sweepstakes, contests, or games of chance, or any misstatements or misrepresentations that appear in any promotional materials, including, without limitation, price discounts, gift cards, store debit or credit cards, prizes, awards, or other value given in connection with any lotteries, sweepstakes, contests, or games of chance.

4.   False Advertising, Cost Guarantees, and Faulty Estimates

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any actual or alleged:

a.   inaccurate, inadequate, or incomplete description of the price of goods, products, or services;

b.   cost guarantees, cost representations, or contract price estimates of probable costs, or cost estimates being exceeded;

c.   failure of goods, products, or services to conform with any represented quality, performance, or authenticity contained in advertising; or

d.   false or deceptive advertising or promotion, or deceptive trade practices in the sale of products, goods, or services.

5.   Pollution

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to the actual, alleged, or threatened discharge, release, escape, seepage, migration, or disposal of Pollutants, or any direction, request, demand, or order that the Insureds test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize Pollutants, or any voluntary decision to do so.

6.  Regulatory and Licensing Bodies

The Insurer shall not be liable for Loss on account of any Claim brought by or on behalf of:

a.  any federal, state, local, or foreign regulatory agency or authority; or

b.  the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), or Society of European Stage Authors and Composers (SESAC) or other intellectual property licensing or rights organization;

except that this Exclusion shall not apply to a Claim by any such agency, authority, or organization in its capacity as a customer or client of the Company.

D.  The following Exclusion applies to Insuring Agreements E., F., G., H., and I. only:

Governmental Action

The Insurer shall not be liable for Loss based upon, arising from, or attributable to seizure, confiscation, expropriation, nationalization, or destruction of any Computer System or Digital Assets by order of any governmental authority.

## V.  LIMITS OF LIABILITY AND RETENTIONS

A.  Limits of Liability

1.  The Insurer's maximum aggregate liability for all Loss on account of all Claims and all Cyber Events under all Insuring Agreements combined is the Maximum Aggregate Limit of Liability set forth in the Declarations. If the Maximum Aggregate Limit of Liability is exhausted by the payment of Loss, then the Insurer's obligations with respect to the payment of Loss under this Policy shall be completely fulfilled and extinguished.

2.  The Insurer's maximum liability for all Loss on account of each Claim under this Policy shall not exceed the applicable Each Claim Limit set forth in the Declarations.

3.  The Insurer's maximum liability for all Loss on account of each Cyber Event under this Policy shall not exceed the applicable Each Cyber Event Limit set forth in the Declarations.

4.  The Insurer's maximum liability for all Loss on account of all Claims and all Cyber Events under a particular Insuring Agreement of this Policy shall not exceed the applicable Insuring Agreement Aggregate Limit set forth in the Declarations.

5.  The Each Claim Limit and Each Cyber Event Limit are each part of, and not in addition to, the applicable Insuring Agreement Aggregate Limit, which is part of, and not in addition to, the Maximum Aggregate Limit of Liability.

6.  The Limits of Liability for any Extended Reporting Period shall be the remaining portion, if any, of the applicable Limits of Liability for the Policy Period. Such limits shall be part of, and not in addition to, the applicable Limits of Liability for the Policy Period. The purchase of the Extended Reporting Period shall not increase or reinstate any applicable Limit of Liability.

7. If a single Claim is subject to more than one Each Claim Limit, or a single Cyber Event is subject to more than one Each Cyber Event Limit, then the relevant Limits of Liability shall be applied separately to the different parts of such Claim or Cyber Event, but the Insurer's maximum aggregate liability for a single Claim or a single Cyber Event shall not exceed the largest applicable Each Claim Limit or Each Cyber Event Limit.

8. The Insurer's maximum liability for all PCI Fines and Penalties on account of all Claims shall not exceed the amount set forth in the Declarations as the PCI Fines and Penalties Limit, which is part of, and not in addition to, the Each Claim Limit and the Insuring Agreement Aggregate Limit for Insuring Agreement D.

9. The Insurer's maximum liability for all Reward Payments on account of all Cyber Extortion Threats shall not exceed the amount set forth in the Declarations as the Reward Payments Limit, which is part of, and not in addition to, the Each Cyber Event Limit and the Insuring Agreement Aggregate Limit for Insuring Agreement I.

B. Retentions

1. The Insurer's liability for Loss on account of each Claim or each Cyber Event other than an Interruption of Service shall apply only to that part of Loss that is excess of the applicable Retention amount set forth in the Declarations. Such Retention shall be borne by the Named Insured uninsured and at the risk of all Insureds, and shall be paid by the Insured as a condition precedent to payment of any Loss under this Policy.

2. The Insurer's liability for Loss on account of each Interruption of Service shall apply only to that part of Loss that is excess of the greater of either the Retention applicable to the relevant Insuring Agreement set forth in the Declarations or the applicable Waiting Hours Retention.

3. If multiple Retentions apply to a single Claim or Cyber Event, then each Retention shall apply separately to each part of the Claim or Cyber Event, but the total Retention shall not exceed the largest applicable Retention.

C. Related Claims and Cyber Events

The inclusion herein of more than one Insured with respect to any Claim or Cyber Event shall not operate to increase the Limits of Liability of this Policy.

Claims based upon, arising from, or attributable to Wrongful Acts that are Interrelated shall be treated as a single Claim. All such Claims shall be deemed first made when the earliest such Claim is made, whether before or during the Policy Period.

Cyber Events based upon, arising from, or attributable to Interrelated facts, circumstances, situations, or events shall be treated as a single Cyber Event. All such Cyber Events shall be deemed to have first occurred, or deemed to have been Discovered, as applicable, when the earliest such Cyber Event occurs or is Discovered, whether before or during the Policy Period.

With respect to Claims and Cyber Events based upon, arising from, or attributable to Interrelated facts, circumstances, situations, events, or Wrongful Acts:

1. all such Claims shall be deemed first made on the earlier of either the date that the first such Claim

is made or the date that the first such Cyber Event occurs or is Discovered, as applicable, whether before or during the Policy Period; and

2. all such Cyber Events shall be deemed to have first occurred, or deemed to have been Discovered, as applicable, on the earlier of either the date that the first such Cyber Event occurs or is Discovered, or the date that the first such Claim is made, whether before or during the Policy Period.

## VI. DEFENSE, SETTLEMENT, AND COOPERATION

A. Defense and Settlement of Claims

The Insurer shall have the right and the duty to select defense counsel and defend any Claim, even if any of the allegations of the Claim are groundless, false, or fraudulent. The Insureds shall not incur Claim Expenses without the prior written consent of the Insurer, which shall not be unreasonably withheld. The Insurer's duty to defend any Claim shall cease upon exhaustion of the applicable Limits of Liability. In such event, the Insurer may tender control of the defense of such Claim to the Insured, and the Insured agrees, as a condition precedent to the coverage of such Claim under this Policy, to accept such tender.

The Insureds shall not settle or offer to settle any Claim, incur Claim Expenses, admit any liability, stipulate to any judgment, or otherwise assume any obligation with respect to any Claim without the prior written consent of the Insurer, which shall not be unreasonably withheld. The Insurer shall not be liable for Loss as a result of any offer to settle, settlement, assumed obligation, admission of liability, stipulated judgment, or Claim Expenses to which it has not consented. However, if the Insureds are able to fully and finally settle, with prejudice, all Claims subject to a single Retention for an aggregate amount, including Claim Expenses, that does not exceed such Retention, then the Insurer's consent is not required for such settlement.

The Insurer shall have the right to make any investigation it deems necessary and, with the written consent of the Insured, make any settlement of a Claim covered by this Policy. If the Insurer recommends settlement of a Claim, the claimant is willing to agree to such settlement, and the Insured refuses to give written consent to settlement as recommended by the Insurer, then the Insured thereafter shall negotiate or defend such Claim independently of the Insurer and on the Insured's own behalf. In such event, the Insurer's liability for any such Claim shall be limited to the amount of the proposed settlement, Claim Expenses incurred until the time that the Insured refused to settle the Claim, plus fifty percent (50%) of all Loss, including Claim Expenses, incurred over such amount.

B. Cooperation with Respect to Claims

The Insureds agree to provide the Insurer with all information, assistance, and cooperation that the Insurer reasonably requests with respect to any Claim, and agree that they will not knowingly take any action that will prejudice the Insurer's position or its potential or actual rights of recovery with respect to any Loss paid under this Policy. The Insureds shall forward to the Insurer every demand, pleading, notice, or other process received by or on behalf of the Insured in connection with any Claim.

C. Cooperation with Respect to Cyber Events

The Insureds shall cooperate with the Insurer, and shall provide any additional information reasonably requested by the Insurer in connection with a Cyber Event, including in investigating any Cyber Event, enforcing the legal rights the Insured or the Insurer may have against any party that may be liable to the Insured, and conducting a forensic accounting exercise to calculate Business Income Loss. The Insured agrees to take all reasonable steps and measures to limit or mitigate Business Income Loss, Digital Asset Replacement Expenses, and Loss on account of a Cyber Extortion Threat.

Except as otherwise provided in the Definition of Breach Costs, the Insured has the right to incur Breach Costs without the prior consent of the Insurer. However, the Insurer shall, at its sole and absolute discretion and in good faith, reimburse the Insured only for such Breach Costs that the Insurer deems to be reasonable and necessary.

## VII. NOTICE AND PROOF OF LOSS

A. Notice of Claims

As a condition precedent to coverage under this Policy for any Claim, the Insured shall provide written notice to the Insurer of such Claim as soon as practicable after such Claim is Discovered, but in no event later than:

1. the end of the Policy Period with respect to a Claim first made against an Insured more than forty-five (45) days before the end of the Policy Period; or

2. sixty (60) days following the end of the Policy Period with respect to a Claim first made against an Insured less than forty-five (45) days before the end of the Policy Period; or

3. with respect to Claims first made during an Extended Reporting Period, if applicable, no later than the end of the Extended Reporting Period.

B. Notice of a Privacy Event or Network Security Event

As a condition precedent to coverage under this Policy for Breach Costs, the Insured shall provide written notice to the Insurer of the Privacy Event or Network Security Event giving rise to such Breach Costs as soon as practicable after such Privacy Event or Network Security Event is Discovered.

C. Notice of an Interruption of Service

As a condition precedent to coverage for Direct Business Income Loss or Contingent Business Income Loss and Extra Expenses, the Insured shall provide written notice to the Insurer of the Interruption of Service giving rise to such Direct Business Income Loss or Contingent Business Income Loss and Extra Expense, or the Network Security Event or System Failure Event giving rise to such Interruption of Service, as soon as practicable after such Interruption of Service, Network Security Event, or System Failure Event is Discovered.

D.   Notice of a Digital Asset Loss Event

As a condition precedent to coverage for Digital Asset Replacement Expenses, the Insured shall provide written notice to the Insurer of the Digital Asset Loss Event giving rise to such Digital Asset Replacement Expenses as soon as practicable after such Digital Asset Loss Event is Discovered.

E.   Notice of a Cyber Extortion Threat

As a condition precedent to coverage for Loss on account of a Cyber Extortion Threat, the Insured shall provide written notice to the Insurer of such Cyber Extortion Threat as soon as practicable after such Cyber Extortion Threat is Discovered.

F.   Notice of a Circumstance or Wrongful Act

If during the Policy Period an Insured first becomes aware of a fact, circumstance, or Wrongful Act that may reasonably give rise to a Claim that would be covered under this Policy, and the Insured provides written notice of such fact, circumstance, or Wrongful Act to the Insurer during the Policy Period, then any Claim that may subsequently be made against an Insured arising out of such fact, circumstance, or Wrongful Act shall be deemed to have been first made during the Policy Period.

As a condition precedent to exercising its rights hereunder, the Insured shall include within any such notice a description of the fact, circumstance, or Wrongful Act that is the subject of the notice, the nature or extent of the injury or potential damages, the names of the potential claimants, the manner in which the Insured first became aware of such fact, circumstance, or Wrongful Act, and give the Insurer any such additional information and cooperation as it may reasonably request. Notice to the Insurer of a Cyber Event as described in Subsections A. through E. above shall constitute notice to the Insurer of a circumstance that could give rise to a Claim as set forth in this Subsection.

G.   Breach Assist Hotline

If during the Policy Period a Cyber Event or suspected Cyber Event is Discovered by an Insured, then the Insured is strongly encouraged to call the Breach Assist Hotline set forth in the Declarations and the Notice attached to this Policy for immediate assistance. If the Insured provides notice to the Insurer through the Breach Assist Hotline of an actual or suspected Cyber Event then such notice shall be deemed notice of a fact, circumstance, or Wrongful Act that could give rise to a Claim as set forth in Subsection F. above.

If the Insured intends to make Extortion Payments in connection with a Cyber Extortion Threat, then the Insured, through the Breach Assist Hotline, can access specialized third-party technical resources to assist in minimizing any potential further compromise of the Insured's Computer System.

H.   Proof of Loss for Cyber Events

With respect to Loss on account of a Cyber Event for which the Insured seeks payment under Insuring Agreements E., F., G., H., and I., the Insured shall provide the Insurer with a proof of loss with the full particulars of the calculation of any such Loss within one hundred eighty (180) days after such Cyber Event is Discovered. Such proof of loss shall include documents and other supporting evidence, including, without limitation, reports, books of accounts, bills, invoices, and any other documentation of payment of such Loss by an Insured. The Insurer shall have the right to audit such proof of loss and inspect the records of the Insured.

I.   Address for Notices of Claims, Circumstances, and Cyber Events

Notices of Claims, Cyber Events, and circumstances or Wrongful Acts that could give rise to a Claim, and proofs of loss shall be provided to the Insurer at the applicable address set forth in the Declarations, except as set forth in Subsection F. above, in which case notice of a Cyber Event or suspected Cyber Event may also be provided through the Breach Assist Hotline.

## VIII. CHANGES IN EXPOSURE

A.   Change in Control of the Named Insured

If during the Policy Period:

1.   the Named Insured merges or consolidates with another organization such that the Named Insured is not the surviving entity; or

2.   another organization, person, or group of organizations or persons acting in concert, acquires:

   a.   Management Control of the Named Insured; or

   b.   all or substantially all of the assets of the Named Insured;

then coverage under this Policy will continue until termination of the Policy Period, but only with respect to Wrongful Acts or Cyber Events taking place before such merger, consolidation, or acquisition. This Policy may not be cancelled after the effective time of such merger, consolidation, or acquisition, and the entire premium for this Policy shall be deemed earned as of such time.

B.   New Subsidiaries

If during the Policy Period the Company obtains Management Control of an organization, or acquires an organization by merger or consolidation, then such organization shall be deemed a Subsidiary and coverage under this Policy shall automatically apply to such new Subsidiary and its Insured Persons.

Notwithstanding the foregoing, if the total annual revenues of such organization exceed twenty percent (20%) of the total consolidated annual revenues of the Named Insured and the Subsidiaries for the twelve (12) months immediately preceding the inception of the Policy Period, then coverage for such organization and its Insured Persons shall not extend beyond sixty (60) days following creation or acquisition of such organization, unless the Named Insured provides the Insurer with written notice thereof, provides any additional information, agrees to any additional terms and conditions, and pays any additional premium reasonably required by the Insurer, and the Insurer has agreed in writing to insure such organization.

C.   Former Subsidiaries

If before or during the Policy Period an organization ceases to be a Subsidiary, then coverage under this Policy for such former Subsidiary and its Insured Persons shall continue until termination of the Policy Period, but only with respect to Wrongful Acts or Cyber Events that take place before the time such organization ceased to be a Subsidiary.

D.   In all events this Policy shall not provide coverage for any Subsidiary, or its Insured Persons in their

capacity as such, for Wrongful Acts or Cyber Events taking place before such organization qualifies as a Subsidiary or after such Subsidiary ceases to be a Subsidiary.

IX.  **REPRESENTATIONS AND SEVERABILITY OF THE APPLICATION**

A.  Representations

The Insureds represent and acknowledge that the statements, representations, and information contained in the Application are true and complete, and are deemed to be incorporated into and a part of this Policy as if physically attached hereto. This Policy has been issued in reliance on the truth and completeness of such statements, representations, and information.

B.  Severability of the Application

In the event the Application contains any untrue or incomplete statement or any omission, and such statement or omission either was made with the intent to deceive or materially affected either the acceptance of the risk or the hazard assumed by the Insurer, then this Policy shall not provide coverage for any Claim or Cyber Event arising from the facts that were untrue or incomplete with respect to any Insured Person who had knowledge of the true facts, or any Company and its Subsidiaries if a Control Group Member of such Company had knowledge of the true facts, whether or not such Insured Person or Control Group Member knew the Application contained such untrue or incomplete statement or omission.

The Application shall be construed as a separate Application for coverage by each of the Insured Persons. For purposes of this Subsection, the knowledge of a Company or an Insured Person shall not be imputed to any other Insured Person.

C.  Non-Rescindable Policy

The Insurer shall not have the right to void or rescind, in whole or in part, the coverage provided under this Policy.

X.  **POLICY TERMINATION**

A.  Cancellation

1.  The Named Insured may cancel this Policy during the Policy Period by giving prior written notice to the Insurer stating when such cancellation shall take effect.

2.  The Insurer may cancel this Policy:

    a.  for nonpayment of premium, by providing notice of cancellation to the Named Insured at least ten (10) days before the effective time of cancellation; or

    b.  for any reason permitted under applicable law other than nonpayment of premium, by providing notice of cancellation to the Named Insured at least ninety (90) days before the effective time of cancellation.

    Notice of cancellation shall state the reason for cancellation and the effective date of cancellation.

3. In the event of cancellation by the Insurer or the Named Insured, the Insurer shall refund any unearned premium computed on a pro rata basis. The return or tender of a return premium is not a condition precedent to the cancellation becoming effective at the time specified in the cancellation notice.

B. Nonrenewal

If the Insurer elects not to renew this Policy, then the Insurer shall provide notice of nonrenewal to the Named Insured at least sixty (60) days before the expiration of the Policy Period. Such notice shall state the reason for nonrenewal. An offer by the Insurer of renewal terms, conditions, limits, or premiums different from those in effect prior to renewal shall not constitute a nonrenewal.

C. Notice of Termination

The Insurer shall mail or deliver notice of cancellation or nonrenewal in writing to the Named Insured and to the Named Insured's authorized agent or broker of record, if any. Proof of mailing will be sufficient proof of notice. Proof of delivery of the notice shall be treated the same as mailing.

## XI. GENERAL CONDITIONS

A. Alteration and Assignment

No change or modification of the terms or any rights under this Policy, or any assignment of interest under this Policy, shall be effective except when made by written endorsement to this Policy issued by the Insurer.

B. Authorization

By acceptance of this Policy, the Insureds agree that the Named Insured shall act on behalf of all Insureds with respect to giving and receiving notices under this Policy, paying premiums, receiving any return premiums that may become due under this Policy, receiving and accepting any endorsements, cancellation, nonrenewal, or the negotiation of renewal of this Policy, agreeing to any changes to this Policy, and purchasing an optional Extended Reporting Period.

C. Bankruptcy

Bankruptcy or insolvency of any Insured or of the estate of any Insured shall neither relieve the Insurer of any of its obligations hereunder nor deprive the Insurer of its rights or defenses under this Policy.

D. Calculation of Business Interruption Loss

For purposes of determining Direct Business Income Loss and Contingent Business Income Loss, net profit or loss and expenses will be calculated on an hourly basis. In determining the amount of net profit or loss, the Insurer will give due consideration to the net profit or loss of the Insured before the Interruption of Service occurred and the probable net profit or loss of the Insured had no Interruption of Service occurred.

However, such net profit or loss calculations shall not include net income that would likely have been earned as a result of an increase in the volume of the Insured's business due to favorable business conditions caused by the impact of any event similar to a Network Security Event suffered by other

businesses. The Insured will provide the Insurer with access to all relevant sources of information for purposes of determining Direct Business Income Loss and Contingent Business Income Loss, including, without limitation, the Insured's financial records, tax returns, accounting procedures, bills, invoices and other vouchers, and deeds, liens, and contracts.

E.  Form of Notices

Except as otherwise provided in this Policy, all notices under this Policy shall be in writing and delivered as follows:

1.   notice to the Insureds shall be given to the Named Insured and sent by prepaid express courier or certified mail to the address set forth in the Declarations; and

2.   notice to the Insurer shall be sent by prepaid express courier, certified mail, or e-mail, to the applicable address set forth in the Declarations.

Notice given as described above shall be deemed to be received and effective upon actual receipt by the addressee or one day following the date such notice is sent, whichever is earlier, subject to proof of transmittal.

F.  Headings

The headings and subheadings in this Policy are solely for convenience and do not form part of the terms and conditions of coverage under this Policy.

G.  No Action Against the Insurer

No action may be brought against the Insurer under this Policy unless, as a condition precedent to such action, the Insureds have complied fully with the terms of this Policy. Neither a claimant nor the Insureds or their legal representatives shall have any right under this Policy to join the Insurer as a party to any action against the Insureds to establish the Insureds' liability.

H.  Other Insurance

If any Loss is insured under any other valid and collectible policy of insurance, then this Policy shall apply as excess over any such policy, including any deductible or retention of such policy, whether such other insurance is stated to be primary, contributory, excess, contingent, or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided in this Policy by reference to its policy number.

I.  Subrogation

In the event of any payment under this Policy, the Insurer shall be subrogated to the extent of such payment to all of the Insureds' rights of recovery. The Insureds shall execute all papers required, and shall do everything reasonably necessary, to secure and preserve such rights and to enable the Insurer effectively to bring suit in the name of the Insureds.

If the Insurer recovers Loss paid under this Policy, then the Insurer shall reinstate the applicable Limits of Liability to the extent of any recovery, less any costs incurred by the Insurer in recovering such Loss. The Insurer shall have no duty to seek a recovery of Loss paid under this Policy.

J.  Territory and Valuation

Coverage under this Policy shall apply anywhere in the world, to the extent legally permitted.

All premiums, limits, Retentions, Loss, and other monetary amounts of this Policy are expressed and payable in the currency of the United States of America. If a judgment is rendered, settlement is denominated, or another element of Loss under this Policy is payable in a currency other than United States of America dollars, then payment under this Policy shall be made in United States of America dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon, or the element of Loss is due, respectively.



# Endurance American Specialty Insurance Company
## 1221 Avenue of the Americas
## New York, NY 10020

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President and Senior Vice President and countersigned where required by law on the Declarations page by its duly authorized representative.

Senior Vice President                              President

POLICYHOLDER NOTICE

**U. S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")**

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC.  **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency".  OFAC has identified and listed numerous:

- Foreign agents;

- Front organizations;

- Terrorists;

- Terrorist organizations; and

- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons".  This list can be located on the United States Treasury's website - http://www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC.  When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC.  Other limitations on the premiums and payments also apply.

| | |
|---|---|
| Case Number: | 23-2-11110-9 |
| Date: | August 29, 2024 |
| Serial ID: | 24-493273-6303550W5Q |
| Certified By: | Catherine Cornwall |
| | King County Clerk, Washington |

I, CATHERINE CORNWALL, Clerk of the Superior Court of the State of Washington for King County, do hereby certify that this copy is a true and perfect transcript of said original as it appears on file and of record in my office and of the whole thereof. IN TESTIMONY WHEREOF, I have affixed this Seal of said Superior Court at my office at Seattle.



Catherine Cornwall, King County Clerk



**Instructions to recipient:** If you wish to verify the authenticity of the certified document that was transmitted by the Clerk, you must create and/or sign-in to your KC Script Portal account. Only e-certified documents that were directly ordered through the KC Script Portal can be verified through this tool.

Sign in to KC Script Portal:

**https://dja-prd-ecexap1.kingcounty.gov/**

After you login to your account, click Certified Copy Verification from the black ribbon menu at the top of the screen. There you will enter the following Serial ID.

Serial ID:     **24-493273-6303550W5Q**

This document contains 104 page plus this sheet, and is a true and correct copy of the original that is of record in the King County Clerk's Office. The copy associated with Serial ID will be displayed by the Clerk.

Case Number: 23-2-11110-9
Date:              August 29, 2024
Serial ID:         24-492776-6301724U2I
Certified By:      Catherine Cornwall
                   King County Clerk, Washington

**Honorable Brian McDonald**
**Hearing Date: Friday, November 17, 2023**
**Hearing Time: 11:00 a.m.**

IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

AVENUE5 PARTNERS LLC, a Delaware limited liability company, and AVENUE5 RESIDENTIAL LLC, a Delaware limited liability company,

        Plaintiffs,

        vs.

ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY, a Delaware corporation,

        Defendant.

No. 23-2-11110-9 SEA

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    <u>INTRODUCTION AND RELIEF REQUESTED</u>

In this lawsuit, Plaintiffs erroneously contend they are entitled to defense and indemnity for rental housing price-fixing antitrust class actions, despite the directly-applicable "Unfair Business Practices and Antitrust" exclusion in the policy that defendant Endurance American Specialty Insurance Company ("Endurance") issued. Plaintiff Avenue5 Residential LLC ("Avenue5") is in the business of apartment management. Avenue5, along with many other landlords and property managers, has been sued by proposed classes of tenants (now consolidated as a federal "MDL" proceeding) for using a service known as RealPage to conspire and form an

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164
(206) 689-8500 • (206) 689-8501 FAX

1  alleged pricing "cartel" in the multifamily rental housing market. Endurance denied coverage to

2  Avenue5 for these antitrust class action lawsuits based on alleged anti-competitive practices, citing

3  the Endurance policy's specific coverage exclusion for antitrust claims.

4  First, the Endurance policy's Insuring Agreement for Professional Services Liability has

5  not been triggered, because conspiring to fix rental prices is not one of the "Professional Services"

6  insured by the Endurance policy. Even if this conduct were part of the Endurance policy's covered

7  "Professional Services" as Plaintiffs contend, an argument with which Endurance disagrees,

8  Endurance has no duty to defend or any other coverage obligation to Avenue5 because the plain

9  language of the policy's "Unfair Business Practices and Antitrust" exclusion applies to preclude

10  coverage for the underlying antitrust claims. This policy exclusion broadly excludes coverage for

11  actual or alleged "price fixing" under the Sherman Anti-Trust Act or under federal and state laws

12  "that otherwise protect competition." Avenue5 and other class action defendants allegedly avoided

13  price competition in the multifamily market and thus inflated rents to the financial detriment of

14  proposed class members, tenants and rent payers. The allegations against Avenue5 constitute a

15  classic antitrust case under the Sherman Anti-Trust Act and under each state's analogous laws.

16  Thus, the Endurance policy's exclusion plainly applies, and there is no coverage.

17  Second, the Endurance policy's Insuring Agreement for Privacy and Network Security

18  Liability is not applicable, because nowhere in the underlying proceedings have any claims or

19  causes of action been asserted that Avenue5, RealPage, or any underlying co-defendant made an

20  unlawful disclosure of personal information that constituted a "Privacy Event" as defined in the

21  Endurance policy. Thus, the proceedings against Avenue5, and any related demands for relief

22  from Avenue5, are not a claim "**for**" any such "Privacy Event", as this Insuring Agreement of the

23  Endurance policy requires.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 2

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

In an effort to circumvent both the lack of any applicable Insuring Agreement providing coverage, and the clearly applicable "Unfair Business Practices and Antitrust" exclusion, Avenue5 requests this Court stretch this exclusion's strictly-limited exception well-beyond its carve-out of a "Claim for a Privacy Event…."  Avenue5's argument is meritless: there is simply no Claim "for" a Privacy Event, as this exception to the antitrust exclusion requires.  Avenue5 cannot rely on the exception to the "Unfair Business Practices and Antitrust" exclusion to create coverage where it does not otherwise exist for Professional Services Liability or for Privacy and Network Security Liability.

Because the Endurance policy provides no coverage for the proceedings against Avenue5, Endurance respectfully requests that the Court grant summary judgment to Endurance and dismiss Plaintiffs' complaint with prejudice.

## II.     STATEMENT OF RELEVANT FACTS

### A.     The Underlying MDL Complaint Against Avenue5

The underlying antitrust dispute has resulted in more than two-dozen federal class action lawsuits.  Plaintiffs' complaint in this matter asserts that the current count is "approximately thirty-eight," some of which have been dismissed and the remainder transferred to an "MDL" (Multi District Litigation) in the Middle District of Tennessee[1], where a consolidated complaint was filed in mid-June 2023.  (Amended Complaint, Dkt. 16, ¶ 8).  Subsequently, amended MDL complaints have been filed, each alleging a putative class action lawsuit.

The current version of the MDL complaint is the Second Amended Consolidated Class Action Complaint (hereinafter the "Underlying MDL Complaint"), filed on September 7, 2023.

---

[1] *Goldman et al. v. RealPage, Inc., et al.*, United States District Court of the Middle District of Tennessee Case No. 3:23-md-03071.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 3

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

The Underlying Complaint is 302 pages long, contains 757 numbered paragraphs of allegations, and 266 footnotes.  (Exh. 1 to Declaration of Daniel L. Syhre in Support of Defendant's Motion For Summary Judgment ("Syhre Decl.")).  Endurance submits that the Underlying MDL Complaint should be treated as the most complete and authoritative statement of the underlying allegations against Avenue5.[2]

The Underlying MDL Complaint alleges defendants anticompetitively conspired to control rental housing costs.  The substance of the Underlying MDL Complaint is stated in its opening paragraph:

> 1. From at least January 2016, through the present (the "Conspiracy Period"), Defendants engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing across the country. Leveraging their control of the multifamily rental housing market from at least January 2016, Defendants conspired to limit supply and raise multifamily rental housing prices, causing substantial damages to Plaintiffs and other members of the Class whose ability to obtain affordable housing depended on getting competitive prices for the units they rented. Several witness accounts, including 12 discussed herein, rental price and occupancy data, economic evidence, and public investigations, confirm the anticompetitive conduct taken pursuant to this agreement.

(Underlying MDL Complaint, ¶ 1 (footnote omitted)).

The Underlying MDL Complaint describes RealPage as a means that landlords and property managers, from nominally different and ostensibly competing firms, use to form a "cartel" by sharing data with RealPage and accepting RealPage's pricing direction:

> 6. By using RealPage's RMS, each Owner, Owner-Operator, and Managing Defendants agreed with the overarching principles of the cartel: that (1) all

---

[2] Avenue5 apparently agreed, as of August 2023, that the MDL proceeding had become the only proceeding requiring its defense counsel and that no defense counsel was needed in Washington.  Avenue5's August 2023 motion filed in the MDL proceeding stated that, based on the transfer of all earlier class action lawsuits "originally filed in the Western District of Washington" to the MDL, "Avenue5 no longer requires counsel in Washington following such consolidation and transfer."  (MDL Dkt. 515, Exh. 2 to Syhre Decl., at p. 1 of 5).  The MDL court relied, in granting this Motion to Withdraw as Attorney of Record, upon the written Notice from Ashbaugh Beal LLC (one of Plaintiffs' attorneys of record in this matter), that Avenue5 was "no longer in need of" local counsel "for the W.D. of Washington cases." (*Id.* at p. 5 of 5).  Thus, the only operative pleading for this Court's analysis is the Underlying MDL Complaint.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 4

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

members, who were otherwise horizontal competitors, would share the
proprietary data necessary for RealPage's RMS to generate rental price
recommendations; (2) all members would delegate their rental price and
supply decisions to a common decision maker, RealPage; and (3) knowing that
cooperation was essential to the successful operation of the scheme, all
members would abide by RealPage's price and supply decisions generated by
RMS.

(*Id.* at ¶ 6).

The Underlying MDL Complaint alleges that clients of RealPage share their own
"commercially sensitive" data with RealPage into a common data pool to facilitate price fixing
collusion:

13. Cartel members provide RealPage with vast amounts of their non-public
proprietary data, including their lease transactions, rent prices, and occupancy
and inventory levels. This commercially sensitive data is fed into a common
data pool, along with additional data collected by Defendant RealPage's other
data-analytics, benchmarking, and rental-management software products.
RealPage then trains its machine learning and artificial intelligence algorithms
across that pool of proprietary data, generating rental prices daily for each RMS
user's available units, singularly focused on increasing revenues by raising rent.
Defendants boast about their ability to increase revenue by way of increasing
rents regardless of true market conditions, including economic downturns or an
all-out recession. ***

(*Id.* at ¶ 13).

The exchange of sensitive commercial information is referenced in the Underlying MDL

Complaint not as allegedly harmful to the underlying plaintiffs' privacy in and of itself, but instead

as evidence supporting an alleged inference of anti-competitive behavior. The Underlying MDL

Complaint explains this in a series of paragraphs devoted to the concept of "plus factors" in the

multifamily rental housing market:

366. The presence of a number of factors, referred to as "plus factors" and "super
plus factors" render the market for multifamily rental housing units highly
conducive to collusion. Plus factors are "economic actions and outcomes, above
and beyond parallel conduct by oligopolistic firms, that are largely inconsistent
with unilateral conduct but largely consistent with explicitly coordinated

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 5

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164
(206) 689-8500 • (206) 689-8501 FAX

4866-3003-8150, v. 1

00110

action," and therefore support an inference of collusion.[208] "Super plus factors are actions or outcomes that would almost never be observed in the absence of collusion, [such that], it is reasonable to presume that the cartel finds these conducts or outcomes important to the implementation and operation of the collusive structures."

367. Specifically, the following plus and super plus factors support an inference that Defendants' actions constituted a *per se* unlawful price fixing conspiracy, not merely parallel conduct: the multifamily rental housing market (i) is highly concentrated; (ii) has high barriers to entry for would-be competitors; (iii) has high switching costs for renters; (iv) has inelastic demand; and (v) offers a fungible product. In addition, Defendants (vi) **exchange competitively sensitive information**; and (vii) have motive, opportunities, and invitations to collude.

*..*..*

**vi. Defendants Exchange Competitively Sensitive Information**.

380. The reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion. As described above, Defendant RealPage requires clients to input data on actual rents paid and occupancy rates, along with detailed records of lease transactions. This data, which would normally be kept private, is fed into RealPage's RMS algorithm(s) which sets coordinated rents among competing property owners and managers. RealPage disseminates building-specific comparables data to its clients, thereby providing clients, including Owners, Owner-Operators, and Managing Defendants not only with knowledge as to which of its competitors use RealPage's RMS to price their multifamily units, but also the specific levels at which competitors are pricing their multifamily units. Importantly, individual property owners and managers would be competitively disadvantaged by providing private data to other property owners or managers unilaterally, and rational actors will only do so with the expectation that they will benefit from similar private information shared by their competitors. These horizontal competitors, then, have access to others' confidential pricing information prior to implementing their own rent prices.

(*Id.* at ¶¶ 366-367, 380 (**emphasis** added; footnote text omitted)).

The reference to this type of information sharing as a "plus factor" is a term of art in antitrust law, describing a fact that supports the inference of unlawful anti-competitive collusion. The point is that it would be extremely disadvantageous for a non-collusive seller to share such

FORSBERG & UMLAUF, P.S.
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164
(206) 689-8500 • (206) 689-8501 FAX

information with competing non-collusive sellers.  The fact that the firms nevertheless voluntarily

engage in this behavior supports the inference that they are colluding rather than competing.

William E. Kovacic et al., *Plus Factors and Agreement in Antitrust Law,* 110 Mich. L. Rev. 393,

423 (2011).

The Underlying MDL Complaint does not allege that **class members** were wronged

directly by the sharing of the class members' own private information. The Underlying MDL

Complaint completely fails to allege that the class representatives seek any relief for violations of

the privacy rights of class members.  The legal theories pleaded in the Underlying MDL Complaint

are as follows:

**Count I**: Price Fixing in Violation of Section 1 of the Sherman Act (15 U.S.C § 1) (*Id.* at

p. 276); and

**Count II**: Violation of State Antitrust Statutes (*Id.* at p. 278).

In sum, the Underlying MDL Complaint does not cite a single privacy-protection statute,

regulation or common law rule, let alone allege any provision of such a statute, regulation or rule

was violated.

The Washington State-specific allegations are in paragraph 754 of the Underlying MDL

Complaint:

> 754. **WASHINGTON:** Defendants have entered into an unlawful agreement in
> restraint of trade in violation of WASH. REV. CODE ANN. § 19.86.010, *et seq*.
> *See* WASH. REV. CODE ANN. § 19.86.030. Defendants' combinations or
> conspiracies had the following effects: (1) price competition for residential
> units was restrained, suppressed, and eliminated throughout Washington; (2)
> price of residential units was raised, fixed, maintained, and stabilized at
> artificially high levels throughout Washington; and (3) individuals have been
> deprived of free and open competition for residential units. During the Class
> Period, Defendants' illegal conduct substantially affected commerce in the
> State of Washington. Accordingly, Plaintiffs and members of the Class seek all
> forms of relief available under WASH. REV. CODE ANN. § 19.86.010, *et seq.*

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

1    (*Id*. at ¶ 754).

2        Finally, the proposed class the Underlying MDL Complaint seek to certify makes payment

3   of rent to an underlying defendant,[3] at any time during the "Class Period", the sole criterion for

4   class membership:

> 681. Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable and injunctive relief, on behalf of the following Class:
>
> All persons and entities in the United States and its territories who paid rent on at least one multifamily residential real estate lease from any Owner, Managing Defendants and/or Owner-Operator participating in RealPage's Revenue Management Solutions, including its pricing software and/or lease renewal staggering software programs, or from a division, subsidiary, predecessor, agent, or affiliate of any such Owner, Managing Defendant, and/or Owner-Operator, at any time during the period of October 18, 2018 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist ("Class Period").

(*Id*. at ¶ 681).

### B.    <u>The Endurance Policy</u>

       Endurance policy No. MPC30015690200 ("Policy") was in effect between February 1, 2022, to February 1, 2023, with a limit of liability of $5,000,000 for each claim and in the aggregate. The Professional Services Liability Insuring Agreement of the Policy states:

> A. Professional Services Liability
>
> If Insuring Agreement A. is purchased, the Insurer shall pay **Loss** on behalf of an **Insured** on account of a **Claim** first made against such **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Professional Services**

---

[3] Avenue5 Partners, LLC, is the owner of Avenue5 (Avenue5 Residential, LLC), but Avenue5 Partners, LLC, is not one of the defendants in the Underlying MDL Complaint; only "Avenue5 Residential, LLC" is. However, as one of the Plaintiffs filing the complaint in this matter, Avenue5 Partners LLC would be equally subject to the relief requested in this Motion.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 8

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164
(206) 689-8500 • (206) 689-8501 FAX

4866-3003-8150, v. 1

**Wrongful Act** that first takes place on or after the **Retroactive Date** and before the end of the **Policy Period**.[4]

(Exh. 3 to Syhre Decl., at p. 62). Relevant terms in **bold** above are defined as follows:

**Claim** means:

1. a written demand received by an **Insured** for monetary or non-monetary relief, including a demand for injunctive relief, commenced by receipt of such demand;

2. a civil proceeding commenced by the service of a complaint or similar pleading on an **Insured**; . . .

\* ..\*.. \*

**Professional Services** means those services defined as Professional Services in the Declarations that are provided by an **Insured** to others.

**Professional Services Wrongful Act** means any act, error, omission, misstatement, misleading statement, neglect, breach of duty, or **Personal Injury Tort** actually or allegedly committed or attempted by an **Insured** in the performance of or failure to perform **Professional Services**.

(*Id.* at 66).

The Declarations of the Policy state, in part:

Item 10.  **Professional Services**:

Solely in the performance of or failure to perform property management services, real estate agent/broker services, agency construction management services, real estate advisory services, tenant credit screening services, compliance services, due diligence any physical condition assessments, and insurance agency services limited to renters insurance products provided in conjunction with property management services.

(*Id.* at 9).

---

[4] Endurance reserves rights to assert any and all bases under the Policy, whether or not fully briefed in this Motion, for determinations in its favor on insurance coverage issues, including but not limited to the application of this Insuring Agreement's requirement that wrongful acts must not "first take[] place" before the Retroactive Date. The Underlying MDL Complaint's opening paragraph alleges, as quoted above, that anticompetitive conduct began before the Retroactive Date. (Underlying MDL Complaint, ¶ 1).

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 9

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

4866-3003-8150, v. 1

00114

The above definition of **Professional Services** is in turn amended, and thereby supplemented, by Endorsement No. 17 to the Policy stating, in part, that "**Professional Services** means, in addition to any other services listed . . . **Property Manager Services**." (Id. at 17). The Endorsement defines "**Property Manager Services**" as:

> **Property Manager Services** means the following services provided by an **Insured** to others in connection with the management of real property pursuant to a written contract:
>
> 1.  developing management plans and budgets;
>
> 2.  overseeing the physical maintenance of real property;
>
> 3.  tenant relation services, including, but not limited to, the collection of rent and processing evictions;
> 4.  soliciting and negotiating contracts for the sale or leasing of real property;
>
> 5.  developing, implementing, and managing contracts and subcontracts necessary to the daily functioning of real property; and
>
> 6.  record keeping.

(*Id.* at 38).

In addition to the Professional Services Liability Insuring Agreement, the Policy also contains a Privacy and Network Security Liability Insuring Agreement:

> D.  Privacy and Network Security Liability
>
> If Insuring Agreement D. is purchased, the Insurer shall pay **Loss** on behalf of an **Insured** on account of a **Claim** first made against such Insured during the **Policy Period** or the Extended Reporting Period, if applicable, for a **Privacy Event** or **Network Security Event** that takes place on or after the **Retroactive Date** and before the end of the **Policy Period**.

(*Id.* at 62). The terms in **bold** above are subject to these definitions in the Policy:

> **Network Security** means measures taken to protect against **Unauthorized Access or Use** of, a denial of service attack directed against, or the transmission of **Malicious Code** to or from, a **Computer System**.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 10

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164
(206) 689-8500 • (206) 689-8501 FAX

4866-3003-8150, v. 1

00115

**Network Security Event** means an actual or suspected failure of the **Network Security** of the **Company** that results in or does not prevent:

1. the theft, alteration, or destruction of electronic data or software on the **Insured's Computer System**;

2. the **Unauthorized Access or Use** of the **Insured's Computer System**;

3. a denial of service attack against, or restriction or inhibition of access to, the **Insured's Computer System**;

4. the participation by the **Insured's Computer System** in a denial of service attack directed against a third party's **Computer System**; or

5. the transmission of **Malicious Code** to the **Insured's Computer System**, or from the **Insured's Computer System** to a third party's **Computer System**.

(*Id.* at 72).

**Privacy Event** means an actual or suspected:

1. unauthorized disclosure, loss, or theft of:

   a. **Personal Information** for which the **Insured** is legally responsible that is in the care, custody, or control of any **Insured** or a third-party service provider; or

   b. other information of a third party that is not available to the general public, that the **Insured** is legally responsible to maintain the confidentiality of, and that is in the care, custody, or control of any **Insured** or a third-party service provider;

2. unauthorized collection of **Personal Information**; or

3. violation of any **Privacy Regulation**.

**Privacy Regulation** means the provisions of any federal, state, local, or foreign identity theft or privacy protection law or regulation that require commercial entities that collect **Personal Information** or other confidential information, to post privacy policies, adopt specific privacy or security controls, provide notice as to how **Personal Information** or other confidential information is used, or notify individuals in the event that **Personal Information** or other confidential information is compromised or is potentially compromised, and any amendments thereto, including, without limitation, the following:

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 11

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

1. the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) and the Health Information Technology for Economic and Clinical Health Act;

2. the Gramm-Leach-Bliley Act of 1999;

3. the California Security Breach Notification Act (CA SB 1386) and Massachusetts 201 CMR 17;

4. the California Consumer Privacy Act of 2018 (CA AB 375);

5. Identity Theft Red Flags under the Fair and Accurate Credit Transactions Act of 2003;

6. Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), but solely for alleged unfair or deceptive acts or practices in or affecting commerce; and

7. EU General Data Protection Regulation (GDPR) (Regulation (EU) 2016/679).

(*Id.* at 73).

\*..\*..\*

**Personal Information** means:

1. an individual's name, social security number, medical or healthcare data, biometric data, driver's license number, state identification number, credit card number, debit card number, address, e-mail address, IP address, geolocation tag, telephone number, bank or other financial institution account number, account history, account password, or any other legally protected personal information, in any format; and

2. other nonpublic personal information, in any format, subject to protection under **Privacy Regulations**.

(*Id.* at 72).

The Policy is subject to an Unfair Business Practices and Antitrust exclusion, stating:

**IV. EXCLUSIONS**

\* .\*. \*

9.    Unfair Business Practices and Antitrust

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 12

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164
(206) 689-8500 • (206) 689-8501 FAX

The Insurer shall not be liable for Loss on account of any Claim based upon, arising from, or attributable to any actual or alleged:

a.   false, deceptive, or unfair business practices, unfair trade practices, or unfair competition other than unfair trade practices or unfair competition as part of a **Media Wrongful Act**;

b.   violation of consumer protection laws; or

c.   price fixing, restraint of trade, monopolization, or any violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, each as amended, or any other federal, state, local, or foreign laws, regulations, or common law pertaining to antitrust, monopoly, price fixing, price discrimination, predatory pricing, or restraint of trade, or that otherwise protect competition;

except that this Exclusion shall not apply to a **Claim** for a **Privacy Event** or a **Network Security Event**.

(*Id.* at 80).

## III.   <u>STATEMENT OF THE ISSUES</u>

1.   Whether the Underlying MDL Complaint's allegations that Avenue5 delegated price-setting aspects of its business to RealPage, for the purpose of facilitating a price-fixing conspiracy, trigger the Endurance Policy's Professional Services Liability Insuring Agreement.

2.   Whether the Underlying MDL Complaint alleges a Claim within the Policy's Privacy and Network Security Liability Insuring Agreement, despite the absence of any allegations of violations of class members' privacy and the absence of any privacy-related causes of action.

3.   Whether coverage is barred because the Underlying MDL Complaint falls squarely within the Policy's Unfair Business Practices and Antitrust exclusion.

4.   Whether Plaintiffs' bad faith, Consumer Protection Act, and Insurance Fair Conduct Act claims should be dismissed because Endurance correctly determined that there is no coverage for the allegations against Avenue5.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 13

4866-3003-8150, v. 1

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

00118

## IV.    **EVIDENCE RELIED UPON**

Declaration of Daniel L. Syhre in Support of Defendant's Motion For Summary Judgment and Exhibits thereto, together with the pleadings and filings in this matter.

## V.    **AUTHORITY**

### A.    **Summary Judgment Standard**

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Ruff v. County of King*, 125 Wn.2d 697, 703 (1995); *see also* CR 56(c).  In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248.

### B.    **Washington Rules of Insurance Policy Construction and Duty to Defend**

Under Washington law, "the interpretation of language in an insurance policy is a matter of law." *Moeller v. Farmers Ins. Co. of Wash.,* 173 Wn.2d 264, 271, 267 P.3d 998 (2011). "Insurance is a contractual relationship between the insurer and the insured." *Ohio Cas. Ins. Co. v. Nelson*, 49 Wn.2d 748, 751, 306 P.2d 201 (1957); *Geer v. Tonnon*, 137 Wn.App. 838, 849, 155 P.3d 1639 (2007).  "If the language in an insurance contract is clear and unambiguous, the court must enforce it as written and may not modify the contract or create ambiguity where none exists." *Transcon. Ins. Co. v. Wash. Pub. Util. Dist. Util. Sys.,* 111 Wn.2d 452, 456, 760 P.2d 337 (1988). A term or phrase is ambiguous only if the contract language, on its face, would be fairly susceptible

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 14

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

4866-3003-8150, v. 1

**00119**

to more than one reasonable interpretation by an average purchaser of insurance. *Allstate Ins. Co. v. Peasley*, 131 Wn.2d 420, 424, 932 P.2d 1244 (1997).

The insured must show the loss falls within the scope of the policy's insured losses. To avoid coverage, the insurer must then show the loss is excluded by specific policy language. *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 731, 837 P.2d 1000, 1003-04 (1992). Courts applying Washington law have held that insureds bear the burden of proving that an exception to an exclusion applies. *MKB Constructors v. Am. Zurich Ins. Co.*, 49 F.Supp.3d 814, 836 (W.D. Wash. 2014); *Mid–Continent Cas. Co. v. Titan Constr. Corp.*, No. 05–CV–1240 MJP, 2009 WL 1587215, at *5 (W.D. Wash. June 5, 2009) ("A large majority of ... courts hold[ ] that the burden of proof, which falls on the insured for coverage and shifts to the insurer for an exclusion, shifts back to the insured for an exception to an exclusion.").

An insurer's duty to defend arises when a complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's coverage. *Truck Ins. Exch. v. Vanport Homes, Inc.*, 147 Wn.2d 751, 760, 58 P.3d 276 (2002). Facts extrinsic to the complaint against the insured do not create a duty to defend unless allegations in the complaint conflict with facts known to or readily ascertainable by the insurer or if the allegations are ambiguous or inadequate. *Woo v. Fireman's Fund Ins. Co.*, 161 Wn.2d 43, 54, 164 P.3d 454 (2007). Otherwise, the question of law regarding whether the duty to defend is triggered must be resolved based on only (1) the allegations against the insured and (2) the insurance policy provisions. *Id.*, 161 Wn.2d at 53–54; *Quadrant Corp. v. Am. States Ins. Co.*, 154 Wn.2d 165, 171, 110 P.3d 733 (2005) (applying plain language of liability policy's exclusion of defined "pollutants" to preclude coverage for the underlying claims).

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 15

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164
(206) 689-8500 • (206) 689-8501 FAX

4866-3003-8150, v. 1

00120

**C.**    **The Underlying MDL Complaint Alleges Anti-Competitive Conspiracies to Fix Rental Prices, Not Covered Professional Services**

The opening paragraph of the Underlying MDL Complaint states that "From at least January 2016, through the present (the "Conspiracy Period"), Defendants engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing across the country." Courts in Washington hold that not every alleged wrongful act or omission of an insured constitutes the insured's "professional service," and accordingly, analysis is required of "the act itself" to determine whether professional training or skill was involved. *Chicago Ins. Co. v. Center for Counseling and Health Resources*, 2011 WL 1222792, *2 (W.D. Wash., Mar. 31, 2011) (*Center for Counseling*) (citation omitted) (no duty to defend or indemnify for alleged billing fraud). Here, the allegations that Avenue5 profited from computerized price fixing closely resemble the fraudulent billing that was at issue in *Center for Counseling*, rather than resembling the services of specialized skill encompassed within Avenue5's "**Property Manager Services**" or any other aspects of the Policy's defined "**Professional Services**." Additionally, Avenue5 and other cartel participants allegedly "delegate[d] their rental price and supply decisions," thereby outsourcing all professional judgment on pricing to an external computer program, RealPage's RMS algorithm(s). (Underlying MDL Complaint, Exh. 1 to Syhre Decl., at ¶¶ 6 & 13). Therefore, none of the conduct alleged against Avenue5 falls within the Policy's Insuring Agreement for "Professional Services Liability."

**D.**    **The Underlying MDL Complaint Does Not Come Within Coverage D., Regarding Alleged Claims For Privacy Events**

The Privacy and Network Security Liability coverage part of the Policy has not been triggered by the allegations in the Underlying MDL Complaint and accordingly, its Insuring Agreement does not provide coverage for the underlying antitrust lawsuit. The class members

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 16

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164
(206) 689-8500 • (206) 689-8501 FAX

4866-3003-8150, v. 1

00121

1  allege only two causes of action: first, for price fixing in violation of the Sherman Anti-Trust Act;

2  and second, for restraint of trade in violation of similar state unfair business practices statutes.

3  (Underlying MDL Complaint, Exh. 1 to Syhre Decl., at Section X. Count I and Count II).  These

4  two causes of action pleaded in the Underlying MDL Complaint arise from alleged restraint of

5  trade violations. There are no claims, nor are any causes of action asserted, seeking relief for

6  alleged violations of individual privacy rights.

7       Moreover, as the Privacy and Network Security coverage part of the Policy requires, no

8  claim has been alleged "**for**" a "**Privacy Event**" as that term is defined in the Policy, not even in

9  passing.  There is no allegation or cause of action in the Underlying MDL Complaint involving a

10  claim for loss of, theft of, or disclosure of the class member's "**Personal Information**" as defined

11  in the Policy.  Notably, the term "**Privacy Event**" does not encompass any and all provisions of

12  all laws and regulations protecting personal information, but instead it is strictly defined in the

13  Policy, with references to particular "**Privacy Regulation**" provisions that require adoption of

14  security controls or notices when "…confidential information is compromised."[5]  At most, the

15  Underlying MDL Complaint alleges that the *cartel-member defendants*, including Avenue5,

16  *shared their own* "commercially sensitive" information with RealPage and with one another, as

17  support for the allegation that these defendants were colluding with one another rather than

18  competing in the marketplace.  (Underlying MDL Complaint, Exh. 1 to Syhre Decl., at ¶ 13).  Even

19  if it could be inferred as factual background that incidental sharing of class members' rent payment

20  amounts took place, there is simply no claim in the Underlying MDL Complaint "**for**" such

21  collection or disclosure allegedly breaching any "**Privacy Regulation**."  This Court's legal

22

23  [5] No failures of network security, as required by the Policy's defined term "**Network Security Event**", are mentioned in or inferred by the Underlying MDL Complaint.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 17

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE ● SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 ● (206) 689-8501 FAX

4866-3003-8150, v. 1

00122

1  determination of any duty to defend Avenue5 under the Policy is required to be based on the

2  allegations set forth in the Underlying MDL Complaint, not based on speculation or imagination

3  that any privacy interests of underlying plaintiffs were possibly violated.  *Woo*, 161 Wn.2d at 53-

4  54.  The class members must make a claim "**for**" a "**Privacy Event**," before Coverage D

5  conceivably applies.  They do not.

6       **E.    The Underlying MDL Complaint Unambiguously Falls within the**
             **Policy's Unfair Business Practices and Antitrust Exclusion**

7       Despite its length, the Underlying MDL Complaint is clearly about one thing: antitrust –

8  a conspiracy to restrain trade by using RealPage software to fix rents for multifamily residential

9  housing, in violation of the Sherman Anti-Trust Act and state law analogs. This is precisely what

10 the Policy's Unfair Business Practices and Antitrust exclusion precludes coverage for:

11       c.    price fixing, restraint of trade, monopolization, or any violation of the Federal
12             Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, each as
               amended, or any other federal, state, local, or foreign laws, regulations, or
13             common law pertaining to antitrust, monopoly, price fixing, price
               discrimination, predatory pricing, or restraint of trade, or that otherwise protect
14             competition;

15 The above paragraph, appearing within the Unfair Business Practices and Antitrust exclusion,

16 aptly summarizes the entirety of the Underlying MDL Complaint, stripped of party names and

17 claim-specific facts. The Underlying MDL Complaint alleges that class members were wronged

18 only in the fact that they paid higher rents, as evidenced by both the definition of class membership

19 (rent payers, rather than exclusively tenants) and the causes of action they plead (Sherman Anti-

20 Trust Act and state law analogs). All of the legal theories pleaded in the Underlying MDL

21 Complaint depend on alleged restraint of trade violations. Thus, all of the claims in the Underlying

22 MDL Complaint are clearly excluded.

23

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 18

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

4866-3003-8150, v. 1

**00123**

1    Although this exclusion concludes with an exception for a "**Claim** for a **Privacy Event** or

2    a **Network Security Event,**" neither category of "**Claim**" is alleged in the Underlying MDL

3    Complaint, and Avenue5 cannot meet its burden of showing that this exception applies.  This is

4    for the same reason that the claims in the Underlying MDL Complaint do not fall within Coverage

5    D.  Importantly, there is simply no allegation of any demand for class relief because Avenue5 and

6    its underlying co-defendants shared class members' "personal information" with others.

7    Therefore, the proceedings against Avenue5 are not "**for**" any matter that the Endurance Policy

8    defines as a "**Privacy Event**."

9    **F.    "Bad Faith," Consumer Protection Act, and Insurance Fair Conduct
         Act Claims Must be Dismissed, Due to Absence of Coverage or Duty**

10    Avenue5's tort claims against Endurance are not maintainable in the absence of coverage

11    or a duty to defend.  The Insurance Fair Conduct Act claim is necessarily dependent on Endurance

12    having "unreasonably denied" coverage or payment of benefits, and cannot be maintained here

13    because Endurance correctly denied coverage.  RCW 48.30.015. While bad faith and Consumer

14    Protection Act claims for specific discrete harms theoretically may be made in the absence of

15    coverage or a duty to defend, *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 165 Wn.2d 122, 133,

16    196 P.3d 664 (2008), Avenue5 does not actually allege wrongful conduct independent of

17    Endurance's allegedly wrongful denial of coverage, because there was none.  Unless Avenue5 can

18    point to a valid basis for maintaining a cause of action against Endurance in the absence of

19    coverage or a duty to defend, Avenue5's tort claims must also be dismissed.

20    **VI.    CONCLUSION**

21    The Underlying MDL Complaint does not fall within the Policy's Insuring Agreements for

22    either Professional Services Liability or for Privacy and Network Security Liability.    The

23

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 19

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

4866-3003-8150, v. 1

Underlying MDL Complaint is also clearly excluded by the Policy's antitrust exclusion, because antitrust is the sole basis for recovery in the Underlying MDL Complaint.  Because Endurance has no duty to defend and accordingly no coverage obligations regarding the Underlying MDL Complaint, Endurance respectfully requests that Plaintiffs' lawsuit be dismissed with prejudice.

Dated this 20th day of October, 2023.

FORSBERG & UMLAUF, P.S.

By: *s/Daniel L Syhre*
    Michael D. Handler, WSBA No. 25654
    Daniel L. Syhre, WSBA #34158
    Forsberg & Umlauf, P.S.
    901 5th Ave., Suite 1400
    Seattle, WA 98164
    Phone:    206-689-8500
    Email:    mhandler@foum.law
             dsyhre@foum.law
*Attorneys for Defendant Endurance American*
*Specialty Insurance Company*

In compliance with Local Court Rules, the above submission is certified to contain *5649* words.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT– 20

FORSBERG & UMLAUF, P.S.
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

4866-3003-8150, v. 1

00125

1

## **CERTIFICATE OF SERVICE**

2      The undersigned certifies under the penalty of perjury under the laws of the State of

3 Washington that I am now and at all times herein mentioned, a citizen of the United States, a

4 resident of the State of Washington, over the age of eighteen years, not a party to or interested in

5 the above-entitled action, and competent to be a witness herein.

6      On the date given below I caused to be served the foregoing ***DEFENDANT'S MOTION***

7 ***FOR SUMMARY JUDGMENT*** on the following individuals in the manner indicated:

8  Mr. Joseph M. Campos                    Mr. Gregory L. Dillion
   Mr. Zachary O. McIsaac                   Mr. Daniel S. Schneider
9  Ashbaugh Beal, LLP                       Newmeyer & Dillion LLP
   701 Fifth Ave., Suite 4400               895 Dove St., 2nd Floor
10 Seattle, WA  98104                       Newport Beach, CA  92660
   *Attorneys for Plaintiff's Counsel*       *Attorneys for Plaintiff's Counsel - Pro Hac*
11 (x)  Via King County Court Mandatory      *Vice*
        E-Service                           (x)  Via King County Court Mandatory
12                                               E-Service

13

14      **SIGNED** this 20th day of October, 2023, at Seattle, Washington.

15

16                              *s/Marissa C. Califano*
                               Marissa C. Califano

17

18

19

20

21

22

23

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

4866-3003-8150, v. 1

**00126**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**Honorable Brian McDonald**
**Hearing Date: Friday, November 10, 2023**
**Hearing Time: 11:00 a.m.**

IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

AVENUE5 PARTNERS LLC, a Delaware
limited liability company, and AVENUE5
RESIDENTIAL LLC, a Delaware limited
liability company,

           Plaintiffs,

    vs.

ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY, a Delaware
corporation,

          Defendant.

No. 23-2-11110-9 SEA

**[PROPOSED] ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

      This matter comes before the Court on Defendant Endurance American Specialty Insurance

Company's Motion for Summary Judgment. The Court, being fully advised and having reviewed

the case file and pleadings contained therein, oral argument, and having considered the following

materials:

      1.     Defendant's Motion for Summary Judgment;

      2.     Declaration of Daniel L. Syhre in Support of Defendant's Motion for Summary

Judgment;

      3.     _____;

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT –
1

4878-6920-1032, v. 1

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

00127

1    4.    _____ ;

2    5.    _____ ;

3    6.    _____ ;

4    7.    _____ .

5    IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Defendant's Motion for

6    Summary Judgment is GRANTED.

7    This action is dismissed with prejudice.

8    DATED this _____ of _____, 2023.

9    _____
     Honorable Brian McDonald

10

11   *Presented by:*
     FORSBERG & UMLAUF, P.S.

12

13   *s/Daniel L. Syhre*_____
     Michael D. Handler, WSBA #25654

14   Daniel L. Syhre, WSBA #34158
     *Attorneys for Defendant Endurance*

15   *American Specialty Insurance Company*

16

17

18

19

20

21

22

23

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT –
2

4878-6920-1032, v. 1

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164
(206) 689-8500 • (206) 689-8501 FAX

**00128**

| | |
|---|---|
| Case Number: | 23-2-11110-9 |
| Date: | August 29, 2024 |
| Serial ID: | 24-492776-6301724U2I |
| Certified By: | Catherine Cornwall |
| | King County Clerk, Washington |

I, CATHERINE CORNWALL, Clerk of the Superior Court of the State of Washington for King County, do hereby certify that this copy is a true and perfect transcript of said original as it appears on file and of record in my office and of the whole thereof. IN TESTIMONY WHEREOF, I have affixed this Seal of said Superior Court at my office at Seattle.





Catherine Cornwall, King County Clerk

**Instructions to recipient:** If you wish to verify the authenticity of the certified document that was transmitted by the Clerk, you must create and/or sign-in to your KC Script Portal account. Only e-certified documents that were directly ordered through the KC Script Portal can be verified through this tool.

Sign in to KC Script Portal:

**https://dja-prd-ecexap1.kingcounty.gov/**

After you login to your account, click Certified Copy Verification from the black ribbon menu at the top of the screen. There you will enter the following Serial ID.

Serial ID:    **24-492776-6301724U2I**

This document contains 23 page plus this sheet, and is a true and correct copy of the original that is of record in the King County Clerk's Office. The copy associated with Serial ID will be displayed by the Clerk.

**00129**

Case Number: 23-2-11110-9
Date: August 29, 2024
Serial ID: 24-492776-6301725H6K
Certified By: Catherine Cornwall
King County Clerk, Washington

ØŠÒÒ

ĠⅭ×ⅠⅣⅤⅥⅦⅧⅨⅩ⁄ⅤⅥⅦⅧⅨ⁄ⅣⅥⅡ⁄ⅦⅥⅢⅡⅢⅥⅢⅤⅥ⁄ⅢⅦⅠⅠⅦⅠⅦⅦⅠⅠⅦⅠⅦⅧ
SⅤⅦⅤⅠⅦ⁄ⅡⅤⅧⅡⅢ⁄UⅢⅦⅥⅢ▸VⅢⅦ
ÙⅦⅤÚⅦ▸ⅤⅡⅤ⁄ⅡⅢⅤÚⅦⅢUⅢⅦÚⅢVÃ⁄ÒŠÒÙⅤ
ÒⅡⅥⅩⅩÒÒ
ÔÒÛⅤ⁄ÒÃⅥⅩÇⅢ⁄ⅢÇⅧⅡⅦÇⅡ€ÉⅡÁⅤÛⅡÒⅢ

                                                            **Honorable Brian McDonald**

IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

AVENUE5 PARTNERS LLC, a Delaware
limited liability company, and AVENUE5
RESIDENTIAL LLC, a Delaware limited
liability company,

                Plaintiffs,

      vs.

ENDURANCE AMERICAN SPECIALTY
INSURANCE COMPANY, a Delaware
corporation,

                Defendant.

No. 23-2-11110-9 SEA

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY
JUDGMENT**

        This matter comes before the Court on Defendant Endurance American Specialty Insurance

Company's Motion for Summary Judgment and on Plaintiffs Avenue5 Partners LLC and Avenue5

Residential LLC's Motion for Partial Summary Judgment as to Liability and Declaratory Relief.

The Court, being fully advised and having reviewed the case file and pleadings contained therein,

hearing oral argument on December 8, 2023, and on January 26, 2024, and having considered the

following materials:

        1.      Amended Complaint for: (1) Breach of Contract; (2) Insurance Bad Faith;

(3) Violation of Consumer Protection Act; (4) Violation of the Insurance Fair Conduct Act; and

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND
DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT – 1

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

**00130**

(5) Declaratory Relief, and Exhibit A thereto;

2. Defendant's Answer to Amended Complaint;

3. Defendant's Motion for Summary Judgment;

4. Declaration of Daniel L. Syhre in Support of Defendants' Motion for Summary Judgment, and Exhibits thereto;

5. Plaintiffs' Opposition to Defendant's Motion for Summary Judgment;

6. Appendices "A" – "II" [to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment];

7. Declaration of Gregory L. Dillion in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, and Exhibits thereto;

8. Declaration of Stephanie Thornberg in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, and Exhibits thereto;

9. Request for Judicial Notice in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, Volumes 1-4, and Exhibits 1-33 thereto;

10. Defendant Endurance American Specialty Insurance Company's Reply in Support of its Motion for Summary Judgment;

11. Supplemental Declaration of Daniel L. Syhre in Support of Defendant's Motion for Summary Judgment;

12. Plaintiffs' Motion for Partial Summary Judgment as to Liability and Declaratory Relief;

13. Appendices "A" – "FF" [to Plaintiffs' Motion for Partial Summary Judgment as to Liability and Declaratory Relief];

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT – 2

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

00131

14.    Declaration of Gregory L. Dillion in Support of Plaintiffs' Motion for Partial Summary Judgment, and Exhibits thereto;

15.    Declaration of Stephanie Thornberg in Support of Plaintiffs' Motion for Partial Summary Judgment, and Exhibits thereto;

16.    Request for Judicial Notice in Support of Plaintiffs' Motion for Partial Summary Judgment, Volumes 1-4, and Exhibits 1-34 thereto;

17.    Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment as to Liability and Declaratory Relief;

18.    Plaintiffs' Reply in Support of Their Motion for Partial Summary Judgment as to Liability and Declaratory Relief;

19.    Appendix "GG" [to Plaintiffs' Reply in Support of Their Motion for Partial Summary Judgment as to Liability and Declaratory Relief];

20.    Declaration of Linda Kwon in Support of Plaintiffs' Reply in Support of Their Motion for Partial Summary Judgment, and Exhibit thereto;

21.    Declaration of Stephanie Thornberg in Support of Plaintiffs' Reply in Support of Their Motion for Partial Summary Judgment;

22.    Plaintiffs' Supplemental Brief Re: FTCA Section 5(a) [Dkt. 55];

23.    Appendices "HH" – "MM" [to Plaintiffs' Supplemental Brief Re: FTCA Section 5(a)];

24.    Defendant Endurance American [Specialty] Insurance Company's Response to Plaintiffs' Supplemental Brief Re: FTCA Section 5(a) [Dkt. 56];

25.    Plaintiffs' Motion to Strike a Portion of Defendant's Overlength Response to Plaintiffs' Supplemental Brief Re: FTCA Section 5(a), or for Alternative Relief;

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT – 3

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164
(206) 689-8500 • (206) 689-8501 FAX

**00132**

26.     Appendices "A" and "B" [to Plaintiffs' Motion to Strike a Portion of Defendant's Overlength Response to Plaintiffs' Supplemental Brief Re: FTCA Section 5(a), or for Alternative Relief];

27.     Declaration of Gregory L. Dillion in Support of Plaintiffs' Motion to Strike a Portion of Defendant's Overlength Response to Plaintiffs' Supplemental Brief Re: FTCA Section 5(a), or for Alternative Relief;

28.     Defendant's Response to Plaintiffs' Motion to Strike, and Appendices A & B thereto;

29.     Plaintiffs' Reply in Support of Their Motion to Strike a Portion of Defendant's Overlength Response to Plaintiffs' Supplemental Brief Re: FTCA Section 5(a), or for Alternative Relief;

30.     Appendix "NN" [to Plaintiffs' Reply in Support of Their Motion to Strike a Portion of Defendant's Overlength Response to Plaintiffs' Supplemental Brief Re: FTCA Section 5(a), or for Alternative Relief];

31.     Declaration of Gregory L. Dillion in Support of Plaintiffs' Motion to Strike a Portion of Defendant's Overlength Response to Plaintiffs' Supplemental Brief Re: FTCA Section 5(a), or for Alternative Relief;

32.     Supplemental Request for Judicial Notice in Support of Plaintiffs' Motion for Partial Summary Judgment, and Exhibit 35 thereto;

33.     [Plaintiffs'] Praecipe Re: Supplemental Request for Judicial Notice in Support of Plaintiffs' Motion for Partial Summary Judgment;

34.     Plaintiffs' Revised Supplemental Brief Re: FTCA Section 5(a);

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT – 4

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

**00133**

35.     Appendices "HH" – "RR" [to Plaintiffs' Revised Supplemental Brief Re: FTCA Section 5(a)]; and

36.     Defendant Endurance American Specialty Insurance Company's Response to Plaintiffs' Supplemental Brief Re: FTCA Section 5(a),

hereby orders as follows:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

(1)     Defendant Endurance American Specialty Insurance Company's Motion for Summary Judgment is GRANTED,

(2)     Plaintiffs' Motion for Partial Summary Judgment as to Liability and Declaratory Relief is DENIED,

and

(3)     Plaintiffs' above-titled action is DISMISSED, with prejudice,

for all of the reasons set forth by this Court on the record of proceedings on December 8, 2023, and January 26, 2024.

DATED this _____ of _____, 2024.


_____
Honorable Brian McDonald

*Presented by:*
FORSBERG & UMLAUF, P.S.

*s/Michael D. Handler*
Michael D. Handler, WSBA #25654
Daniel L. Syhre, WSBA #34158
*Attorneys for Defendant Endurance*
*American Specialty Insurance Company*

///

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND
DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT – 5

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON  98164
(206) 689-8500 • (206) 689-8501 FAX

00134

1

*Approved as to Form:*
NEWMEYER & DILLION LLP

2

*s/ Gregory L. Dillion*

3

Gregory L. Dillion (*pro hac vice*)
Daniel S. Schneider (*pro hac vice*)

4

*of Attorneys for Plaintiffs Avenue5 Partners
LLC and Avenue5 Residential LLC*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND
DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT – 6

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
901 FIFTH AVENUE • SUITE 1400
SEATTLE, WASHINGTON 98164
(206) 689-8500 • (206) 689-8501 FAX

**00135**

# King County Superior Court
## Judicial Electronic Signature Page

Case Number:     23-2-11110-9

Case Title:      AVENUE5 PARTNERS ET ANO VS ENDURANCE AMERICAN
                 SPECIALTY INS CO

Document Title:  ORDER OF DISMISSAL

Signed By:       Brian McDonald

Date:            February 12, 2024

---

Judge: Brian McDonald

This document is signed in accordance with the provisions in GR 30.

Certificate Hash:            EB2FC2BCB5DEBEA152D5B8D72B65DAFD8D8A64C1

Certificate effective date:  9/9/2019 6:12:37 PM

Certificate expiry date:     9/9/2024 6:12:37 PM

Certificate Issued by:       C=US, E=kcscefiling@kingcounty.gov, OU=KCDJA,
                             O=KCDJA, CN="Brian McDonald:
                             ylMMEpRJ6RGYICi3jC1lQQ=="

Page 7 of 7

00136

| Case Number: | 23-2-11110-9 |
|---|---|
| Date: | August 29, 2024 |
| Serial ID: | 24-492776-6301725H6K |
| Certified By: | Catherine Cornwall |
| | King County Clerk, Washington |

I, CATHERINE CORNWALL, Clerk of the Superior Court of the State of Washington for King County, do hereby certify that this copy is a true and perfect transcript of said original as it appears on file and of record in my office and of the whole thereof. IN TESTIMONY WHEREOF, I have affixed this Seal of said Superior Court at my office at Seattle.



Catherine Cornwall, King County Clerk



**Instructions to recipient:** If you wish to verify the authenticity of the certified document that was transmitted by the Clerk, you must create and/or sign-in to your KC Script Portal account. Only e-certified documents that were directly ordered through the KC Script Portal can be verified through this tool.

Sign in to KC Script Portal:

**https://dja-prd-ecexap1.kingcounty.gov/**

After you login to your account, click Certified Copy Verification from the black ribbon menu at the top of the screen. There you will enter the following Serial ID.

Serial ID:    **24-492776-6301725H6K**

This document contains 7 page plus this sheet, and is a true and correct copy of the original that is of record in the King County Clerk's Office.  The copy associated with Serial ID will be displayed by the Clerk.