**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **WILLOW BRIDGE PROPERTY COMPANY, LLC,** | § § § | |
| *Plaintiff*, | § § | **CIVIL ACTION NO. 3:24-cv-00029-D** |
| **v.** | § § | |
| **ARCH SPECIALTY INSURANCE COMPANY** | § § § | |
| *Defendant.* | § § | |

---

**DEFENDANT ARCH SPECALTY INSURANCE COMPANY'S**
**BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

Respectfully submitted,


**MAYER LLP**

750 N. Saint Paul Street, Suite 700
Dallas, Texas 75201
Telephone: (214) 379-4763
Telecopy: (214) 379-6939

**ATTORNEYS FOR DEFENDANT,**
**ARCH SPECIALTY INSURANCE COMPANY**

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................... 1

II.     FACTUAL SUMMARY ...................................................................................... 2

        A.      The MDL ................................................................................................. 2

        B.      The Policy ............................................................................................... 5

III.    SUMMARY OF ARGUMENT .......................................................................... 9

IV.     SUMMARY JUDGMENT EVIDENCE .......................................................... 10

V.      STANDARDS OF REVIEW ........................................................................... 10

        A.      Summary Judgment ............................................................................... 10

        B.      Duty to Defend ...................................................................................... 11

        C.      Duty to Indemnify ................................................................................. 11

        D.      General Principles of Contract Interpretation ....................................... 12

VI.     ARGUMENT AND AUTHORITY ................................................................... 13

        A.      The CAPs Do Not Allege A Wrongful Act ........................................... 13

                1.      *Conspiracy Requires Intent* ...................................................... 13

                2.      *Arch Has No Duty To Defend Or Indemnify LPC For Claims Of Intentional Conduct* ................................................................. 16

        B.      Consumer Protection Exclusion Unambiguously Precludes Coverage ......... 18

                1.      *"Consumer Protection Laws" is Unambiguous* ......................... 18

                2.      *"Unfair Trade Practices" Is Unambiguous* .............................. 20

VII.    CONCLUSION ................................................................................................ 22

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anderson v. Libby Lobby, Inc.*,
   477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).......................................................... 10

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985) ........................................................................................................................ 20

*Berry v. Indianapolis Life Ins. Co.*,
   2009 WL 424545 (N.D. Tex. Feb. 19, 2009) ............................................................................ 13

*Beverage v. Apple, Inc.*,
   101 Cal. App. 5th 736 (2024) ..................................................................................................... 19

*Brown v. Carlton*,
   2008 WL 11425361 (N.D. Tex. Mar. 3, 2008)........................................................................ 14

*Bunker's Glass Co. v. Pilkington plc*,
   47 P.3d 1119 (Ariz. Ct. App. 2002)........................................................................................... 19

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 265 (1986).............................................................. 11

*Coker v. Coker*,
   650 S.W.2d 391 (Tex. 1983) ...................................................................................................... 12

*Cruden Bay Holdings, LLC v. Jezierski*,
   2022 WL 447080 (N.D. Tex. Feb. 14, 2022) .......................................................................... 14

*D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co.*,
   300 S.W.3d 740 (Tex. 2009) ...................................................................................................... 11

*DeWitt Cty. Elec. Coop., Inc. v. Parks*,
   1 S.W.3d 96 (Tex. 1999) ............................................................................................................. 12

*Estate of Miranda v. Navistar, Inc.*,
   23 F.4th 500 (5th Cir. 2022) ...................................................................................................... 10

*Farmers Tex. Ins. Co. v. Griffin*,
   955 S.W.2d 81 (Tex. 1997) ........................................................................................................ 11

*Fed. Trade Comm'n v. Cement Inst.*,
    333 U.S. 683, 68 S. Ct. 793, 92 L. Ed. 1010 (1948).................................................................. 20

*Fiess v. State Farm Lloyds*,
    202 S.W.3d 744 (Tex. 2006) ............................................................................................... 13

*Firestone Steel Prods. Co. v. Barajas*,
    927 S.W.2d 608 (Tex. 1996) ............................................................................................... 14

*Fishman v. Est. of Wirtz*,
    807 F.2d 520 (7th Cir. 1986) .............................................................................................. 19

*Forbau v. Aetna Life Ins. Co.*,
    876 S.W.2d 132 (Tex. 1994) ............................................................................................... 12

*Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*,
    327 S.W.3d 118 (Tex. 2010) ............................................................................................... 12

*Golden Bridge Tech., Inc. v. Motorola, Inc.*,
    547 F.3d 266 (5th Cir. 2008) .............................................................................................. 20

*GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*,
    197 S.W.3d 305 (Tex. 2006) ............................................................................................... 11

*Hartford Cas. Ins. Co. v. DP Engineering, LLC*,
    827 F.3d 423 (5th Cir. 2016) .............................................................................................. 11

*Harville v. City of Houston*,
    945 F.3d 870 (5th Cir. 2019) .............................................................................................. 10

*Health Servs., Inc. v. Renaissance Women's Grp., P.A.*,
    121 S.W.3d 742 (Tex. 2003) ............................................................................................... 12

*Heyden Newport Chem. Corp. v. So. Gen. Ins. Co.*,
    387 S.W.2d 22 (Tex. 1965) ................................................................................................. 11

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    350 F. Supp. 2d 160 (D. Me. 2004)...................................................................................... 21

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    05-MD-1720 2024 WL 278565 (E.D.N.Y. Jan. 25, 2024)....................................................... 19

*In re Pork Antitrust Litig.*,
    495 F. Supp. 3d 753 (D. Minn. 2020)................................................................................... 21

*In re Revlimid & Thalomid Purchaser Antitrust Litig.*,
    2024 WL 2861865 (D.N.J. June 6, 2024)...................................................... 19

*Julh v. Airington*,
    936 S.W.2d 640 (Tex. 1996) ....................................................................... 14

*Loya Ins. Co. v. Avalos*,
    610 S.W.3d 878 (Tex. 2020) ....................................................................... 11

*Massey v. Armco Steel Co.*,
    652 S.W.2d 932 (Tex. 1983) ................................................................... 14, 15

*McCoy v. Valvoline*,
    568 F. Supp. 3d 666 (N.D. Tex. 2021) ....................................................... 11

*Nationwide Mutual Insurance Company v. Choi*, 2023 WL 4747388
    (S.D. Tex. July 25, 2023)......................................................................... 16, 17

*Nat'l Collegiate Athletic Ass'n Board of Regents of University of Oklahoma*,
    468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)................................... 19

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.*,
    907 S.W.2d 517 (Tex. 1995) ....................................................................... 12

*Open Cheer & Dance Championship Series, LLC v. Varsity Spirit, LLC*,
    2024 WL 1218573 (N.D. Tex. Mar 21, 2024).............................................. 19

*Piranha Partners v. Joe Neuoff*,
    596 S.W.3d 740 (Tex. 2020) ....................................................................... 12

*Reiter v. Sonotone Corp.*,
    442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)................................. 19

*Richards v. State Farm Lloyds*,
    597 S.W.3d 492 (Tex. 2020) ....................................................................... 12

*River Ins. Co. v. Rawlings Sporting Goods Co., Inc.*,
    2021 WL 346418 (C.D. Cal. Jan. 25, 2021)................................................ 21

*RSUI Indem. Co. v. The Lynd Co.*,
    466 S.W.3d 113 (Tex. 2015) ....................................................................... 12

*Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*,
    435 S.W.2d 854 (Tex. 1968) ....................................................................... 15

*Standard Oil Co. of New Jersey v. U.S.*,
    221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911)............................................................ 18

*Triplex Comms., Inc. v. Riley*,
    900 S.W.2d 716 (Tex. 1995) .................................................................. 14, 15

*U.S. v. Nat'l Lead Co.*,
    332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947)............................................. 14

*United States v. Vandebrake*,
    771 F. Supp. 2d 961 (N.D. Iowa 2011) ............................................................ 19

*Valance Op. Co. v. Dorsett*,
    164 S.W.3d 656 (Tex. 2005) ........................................................................ 13

*Wenske v. Ealy*,
    521 S.W.3d 791 (Tex. 2017) ........................................................................ 12

## Rules

Fed. R. Civ. P. 56................................................................................................ 1

Fed R. Civ. P. 56(a) ......................................................................................... 10

## Other Authorities

L.R. 7.1 ............................................................................................................. 1

LR 7.2 ................................................................................................................ 1

LR 56 ................................................................................................................. 1

**DEFENDANT ARCH SPECIALTY INSURANCE COMPANY'S
BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**COMES NOW**, Defendant Arch Specialty Insurance Company ("Arch"), and pursuant to Fed. R. Civ. P. 56, LR 7.1, LR 7.2, and LR 56.5, files this Brief in Support of its Motion for Summary Judgment as respects all claims and defenses, and would respectfully show the Court as follows:

## I.      INTRODUCTION

1.      This is an insurance coverage declaratory judgment action. Arch issued a professional liability insurance policy to LPC Multifamily Holdco LLC d/b/a Lincoln Property Company ("LPC"). LPC was sued in multi-district litigation (the "MDL") alleging price fixing, and violations of federal and state antitrust laws. The Class Action Plaintiffs ("CAPs") allege that LPC and others engaged in a nationwide conspiracy to limit supply and raise multifamily rental housing prices through the use of a software platform. They claim that LPC's actions were a *per se* unlawful restraint of trade under Section 1 of the Sherman Act.

2.      LPC sought defense from Arch in the MDL. The policy Arch issued to LPC covers **Wrongful Acts**, which are defined, in relevant part, as actual or alleged negligent acts, errors or omissions. But allegations that LPC participated in an unlawful conspiracy with others to fix prices and artificially suppress supply, ultimately violating federal and state trade laws, are not allegations of negligent acts, errors, or omissions. The CAPs do not allege that LPC engaged in *any* negligent act. Consequently, the policy's insuring agreement is not triggered.

3.      Even if the policy's insuring agreement was triggered, which it is not, the policy provides that Arch shall not pay for **Loss** (including **Defense Costs**) in connection with any **Claim**

for, based upon, arising from, or any in way related to unfair trade practices or violation of consumer protection laws. *All* of the claims in the MDL are for, based upon, arising from, or related to unfair trade practices or violations of consumer protection laws. As such, the claims are entirely excluded.

4.    Whether it is because the insuring agreement has not been triggered or because the claims are excluded, Arch is entitled to summary judgment that it has no duty to defend LPC.

5.    The CAPs do not allege any claims other than conspiracy to engage in price fixing, suppression of market supply, and violations of state and federal antitrust acts. Thus, the same reasons that preclude Arch's duty to defend preclude any possibility that it could ever have a duty to indemnify. The duty to indemnify is justiciable now. Arch is also entitled to summary judgment that it has no duty to indemnify.

6.    Arch respectfully requests that this Court grant its motion for summary judgment.

## II.    FACTUAL SUMMARY

### A.    The MDL

7.    The MDL is a consolidated class action styled *Jason Goldman, et al. v. Realpage, Inc., et al.*, Case No. 3:23-md-03071, in the United States District Court, Middle District of Tennessee. App., ECF 31, p. 1 ¶ 2; ECF 31-1.[1] Arch's insured, LPC, is named as an Owner-Operator defendant in the MDL. *See* ECF 31-1, p. 65 ¶ 141.

8.    In the MDL, class action plaintiffs ("CAP") allege:[2]

---

[1] For purposes of their motions for summary judgment, the Parties have stipulated to facts and evidence. *See* ECF 31, and attached Exhibits ECF 31-1 through 31-4.

[2] This brief contains a number of direct quotes from the MD, which is 297 pages long. Arch found it inappropriate to summarize the allegations. Arch extracted what it believes are the most relevant allegations for the Court's review. However, there are many other allegations in the MDL that establish why there are no **Wrongful Acts,** and why the claims are excluded.

. . . Defendants engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing across the country. . . . Defendants conspired to limit supply and raise multifamily rental housing prices, causing substantial damages to Plaintiffs and other members of the Class whose ability to obtain affordable housing depended on getting competitive pricing for the units they rented. . . .

ECF 31-1, pp. 3-4 ¶ 1.

Defendants are RealPage, the developer of an integrated technology platform that provides software solutions . . . and several owners and managers of large-scale multifamily residential apartment buildings that used RealPage's Revenue Management Solutions . . .[3]

ECF 31-1, p. 4 ¶ 2.

Use of RealPage's RMS was conditioned on contributing non-public, competitively sensitive data to RealPage's data pool. That was the bargain on offer -- to access the price-setting tool that promised revenue growth even in a down market, every member (including the Owners, Owner-Operators, and Managing Defendants) agreed to participate in the data co-operative and price their multifamily rental units according to RealPage's RMS. . . .

ECF 31-1, p. 5 ¶ 5.

**By using RealPage's RMS, each Owner, Owner-Operator, and Managing Defendant agreed with the overarching principles of the cartel that: (1) all members, who were otherwise horizontal competitors, would share proprietary data necessary for RealPage's RMS to generate price recommendations; (2) all members would delegate their rental price and supply decisions to a common decision maker, RealPage; and (3) knowing that cooperation was essential to the successful operation of scheme, all members would abide by RealPage's price and supply decisions generated by RMS.**

ECF 31-1, p. 6 ¶ 6. (Emphasis added).

_____

[3] The United States Department of Justice ("DOJ") has now sued RealPage in Case No. 1:24-cv-00710, in the United States District Court for the Middle District of North Carolina. In its Complaint, the DOJ asserts: "Landlords thus share their competitively sensitive information with RealPage with the understanding that RealPage's software will use the data to generate recommendations for rivals[.]" (p. 7 ¶ 16). "Rental housing is a necessity for many Americans, meaning that demand is inelastic[.] . . . There is significant concentration among landlords in local markets, and these landlords engage in widespread, regular communications with each other. And RealPage makes rental units more comparable to each other[.] . . . These industry characteristics exacerbate the harm to the competitive process -- and ultimately to renters -- from the exchange of nonpublic, competitively sensitive data through RealPage[.]" p. 28 ¶ 73.

Here, each Owner, Owner-Operator, and Managing Defendant knew that their competitors had accepted RealPage's invitation to participate in the agreement to fix the price of multifamily rental units, regulate supply, and interfere with the free market across the United States . . . **Defendants accepted RealPage's invitation to participate in the scheme**.

ECF 31-1, p. 7 ¶ 8. (Emphasis added).

The Owners, Owner-Operators, and Managing Defendants knew that their mutual access to the data available through their use of RealPage's RMS allowed them to price their units according to the collective goal of securing revenue lifts by increasing rents without regard for the typical market forces that drive supply and demand in a competitive marketplace.

ECF 31-1, p. 9 ¶ 11.

**Each Defendant knew that the plan, if carried out, would result in increased rents while restricting demand, and with this knowledge, each Owner, Owner-Operator, and Managing Defendant participated in the plan**. The Owner, Owner-Operator, and Managing Defendants all shared an interest in seeing that their competitors subscribed to RealPage's RMS pricing.

ECF 31-1, pp 9-10 ¶ 12. (Emphasis added).

Rents continued to rise while at the same time Defendants reported unprecedented earnings.

ECF 31-1, p. 11 ¶ 15.

**Defendants' price fixing conspiracy is a *per se* unlawful restraint of trade under Section 1 of the Sherman Act**. The Owners, Owner-Operators and Managing Defendants are competitors at the same level of market structure -- providers of multifamily rental units and/or the decision maker behind whether those properties will utilize RealPage's RMS to price its units -- who have engaged in concerted action in furtherance of the conspiracy, which has resulted in artificially inflated rent prices and a diminished supply of multifamily rental units throughout the United States.

ECF 31-1, p. 30 ¶ 43. (Emphasis added).

Vacancy rates rose because each Owner, Owner-Operator, and Managing Director could (and did) allow a larger share of their units to remain vacant, thereby artificially restricting supply, while maintaining higher rental prices across their properties. This behavior is only rational if Defendants know that their competitors

are setting rental prices using RealPage's RMS and thus would not attempt to undercut them.

ECF 31-1, p. 21 ¶ 31.

By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Lincoln agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation.

ECF 31-1, p. 66 ¶ 143.

9.      The CAPs explicitly assert that LPC's conduct in the price fixing conspiracy was a *per se* violation of Section 1 of the Sherman Act and state antitrust statutes. *See* ECF 31-1, pp. 276 - 278 ¶¶ 701 - 707; ECF 31-1, pp. 278 - 296  ¶¶ 708 -  757. The MDL is "based on violations of federal antitrust laws and state laws[.]" ECF 31-1, p. 2, preface.

**B.      The Policy**

10.      Arch issued policy number SPL0066403-01 to LPC Multifamily Holdco, LLC, effective for the period from April 1, 2022 to April 1, 2023 (the "Policy"). *See* ECF 31-2.

11.      The Policy provides liability coverage, subject to terms, conditions, and exclusions, in the amount of $5,000,000 for each claim, $5,000,000 aggregate limit of liability for each policy period, and subject to a $50,000 retention for each claim. ECF 31-2, p. 303.

12.      The Policy contains the following pertinent insuring agreement (form 00 MP0318 00 01 18):

**1.      INSURING AGREEMENTS**

**A.      REAL ESTATE DEVELOPER PROFESSIONAL LIABILITY**

The **Insurer** shall pay **Loss**, in excess of the Retention, on behalf of any **Insured** resulting from a **Claim** first made against such **Insured** during the **Policy Period** or **Extended Reporting Period**, if applicable, for a **Wrongful Act** committed on or subsequent to the

retroactive date.

ECF 31-2, p. 307.

…

13.    The Policy contains the following provisions:

**7.        LIMIT OF LIABILITY AND RETENTION**

**A**.    Subject to subparagraph B. below, the **Each Limit of Liability** specified in item 6.A of the Declarations shall be the maximum amount for each **Claim**.  . . .

**B**.    The **Aggregate Limit of Liability** specified in Item 6.B of the Declarations is the maximum aggregate amount that the **Insurer** shall pay for all **Loss** . . . under this Policy regardless of the number of **Claims** made. If the **Limit of Liability** is exhausted, the premium shall be fully earned.

**C**.    **Defense Costs** shall be part of, and not in addition to, each applicable **Limit of Liability**. Payment of **Defense Costs** by the **Insurer** shall reduce each applicable **Limit of Liability**.

**D**.    The **Insurer** shall pay covered **Loss** . . . arising from each **Claim** covered under this Policy only to the extent that each **Loss** is in excess of the applicable Retention specified in Item 6.C of the Declarations. The Retention shall be paid by the **Insured** and shall be applicable to each **Claim** and shall include all **Loss** . . . up to the Retention amount for each **Claim**.  The **Insurer** may at its sole discretion advance the payment of **Loss** within the Retention. Any **Loss** . . . paid by the **Insurer** pursuant to a duty to defend or otherwise that is within any applicable Retention shall be reimbursed by any **Insured** upon the **Insurer's** written request within 30 days.

**E**.    The **Insurer** shall pay covered **Loss** . . . only to the extent such **Loss** . . . exceed the applicable Retention. The Retention shall be borne by the **Insureds** uninsured at the **Insureds'** own risk.

…

ECF 31-2, p. 316 ¶ 7.

14.    The Policy contains the following relevant definitions:

\*\*\*

C.     **"Claim"** means any:

1.      written demand for monetary damages or non-monetary relief commenced by the receipt of any **Insured** of such demand;

2.      civil proceeding against any **Insured** for monetary or non-monetary relief commenced by the receipt by, or the service upon, any **Insured** of a complaint or similar proceeding;

3.      written request to an **Insured** to toll or waive a period or statute of limitations regarding a potential **Claim** as described in 1 or 2 above commenced by the receipt by such **Insured** of such request;

All **Claims** arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the earliest date that:

1.      any of such **Claims** was commenced, even if such date is before the **Policy Period**;

2.      notice of such **Wrongful Act** or any **Interrelated Wrongful Act** was given to the **Insurer** pursuant to Section 9.B; or

3.      notice of any fact, circumstance, or situation including such **Wrongful Act** or any **Interrelated Wrongful Act** was given under any prior policy of which this Policy is a renewal or replacement.

No coverage is provided for any **Claim** made, or deemed first made, before the **Policy Period**.

…

ECF 31-2, p. 337 (Endorsement 00 MPX0645 00 05 21).

F.     **"Defense Costs"** means reasonable and necessary fees and expenses incurred in the defense or appeal of a **Claim**. **Defense Costs** shall include the premium for any appeal, attachment, or similar bond, provided that the **Insurer** shall have no obligation to furnish such bond. **Defense Costs** exclude any compensation, benefit, expenses or overhead of, or paid to, any Insured.

ECF 31-2, p. 309 ¶ 3.F.

L.     **"Loss"** means **Defense Costs**, damages, settlements, judgments, pre- and post-judgment interest, and punitive, exemplary or multiple damages to the extent such damages are insurable under applicable law.

**Loss**, other than **Defense Costs**, excludes any:

1.    taxes, fines or penalties imposed by law;
2.    amount for which the **Insureds** are not liable or for which the claimants are without legal recourse to the Insureds;
3.    non-monetary or injunctive relief;
4.    fees, deposits, commissions or charges; or
5.    matters that are uninsurable pursuant to applicable law.

…

ECF 31-2, pp. 309 - 310 ¶¶ 3.L.

X.    **"Real Estate Development Services"** means Property Management, Asset Management, Construction Management, Development Management, Real Estate Brokerage, Sales and Leasing Services, Real Estate Advisory Services, Facilities Manages and Interior Design performed by the **Insured** for others for a fee or for owned properties without a fee and any other services described by endorsement (if applicable).

…

ECF 31-2, p. 328 (Endorsement No. 2).

AA.    **"Wrongful Act"** means any actual or alleged negligent act, error or omission, misstatement, misleading statement, breach of duty or neglect or **Personal Injury** committed by any Insured; or by any other person for whom the **Insured Organization** is legally responsible, solely in the performance of or failure to perform **Real Estate Development Services**.

ECF 31-2, p. 312 ¶ 3.AA.

15.    With respect to who is an insured, the Policy contains the following definitions:

It is agreed that Section **3, DEFINITIONS, H.** Insured is amended to add:

Lincoln Property Company

…

ECF 31-2, p. 331 (Endorsement No. 5).

16.    The Policy contains the following pertinent exclusion:

6.    **EXCLUSIONS**

The **Insurer** shall not pay **Loss** or **Non-Party Investigation Expenses**:

…
**X**.    in connection with any **Claim** for, based upon, arising from or in any way related to unfair trade practices or violation of consumer protection laws.

ECF 31-1, p. 315 (the "Consumer Protection Exclusion").

### III.    SUMMARY OF ARGUMENT

17.    The Policy covers **Wrongful Acts**. In relevant part, **Wrongful Acts** means actual or alleged negligent acts, errors, or omissions. The CAPs do not allege that LPC engaged in any negligent acts, errors, or omissions. They allege that LPC and others conspired to utilize a software platform to engage in a conspiracy to "fix and inflate the price of multifamily rental housing across the country." They claim that LPC and the other defendants' conduct in price fixing and artificially inflating multi-family housing prices was anti-competitive, unlawful, a *per se* unlawful restraint of trade under Section 1 of the Sherman Act and state antitrust statutes. In other words, the CAPs allege that LPC acted intentionally. The Policy's insuring agreement is not triggered as a threshold matter, and LPC has no duty to defend LPC.

18.    Even if the CAPs alleged a **Wrongful Act**, which they do not, the allegations are based upon, arising from, or related to violations of federal antitrust laws and state antitrust statutes. These are consumer protection laws. Accordingly, the Consumer Protection Exclusion also precludes a duty to defend.

19.    There are no other claims. For the same reasons there is no duty to defend, there is no possibility that Arch could ever have a duty to indemnify LPC in the MDL. No set of facts can transform an intentional conspiracy to price fix and artificially set market conditions into a

negligent act, error, or omission.

20.    There is no genuine issue of material fact. Arch respectfully requests that the Court

grant its motion for summary judgment.

## IV.    <u>SUMMARY JUDGMENT EVIDENCE</u>

21.    Arch relies upon the following summary judgment evidence, to which the parties

have stipulated:[4]

| |
|---|
| Second Amended Consolidated Class Action Complaint in the lawsuit styled *Jason Goldman, et al. v. Realpage, Inc., et al.*, Case No. 3:23-md-03071, in the United States District Court, Middle District of Tennessee (ECF 31-1) |
| Arch policy number SPL0066403-01, issued to LPC Multifamily Holdco, LLC, effective for the period from April 1, 2022 to April 1, 2023 (ECF 31-2) |

## V.    <u>STANDARDS OF REVIEW</u>

### A.    **Summary Judgment**

22.    Summary judgment is proper "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." FED R. CIV. P.

56(a); *Estate of Miranda v. Navistar, Inc*., 23 F.4th 500, 503 (5th Cir. 2022). A fact is material if

it might affect the outcome of the suit, and a factual dispute is genuine if the evidence is such that

a reasonable jury could return a verdict for the nonmovant. *Id*.; *see also Harville v. City of Houston*,

945 F.3d 870, 874 (5th Cir. 2019).

23.    Although courts resolve reasonable doubts and draw reasonable inferences in the

light most favorable to the non-movant, the court need not comb the record in search of evidence

that creates a genuine issue of material fact. *Anderson v. Libby Lobby, Inc*., 477 U.S. 242, 248, 106

---

[4] Arch stipulated to the authenticity and admissibility of two declination letters. *See* Exs. 31-3 and 31-4. While it does not contest that the documents are what they purport to be, it does not intend to use these documents in its briefing as they are outside the eight corners and therefore not relevant to the issues before the Court.

S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *McCoy v. Valvoline*, 568 F. Supp. 3d 666, 673-74 (N.D. Tex. 2021). The non-moving party has a duty to designate evidence in the record that establishes that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 344, 106 S. Ct. 2548, 91 L. Ed. 265 (1986); *McCoy*, 568 F. Supp. 3d at 674.

**B.    Duty to Defend**

24.    An insurer's duty to defend is generally governed by the eight-corners rule. *Heyden Newport Chem. Corp. v. So. Gen. Ins. Co*., 387 S.W.2d 22, 24 (Tex. 1965). Texas courts usually determine whether an insurer has a duty to defend by comparing the underlying petition to the insurance policy. *Loya Ins. Co. v. Avalos*, 610 S.W.3d 878, 879 (Tex. 2020). An insurer's duty to defend is determined without regard to the truth or falsity of the allegations, and without reference to facts either otherwise known or ultimately proven. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006).

**C.    Duty to Indemnify**

25.    An insurer's duties to defend and indemnify are separate and distinct. *Hartford Cas. Ins. Co. v. DP Engineering, LLC*, 827 F.3d 423, 430 (5th Cir. 2016). While the duty to defend is based upon the pleadings, the duty to indemnify is based upon the actual facts. *D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co*., 300 S.W.3d 740, 744 (Tex. 2009). The duty to indemnify usually cannot be determined until after adjudication of the underlying lawsuit. *Farmers Tex. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997). However, in *Griffin*, the Texas Supreme Court explicitly recognized that where the same reasons that negate the duty to defend likewise negate any possibility that the insurer will ever have a duty to indemnify, the issue is ripe for adjudication even before the conclusion of the underlying lawsuit. *Id*.

**D.    General Principles of Contract Interpretation**

26.    Under Texas law, insurance policies are construed in accordance with the rules and principles of contract law. *Richards v. State Farm Lloyds,* 597 S.W.3d 492, 497 (Tex. 2020). Courts "consider the entire agreement and, to the extent possible, resolve any conflicts by harmonizing the agreement's provisions, rather than by applying arbitrary or mechanical default rules." *Piranha Partners v. Joe Neuoff*, 596 S.W.3d 740, 744 (Tex. 2020) (citing *Wenske v. Ealy*, 521 S.W.3d 791, 792 (Tex. 2017)). The contract itself is the best representation of what the parties mutually intended. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010).

27.    If a contract is so written that it can be given definite or certain legal meaning, then it is unambiguous. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). It is only when language of a policy is subject to two or more reasonable interpretations that it is ambiguous. *Id.* Whether a contract is ambiguous is a question of law for the court. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). Lack of clarity does not create an ambiguity, and "not every difference in the interpretation of a contract . . . amounts to ambiguity. *See Univ. Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003) (citing *Forbau v. Aetna Life Ins. Co*., 876 S.W.2d 132, 134 (Tex. 1994)). An ambiguity arises *only* when an agreement is susceptible to more than one reasonable meaning, after the application of established rules of contract construction. *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). The court should adopt a construction that favors the insured *only* where there is uncertainty. *RSUI Indem. Co. v. The Lynd Co*., 466 S.W.3d 113, 118 (Tex. 2015).

28.    The terms of a contract are given their plain, ordinary, generally accepted meaning unless the contract itself redefines those terms or shows that they should be used in a technical or

different sense. *Valance Op. Co. v. Dorsett,* 164 S.W.3d 656, 662 (Tex. 2005). Courts are allowed to use dictionaries in determining a word's plain, ordinary, and generally accepted meaning. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 n.8 (Tex. 2006).

## VI.    ARGUMENT AND AUTHORITY

**A.    The CAPs Do Not Allege A Wrongful Act**

### *1.    Conspiracy Requires Intent*

29.    A comparison of the allegations in the MDL, with the coverage available under the Policy, establishes that the Policy's insuring agreement is not triggered. The Policy provides that the "**Insurer** shall pay **Loss** . . . on behalf of any **Insured** resulting from a **Claim** first made against such **Insured** during the **Policy Period** or **Extended Reporting Period**, if applicable, for a **Wrongful Act[.]**" ECF 31-2, p. 307.

> **Wrongful Act** means any actual or alleged *negligent* act, error or omission, misstatement, misleading statement, breach of duty or neglect or **Personal Injury** committed by any Insured; or by any other person for whom the **Insured Organization** is legally responsible, solely in the performance of or failure to perform **Real Estate Development Services**.

ECF 31-2, p. 312 ¶ 3.AA (emphasis added).

30.    The CAPs do not allege that LPC made an actual or alleged *negligent* act, error or omission, misstatement, misleading statement, breach of duty or neglect or personal injury. Rather, they allege that LPC engaged in *intentional* price fixing and conspiracy with others, in violation of the Sherman Act and violation of state anti-trust statutes. *See, e.g.,* ECF 31-1, pp. 276 - 278 ¶¶ 701 - 707; ECF 31-1, pp. 278 - 296 ¶¶ 708 - 757; ECF 31-1, preface.

31.    Conspiracy is not a standalone claim. *Berry v. Indianapolis Life Ins. Co*., 2009 WL 424545, *5 (N.D. Tex. Feb. 19, 2009). Rather, it depends on participation in some underlying tort. *Id*. The Texas Supreme Court has held that "[t]he essential elements [of civil conspiracy] are: (1)

two or more persons; (2) an object to be accomplished; (3) **a meeting of the minds on the object or course of action**; (4) **one or more unlawful, overt acts**; and (5) damages as the proximate result." *Massey v. Armco Steel Co*., 652 S.W.2d 932, 934 (Tex. 1983) (emphasis added); *see also Brown v. Carlton*, No. 3:07-cv-1367, 2008 WL 11425361, at *4 (N.D. Tex. Mar. 3, 2008) (applying the elements of conspiracy as outlined by the Texas Supreme Court in *Massey*).[5] "Civil conspiracy requires specific intent" to agree "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Massey,* 652 S.W.2d at 934. **Because negligence by definition is not an intentional wrong, one cannot agree or conspire to be negligent**. *Julh v. Airington*, 936 S.W.2d 640 (Tex. 1996); *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996) ("Because a conspiracy requires intent, parties cannot conspire to be negligent."); *Triplex Comms., Inc. v. Riley*, 900 S.W.2d 716, 719, n.2 (Tex. 1995) ("[W]e recognize that a conspiracy cannot be based on negligence."). This Court has held that "[f]or the alleged conspirators to have a meeting of the minds, there must be an agreement among them and each must have a **specific intent** to commit the act." *Cruden Bay Holdings, LLC v. Jezierski*, No. 3:21-cv-01170, 2022 WL 447080, at *5 (N.D. Tex. Feb. 14, 2022) (emphasis added).

32.    In *Triplex*, the Texas Supreme Court considered whether a radio station could be held liable under theories of joint enterprise, civil conspiracy, and negligent promotion for personal injury arising out of a nightclub's violations of Texas's dram shop act. 900 S.W.2d at 717. The radio station assigned a DJ to perform live remote broadcasts during a weekly event. *Id*. The DJ witnessed intoxication and was aware of underage drinking. *Id*. One evening, an underage patron was served 10 alcoholic beverages and subsequently involved in an automobile accident. *Id*. at

---

[5] Violations of Section 1 of the Sherman Act are civil, and not criminal, conspiracies. *See U.S. v. Nat'l Lead Co*., 332 U.S. 319, 338, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947).

718. Another patron was served 16 or 17 drinks, left the event, and hit the scene of the first accident. *Id*. In relevant part, two injured police officers sued the club and radio station for civil conspiracy. *Id*.

33.     The trial court submitted a definition of "civil conspiracy" to the jury to which the officers objected. *Id* at 718. The jury found there was no civil conspiracy, and the officers appealed. *Id*. The court of appeals agreed with the officers, holding that the definition of "civil conspiracy" the trial court submitted to the jury was erroneous. *Id*. at 719. The definition required the jury to find that the parties "intended to accomplish an unlawful or negligent purpose or to accomplish a lawful purpose by unlawful or negligent means." *Id*.

34.     The Texas Supreme Court disagreed with the court of appeals. It reiterated that "[t]he requested question and definition are consistent with this Court's prior decisions relating to civil conspiracy." *Id*. (citing *Massey*, 652 S.W.2d at 934). "The 'gist of a civil conspiracy' is the injury that is intended to be caused." *Triplex*, 900 S.W.2d at 720 (citing *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp*., 435 S.W.2d 854, 856 (Tex. 1968). "One 'cannot agree, either expressly or tacitly, to the commission of a wrong which he knows not of.'" *Triplex*, 900 S.W.2d at 720 (citing *Schlumberger*, 435 S.W.2d at 857). "For a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the inception of the combination or agreement." *Id*. Put another way, "parties cannot engage in a civil conspiracy to be negligent." *Triplex*, 900 S.W.2d 721, fn 2 (emphasis added).

35.     In the MDL, the CAPs do not allege that LPC or any other defendant was negligent. The CAPs allege that these parties acted intentionally. Specifically, they allege that the Owners, Owner-Operators, and Managers conspired -- which they could not do negligently in any event -- to fix multifamily rental housing prices and artificially suppress supply. LPC and the others

allegedly took an overt act in furtherance of the conspiracy when they "agree[d] to fix, increase, maintain, or stabilize rents at artificially high levels, which injured Plaintiffs and members of the Class; exchange[d] . . . competitively sensitive information . . . and participate[d] in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached." ECF 31-1, pp. 278-279 ¶ 710. The CAPs do not allege a **Wrongful Act**. As such, the Policy's insuring agreement is not triggered.

### 2. *Arch Has No Duty To Defend Or Indemnify LPC For Claims Of Intentional Conduct*

36.     Since the CAPs allege only intentional conduct and do not assert that LPC engaged in any **Wrongful Act**, Arch has no duty to defend or indemnify LPC.

37.     In *Nationwide Mutual Insurance Company v. Choi*, the United States District Court for the Southern District of Texas considered whether an insurer had duties to defend and indemnify Choi and Ng. 4:22-cv-01231, 2023 WL 4747388 (S.D. Tex. July 25, 2023), *aff'd*, No. 23-20405, 2024 WL 2131515 (5th Cir. 2024). Like the Policy Arch issued to LPC, the policies in *Choi* covered negligent conduct. *Id*. at *2 ("The policies cover negligent conduct[.]"). The underlying plaintiff alleged that Choi and Ng participated in a scheme to steal Bitcoin. *Id*. In its analysis, the court stated: "The intentional nature of the conduct described is quite clear." *Id*. It determined that the conduct was neither negligent nor accidental, and was outside the scope of the policies' insuring agreements. *Id*.

38.     In *Choi*, the underlying plaintiff included an alternative allegation of negligence. *Id*. The court held that in context, the word "negligence" did not change the crux of the conduct from intentional to accidental. *See id*. It stated: "[The petition] describes the elaborate

correspondence with the original thief that would be required to make such transfers[.] It contains no description of accidental or negligent conduct." *Id*. Since there was no claim even potentially within the scope of coverage, the court held that Nationwide had no duty to defend or indemnify Choi and Ng. *Id*. at *3.

39.     On appeal, the Fifth Circuit affirmed the lower court's decision, stating:

An insurer must defend its insured if a plaintiff's factual allegations potentially support a covered claim, while facts actually established in the underlying suit determine whether the insurer must indemnify its insured.

The policy issued by Nationwide required it to defend and indemnify a claim against the insureds for damages based on an "occurrence" arising from negligent personal acts. . . . The underlying lawsuit against Choi and Ng alleges only intentional acts. We reject the argument that a particular paragraph in the complaint should be interpreted as claiming negligence. Therefore Nationwide has no duty to defend.

The duty to indemnify is justiciable before the insured's liability is determined in the liability lawsuit when the insurer has no duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify*. . . . That court later explained that its decision in *Griffin* "was grounded on the impossibility that the drive-by shooting in that case could be transformed by proof of any conceivable set of facts into an auto accident covered by the insurance policy." There is a similar impossibility that this claim based on theft of property can be transformed into a negligence case.

2024 WL 2131515 at *1 (internal citations omitted).

40.     As in *Choi*, the CAPs allege in the MDL that LPC and others had a meeting of the minds and participated in a scheme. ECF 31-1, p. 7 ¶ 8. The alleged actions LPC and others took in furtherance of the scheme were deliberate and intentional. *See, e.g*., ECF 31-1, pp. 278-279 ¶ 710. Unlike *Choi*, however, the CAPs do not allege that LPC's actions were negligent or accidental. In this respect, the case at hand is considerably clearer.

41.     The Policy covers **Wrongful Acts**, which it defines as "actual or alleged *negligent* act[s], error[s] or omission[s]." ECF 31-2, p. 307. The CAPs do not allege any of these. Since there

is no claim within the scope of the Policy's insuring agreement, Arch is entitled to summary judgment that it has no duty to defend LPC in the MDL.

42.     Further, the same reasons that negate its duty to defend negate any possibility that Arch will ever have a duty to indemnify. A conspiracy to engage in price fixing, market suppression, and anti-trade violations is not negligent, and could never be a **Wrongful Act**. As a result, the duty to indemnify is justiciable now. Arch is entitled to summary judgment that is has no duty to indemnify LPC for any judgment LPC may face in the MDL.

**B.     The Consumer Protection Exclusion Unambiguously Precludes Coverage**

43.     Even if there were a claim within the scope of the Policy's insuring agreement, which there is not, Arch has no duty to defend LPC in the Underlying Lawsuit. According to the Policy, Arch shall not pay Loss or Non-Party Investigation Expense, "in connection with any **Claim** for, based upon, arising from or in any way related to unfair trade practices or violation of consumer protection laws." ECF 31-1, p. 315. Arch is unaware of any Texas court, or any court in any jurisdiction, that has construed the exact exclusion at issue. However, the phrases "consumer protection laws" and "unfair trade practices" are unambiguous. The claims in the MDL fall squarely within the Consumer Protection Exclusion, and Arch has no duty to defend or indemnify LPC.

### 1.     *"Consumer Protection Laws" is Unambiguous*

44.     There is no straight-faced argument that the allegations in the MDL are not related to "consumer protection laws." The CAPs explicitly assert that LPC's conduct in the price fixing conspiracy is a *per se* violation of Section 1 of the Sherman Act and state antitrust statutes. *See* ECF 31-1, pp. 276 - 278 ¶¶ 701 - 707; ECF 31-1, pp. 278 - 296  ¶¶ 708 -  757.

45.     The purpose of the Sherman Act is to protect consumers. *See, e.g., Standard Oil*

*Co. of New Jersey v. U.S.*, 221 U.S. 1, 78, 31 S.Ct. 502, 55 L.Ed. 619 (1911) ("In applying remedies . . . the fact must not be overlooked that injury to the public by the prevention of an undue restraint on, or the monopolization of, trade or commerce, is the foundation upon which the prohibitions of the [Sherman Act] rest, and moreover that one of the fundamental purposes of the statute is to protect, not to destroy, rights of property."); *Nat'l Collegiate Athletic Ass'n Board of Regents of University of Oklahoma*, 468 U.S. 85, 107, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("Congress designed the Sherman Act as a 'consumer welfare prescription'") (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)); *see also United States v. Vandebrake*, 771 F. Supp. 2d 961, 1001 (N.D. Iowa 2011), aff'd, 679 F.3d 1030 (8th Cir. 2012) ("the Sherman Act was aimed at protecting competition in America's free-enterprise system, and in doing so, protecting consumer welfare"); *Fishman v. Est. of Wirtz*, 807 F.2d 520, 570 (7th Cir. 1986) ("the purpose of antitrust is to protect consumers' welfare"); *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, No. CV 19-7532 (ES) (MAH), 2024 WL 2861865, at *54 (D.N.J. June 6, 2024) (Congress designed the Sherman Act to protect consumers or purchasers of goods in a market); *Open Cheer & Dance Championship Series, LLC v. Varsity Spirit, LLC*, No. 2:23- cv-0155, 2024 WL 1218573, at *4 (N.D. Tex. Mar 21, 2024); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2024 WL 278565, at *7 (E.D.N.Y. Jan. 25, 2024) ("The purpose of antitrust law is to protect consumers, markets, and competition"); *Beverage v. Apple, Inc.*, 101 Cal. App. 5th 736, 751–52 (2024) (discussing that federal and state antitrust laws are intended protect and promote competition for the benefit of consumers); *Bunker's Glass Co. v. Pilkington plc*, 47 P.3d 1119, 1124 (Ariz. Ct. App. 2002) (the purpose of antitrust laws is to protect consumers). The point it sends is that "a business must find new customers and higher profits through internal expansion — that is, by competing successfully rather than

arranging treaties with its competitors. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585, 600 (1985). To establish a violation, a plaintiff must allege 1) defendants engaged in a conspiracy, 2) the conspiracy had the effect of restraining trade, and 3) trade was restrained in the relevant marketplace. *Id*. A "conspiracy" is a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Golden Bridge Tech., Inc. v. Motorola, Inc*., 547 F.3d 266, 271 (5th Cir. 2008).

46.     The CAPs expressly allege that the MDL is "based on violations of federal antitrust laws and state laws[.]" ECF 31-1, p. 2, preface. It cannot possibly be any clearer that the allegations against LPC in the MDL are in connection with, based upon, arising from, or related to a **Claim** for unfair trade practices or violation of consumer protection laws. To the extent the Court determines the CAPs allege a **Wrongful Act** against LPC, the Consumer Protection Exclusion precludes Arch's duty to defend.

### 2.     *"Unfair Trade Practices" Is Unambiguous*

47.     The phrase "unfair trade practices" is likewise unambiguous. Here, the CAPs allege that LPC's actions are a per se violation of Section 1 of the Sherman Act and state antitrust statutes. *See* ECF 31-1, pp. 276 - 278 ¶¶ 701 - 707; ECF 31-1, pp. 278 - 296  ¶¶ 708 -  757.

48.     The Consumer Protection Exclusion provides that Arch shall not pay **Loss** or **Non-Party Investigation Expense**, "in connection with any **Claim** for, based upon, arising from or in any way related to unfair trade practices or violation of consumer protection laws." ECF 31-1, p. 315. This exclusion is incredibly broad, and not limited to antitrust claims.

49.     All violations of the Sherman Act constitute unfair trade practices.  *Fed. Trade Comm'n v. Cement Inst*., 333 U.S. 683, 694, 68 S. Ct. 793, 800, 92 L. Ed. 1010 (1948) ("all conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of

the Trade Commission Act"); *see also In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 787 (D. Minn. 2020); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 184 (D. Me. 2004).

50.     It is true that some policy exclusions expressly address either only the Sherman Act, or only antitrust claims. *See, e.g., Jas. River Ins. Co. v. Rawlings Sporting Goods Co., Inc.*, 19-6658, 2021 WL 346418 (C.D. Cal. Jan. 25, 2021).  However, these cases are distinguishable. In *Rawlings*, the exclusion at issue was an "Anti-Trust Exclusion." *Id*. at *4. The issue in the case was whether the exclusion had both an antitrust component and a consumer protection component. *Id*. at *5. The court determined that it did not. *Id*. at *7. Although the court determined that the phrase "unfair trade practices" was ambiguous, it did so within the confines of that case: <u>only anti-trust violations were excluded</u>, not consumer protection violations. *Id*. In other words, the holding cannot be simply extrapolated to this case.

51.     The Policy contains a broad Consumer Protection Exclusion. It is not restricted to claims brought under the Sherman Act. However, claims brought under the Sherman Act are plainly encompassed by the Consumer Protection Exclusion, as the Sherman Act is a consumer protection statute.

52.     The CAPs do not allege any potentially covered claims. Arch has no duty to defend, and the same reason that precludes its duty to defend precludes any possibility that it could ever have a duty to indemnify. No fact that is developed in the MDL can transform a claim based upon, arising from, or related to a violation of consumer protection laws into a potentially covered claim. The duty to indemnify is justiciable now. Arch has no duty to indemnify LPC against any judgment in the MDL.

## VII.    <u>CONCLUSION</u>

The Class Action Plaintiffs sued LPC and a group of other defendants for allegedly utilizing a software platform to engage in a conspiracy to "fix and inflate the price of multifamily rental housing across the country." They claim that LPC and the other defendants' conduct in price fixing and artificially inflating multi-family housing prices was anti-competitive, unlawful, and a *per se* unlawful restraint of trade under Section 1 of the Sherman Act and state antitrust statutes.

The Policy covers **Wrongful Acts**, which means negligent acts. The CAPs do not allege LPC acted negligently. There are no claims within the scope of coverage, and Arch has no duty to defend or indemnify LPC.

Even if the Court finds that the CAPs alleged a **Wrongful Act**, the Consumer Protection Exclusion precludes a duty to defend, and any possibility Arch will ever have a duty to indemnify.

**WHEREFORE, PREMISES CONSIDERED,** Arch respectfully requests that the court grant its motion for summary judgment, enter judgment that it has no duty to defend or indemnify LPC, and for such other and further relief, in law and in equity, for which it shall be justly entitled and for which it shall ever pray.

Respectfully submitted,


By: */s/ Summer L. Frederick*

**ROBERT J. WITMEYER**
State Bar No. 24091174
Rwitmeyer@mayerllp.com
**SUMMER L. FREDERICK**
State Bar No. 24067764
Sfrederick@mayerllp.com

**MAYER LLP**

750 N. Saint Paul Street, Suite 700
Dallas, Texas 75201
Telephone: (214) 379-4763
Telecopy: (214) 379-6939

**ATTORNEYS FOR DEFENDANT,
ARCH SPECIALTY INSURANCE COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of August 2024, I served a true and correct copy of the

foregoing document on counsel of record using the Court's ECF filing service:

J. Mark Chevallier
McGuire, Craddock & Strother, PC
500 N. Ackard Street, Suite 2200
Dallas, Texas 75201
Telephone:     214-954-6860
Facsimile:     214-954-6868
mchevallier@mcslaw.com

       -and-

Julie L. Hammerman
Thompson Hammerman Davis LLP
1717 K St., NW, Suite 900
Washington, DC 20006
Telephone:     202-536-7529
Facsimile:     202-318-5356
jhammerman@thompsonhd.com

***Counsel for Plaintiff***
***Willow Bridge Property Company LLC***


                                  */s/ Summer L. Frederick*
                                    **SUMMER L. FREDERICK**