IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **WILLOW BRIDGE PROPERTY COMPANY, LLC,** | § § § | |
| *Plaintiff,* | § § | **CIVIL ACTION NO. 3:24-cv-00029-D** |
| **v.** | § § | |
| **ARCH SPECIALTY INSURANCE COMPANY** | § § § | |
| *Defendant.* | § § § | |

---

**DEFENDANT ARCH SPECIALTY INSURANCE COMPANY'S
BRIEF IN SUPPORT OF ITS RESPONSE TO PLAINTIFF WILLOW BRIDGE
PROPERTY COMPANY, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Respectfully submitted,

**MAYER LLP**

750 N. Saint Paul Street, Suite 700
Dallas, Texas 75201
Telephone: (214) 379-4763
Telecopy: (214) 379-6939

**ATTORNEYS FOR DEFENDANT,
ARCH SPECIALTY INSURANCE COMPANY**

## TABLE OF CONTENTS

I.    BASIS FOR OPPOSITION ........................................................ 1

II.   OBJECTIONS............................................................................ 2

    A.    Objection To "Undisputed" Material Facts In LPC's Brief In Support Of Its PMSJ ......................................................................... 2

    B.    Objection To Exhibits A And B In LPC's Appendix .................................... 4

III.  FACTUAL SUMMARY ............................................................ 4

    A.    The MDL ........................................................................... 4

    B.    The Policy ......................................................................... 6

IV.   SUMMARY OF ARGUMENT .................................................. 10

V.    SUMMARY JUDGMENT EVIDENCE .................................... 12

VI.   STANDARDS OF REVIEW .................................................... 12

    A.    Summary Judgment ................................................................ 12

    B.    Duty To Defend ................................................................... 12

    C.    General Principles Of Contract Interpretation ......................................... 13

VII.  ARGUMENT AND AUTHORITY ............................................ 14

    A.    It Is LPC's Burden To Prove There Is A Claim Within The Scope Of Coverage As A Threshold Matter ..................................................... 14

        1.    *LPC Does Not Argue That The MDL Triggers Coverage Under The Policy* ......................................................................... 14

        2.    *There Are No Allegations Of A Wrongful Act* ...................................... 16

    B.    The Consumer Protection Exclusion Precludes Coverage ............................. 18

        1.    *The Consumer Protection Exclusion Is Unambiguous* ................................ 18

        2.    *Language In Other Policies Does Not Control* ...................................... 20

        3.    *Inapposite Cases From Other Jurisdictions Do Not Control* .......................... 22

**4. *The Exclusion Is Not Ambiguous, But LPC Has Not Provided A Cogent Construction If It Claims Otherwise*** ................................................................... 24

**VIII.    CONCLUSION** ................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              Pages(s)

*Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) ........................ 22

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
   472 U.S. 585 (1985) ............................................................................................... 20

*Berry v. Indianapolis Life Ins. Co.,*
   2009 WL 424545 (N.D. Tex. Feb. 19, 2009) ......................................................... 17

*Big Bridge Holdings, Inc. v. Twin City Fire Insurance Company* , 132 F. Supp.3d 982
   (N.D. Ill. 2015) ...................................................................................................... 24

*Brown v. Carlton,*
   2008 WL 11425361 (N.D. Tex. Mar. 3, 2008)........................................................ 17

*Burlington N. & Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh,*
   394 S.W.3d 228 (Tex. App.—El Paso 2012, pet. denied)........................................ 15

*Coker v. Coker,*
   650 S.W.2d 391 (Tex. 1983) ................................................................................... 14

*Cruden Bay Holdings, LLC v. Jezierski,*
   2022 WL 447080 (N.D. Tex. Feb. 14, 2022) .......................................................... 18

*DeWitt Cty. Elec. Coop., Inc. v. Parks,*
   1 S.W.3d 96 (Tex. 1999) ......................................................................................... 14

*Estate of Miranda v. Navistar, Inc.,*
   23 F.4th 500 (5th Cir. 2022) ................................................................................... 12

*Fed. Trade Comm'n v. Cement Inst.,*
   333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948).................................................. 20

*Fiess v. State Farm Lloyds,*
   202 S.W.3d 744 (Tex. 2006) ................................................................................... 14

*Firestone Steel Prods. Co. v. Barajas,*
   927 S.W.2d 608 (Tex. 1996) ................................................................................... 17

*Fontenot v. Upjohn Co.,*
   780 F.2d 1190 (5th Cir. 1986) ................................................................................ 13

*Forbau v. Aetna Life Ins. Co.*,
    876 S.W.2d 132 (Tex. 1994) ................................................................. 14

*Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*,
    327 S.W.3d 118 (Tex. 2010) ................................................................. 13

*Great Am. Ins. Co. v. Primo*,
    512 S.W.3d 890 (Tex. 2017) ................................................................. 14

*GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*,
    197 S.W.3d 305 (Tex. 2006) ................................................................. 13

*Harville v. City of Houston*,
    945 F.3d 870 (5th Cir. 2019) ................................................................. 12

*Health Servs., Inc. v. Renaissance Women's Grp., P.A.*,
    121 S.W.3d 742 (Tex. 2003) ................................................................. 14

*Heyden Newport Chem. Corp. v. So. Gen. Ins. Co.*,
    387 S.W.2d 22 (Tex. 1965) ................................................................. 13

*In re Pork Antitrust Litig.*,
    495 F. Supp.3d 753 (D. Minn. 2020) ..................................................... 20

*Integra Telecom, Inc. v. Twin City Fire Insurance Company*,
    2010 WL 1753210 (D. Or. April 29, 2010) ....................................... 23, 24

*James River Insurance Company v. Rawlings Sporting Goods Company, Inc.*,
    2021 WL 346418 (C.D. Cal. 2021) ....................................................... 23

*Julh v. Airington*,
    936 S.W.2d 640 (Tex. 1996) ................................................................. 17

*Loya Ins. Co. v. Avalos*,
    610 S.W.3d 878 (Tex. 2020) ................................................................. 13

*Massey v. Armco Steel Co.*,
    652 S.W.2d 932 (Tex. 1983) ................................................................. 17

*Nat'l Collegiate Athletic Ass'n Board of Regents of University of Oklahoma*,
    468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) .............................. 20

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.*,
    907 S.W.2d 517 (Tex. 1995) ................................................................. 14

*Northfield Ins. Co. v. Loving Home Care, Inc.*,
  363 F.3d 523 (5th Cir. 2004) ........................................................................ 15

*Open Cheer & Dance Championship Series, LLC v. Varsity Spirit, LLC*,
  2024 WL 1218573 (N.D. Tex. Mar 21, 2024) .............................................. 20

*Piranha Partners v. Joe Neuoff*,
  596 S.W.3d 740 (Tex. 2020) ........................................................................ 13

*Princeton Excess & Surplus Lines Ins. Co. v. A.H.D. Houston, Inc.*,
  84 F.4th 274 (5th Cir. 2023) ........................................................................ 15

*Quality Auto Painting Center of Roselle, Inc. v. State Farm Indem. Co.*,
  917 F.3d 1249 ................................................................................................ 20

*Ragas v. Tennessee Gas Pipeline Co.*,
  136 F.3d 455 (5th Cir. 1998) ........................................................................ 16

*Reiter v. Sonotone Corp.*,
  442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ................................... 20

*Reserve Ins. Co. v. Pisciotta*,
  30 Cal.3d 800 (1982) .................................................................................... 24

*Richards v. State Farm Lloyds*,
  597 S.W.3d 492 (Tex. 2020) ........................................................................ 13

*RSR Corp. v. Int'l Ins. Co.*,
  612 F.3d 851 (5th Cir. 2010) ........................................................................ 13

*RSUI Indem. Co. v. The Lynd Co.*,
  466 S.W.3d 113 (Tex. 2015) .................................................................. 14, 25

*Shamoun & Norman, LLP v. Ironshore Indem., Inc.*,
  56 F. Supp.3d 840 (N.D. Tex. 2014) ............................................................ 15

*Standard Oil Co. of New Jersey v. U.S.*,
  221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911) ........................................... 19

*State Farm Lloyds v. Richards*,
  966 F.3d 389 (5th Cir. 2020) ........................................................................ 15

*Triplex Comms., Inc. v. Riley*,
  900 S.W.2d 716 (Tex. 1995) ........................................................................ 18

*U.S. v. Nat'l Lead Co.*,
   332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947)..................................................... 17

*Valance Op. Co. v. Dorsett*,
   164 S.W.3d 656 (Tex. 2005) ........................................................................................ 14

*Wenske v. Ealy*,
   521 S.W.3d 791 (Tex. 2017) ........................................................................................ 13

**Rules**

Fed. R. Civ. P. 56 ............................................................................................................... 1

Fed R. Civ. P. 56(a) ........................................................................................................... 12

LR 7.1 .................................................................................................................................. 1

LR 7.2 .................................................................................................................................. 1

LR 56 ................................................................................................................................... 1

**DEFENDANT ARCH SPECIALTY INSURANCE COMPANY'S
BRIEF IN SUPPORT OF ITS RESPONSE TO PLAINTIFF WILLOW BRIDGE
PROPERTY COMPANY, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**COMES NOW**, Defendant Arch Specialty Insurance Company ("Arch"), and pursuant to FED. R. CIV. P. 56, LR 7.1, LR 7.2, and LR 56.5, files this Brief in Support of its Response to Plaintiff Willow Bridge Property Company, LLC's ("LPC") (Arch and LPC are sometimes referred to herein as the "Parties") Motion for Partial Summary Judgment ("PMSJ")[1], and would respectfully show the Court as follows:

## I.      BASIS FOR OPPOSITION

1.      In its PMSJ, LPC advises the Court that the Parties agree there is a single, case-dispositive issue: whether Arch can meet its burden to establish the applicability of the Consumer Protection Exclusion. This is incorrect. The Parties *do not* agree there is only one issue before the Court. As discussed below, Arch objects to LPC's use of a cherry-picked portion of the parties' Agreed Stipulations of Fact to support a premise upon which the parties did not, and do not, agree.

2.      It is a tenet of Texas insurance law that it is the insured's burden to establish that there is a claim within the scope of coverage before the burden shifts to the insurer to show that coverage is excluded. In its PMSJ, LPC does not do so. Instead, it glosses over the Policy's insuring agreement and fails to address its burden at all. LPC's analysis begins with an exclusion without ever addressing the threshold issue of coverage. LPC did not, and cannot, establish there is coverage under the Policy. As a result, its PMSJ should be denied.

3.      Even if the Consumer Protection Exclusion is the starting point for the Court's

---

[1] LPC seeks a ruling only on Arch's duty to defend.

analysis, LPC cannot prevail. Based upon a comparison of the Policy and the allegations in the MDL, Arch can prove that the Consumer Protection Exclusion precludes its duty to defend.

4.      The arguments LPC presents to explain why the Consumer Protection Exclusion does not apply are fatally flawed. LPC's argument that the Consumer Protection Exclusion does not apply to antitrust violations because the exclusion is short, is nonsensical and fails. The exclusion applies to violations of consumer protection laws and unfair trade practices. The Sherman Act is a consumer protection law. All violations of the Sherman Act constitute unfair trade practices. For the same reason, LPC's argument that the Consumer Protection Exclusion does not apply because it does not expressly reference the Sherman Act fails. The Consumer Protection Exclusion is clear and unambiguous, and precludes Arch's duty to defend.

5.      Whether it is because the insuring agreement has not been triggered or because the claims are excluded, there are no claims potentially within the scope of coverage. Arch has no duty to defend. LPC is not entitled to summary judgment.

6.      Arch respectfully requests that this Court deny LPC's PMSJ.

## II.      OBJECTIONS

### A.      Objection To "Undisputed" Material Facts In LPC's Brief In Support Of Its PMSJ

7.      The Parties filed Stipulated Material Facts (the "Stipulations") on August 9, 2024, wherein they stipulated to facts and evidence for purposes of summary judgment. *See* ECF 31. In its PMSJ, LPC presents what it has titled a "STATEMENT OF UNDISPUTED MATERIAL FACTS." ECF 35, pp. 3 – 5.

8.       Arch objects to Paragraph 17 of LPC's Statement of Undisputed Material Facts (ECF 35, p. 5 ¶ 17), which states:

> The parties agree that Arch's duty to defend the Antitrust Suits turns on the interpretation and applicability of Exclusion X. SMF ¶ 16.

9.      Paragraph 17 of LPC's "Undisputed Material Facts" references only half of a stipulation, which makes it misleading and untrue. The entire stipulation reads: "**If the Court finds that that the MDL Plaintiffs allege Wrongful Acts**, the parties agree that Arch's duty to defend the Antitrust Suits turns on the interpretation and applicability of Exclusion X." ECF 31, p. 3 ¶ 16 (emphasis added). It is clear that the parties *did not* stipulate that there is one issue. Rather, they agreed that the Court must first address whether the MDL contains allegations of Wrongful Acts. If it determines there were allegations of Wrongful Acts, the Parties agree there is only one exclusion at issue.

10.     The filings in this case illustrate that LPC understands there are two issues: the insuring agreement and the exclusion. On May 9, 2024, Arch filed its Original Answer to Plaintiff's Second Amended Complaint, wherein it asserted trigger of coverage as an affirmative defense. ECF 24, p. 15 ¶ 57. On August 5, 2024, Arch filed a Motion for Leave to File a First Amended Answer ("MFL"). ECF 30. Arch seeks to amend one paragraph of its Answer to conform it with the remainder of Arch's Answer and its affirmative defense regarding trigger. The MFL contains a certificate of conference that is an entire page long, detailing communications between the parties over a number of days. *Id*. at p. 9. LPC filed a response in opposition to Arch's MFL on August 12, 2014. ECF 32. The Parties filed their Stipulations after Arch filed its MFL. *See* ECF 31. LPC was aware that the parties *did not* agree that whether Arch has a duty to defend is limited to the applicability of an exclusion when the Parties filed their Stipulations, and when LPC filed its PMSJ.

11.     Arch respectfully requests that the Court note its objection to Paragraph 17 of LPC's Statement of Undisputed Material Facts because it does not include the entire stipulation.

A cherry-picked portion of a statement is not an "undisputed" material fact.

**B.    Objection To Exhibits A And B In LPC's Appendix**

12.    The Parties agree that this is an eight-corners case. They stipulated to relevant facts and evidence. Oddly, however, LPC attached a complaint from a different case (ECF 35-1, Ex A, pp. Appx 00001 – 00105) and a dispositive motion from that case (ECF 35-1, Ex. B, Appx 00106 – 00129) as exhibits to its PMSJ. These exhibits are not proper in an eight-corners analysis because they are not case law and are outside the eight corners. Arch respectfully requests that the Court note Arch's objection to Exhibits A and B, included with LPC's appendix, and decline to consider them.

### III.    FACTUAL SUMMARY

**A.    The MDL**

13.    LPC sought defense and indemnify from Arch in a consolidated class action styled *Jason Goldman, et al. v. Realpage, Inc., et al.*, Case No. 3:23-md-03071, in the United States District Court, Middle District of Tennessee (the "MDL"). ECF 31, p. 1 ¶ 2; ECF 31-1. LPC is named as an Owner-Operator defendant in the MDL. *See* ECF 31-1, p. 65 ¶ 141.

14.    In the MDL, class action plaintiffs ("CAP") allege:

. . . Defendants engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing across the country. . . . Defendants conspired to limit supply and raise multifamily rental housing prices, causing substantial damages to Plaintiffs and other members of the Class whose ability to obtain affordable housing depended on getting competitive pricing for the units they rented. . . .

ECF 31-1, pp. 3-4 ¶ 1.

Defendants are RealPage, the developer of an integrated technology platform that provides software solutions . . . and several owners and managers of large-scale multifamily residential apartment buildings that used RealPage's Revenue Management Solutions . . .

ECF 31-1, p. 4 ¶ 2.

Use of RealPage's RMS was conditioned on contributing non-public, competitively sensitive data to RealPage's data pool. That was the bargain on offer -- to access the price-setting tool that promised revenue growth even in a down market, every member (including the Owners, Owner-Operators, and Managing Defendants) agreed to participate in the data co-operative and price their multifamily rental units according to RealPage's RMS. . . .

ECF 31-1, p. 5 ¶ 5.

**By using RealPage's RMS, each Owner, Owner-Operator, and Managing Defendant agreed with the overarching principles of the cartel that: (1) all members, who were otherwise horizontal competitors, would share proprietary data necessary for RealPage's RMS to generate price recommendations; (2) all members would delegate their rental price and supply decisions to a common decision maker, RealPage; and (3) knowing that cooperation was essential to the successful operation of scheme, all members would abide by RealPage's price and supply decisions generated by RMS.**

ECF 31-1, p. 6 ¶ 6. (Emphasis added).

Here, each Owner, Owner-Operator, and Managing Defendant knew that their competitors had accepted RealPage's invitation to participate in the agreement to fix the price of multifamily rental units, regulate supply, and interfere with the free market across the United States . . . **Defendants accepted RealPage's invitation to participate in the scheme**.

ECF 31-1, p. 7 ¶ 8. (Emphasis added).

The Owners, Owner-Operators, and Managing Defendants knew that their mutual access to the data available through their use of RealPage's RMS allowed them to price their units according to the collective goal of securing revenue lifts by increasing rents without regard for the typical market forces that drive supply and demand in a competitive marketplace.

ECF 31-1, p. 9 ¶ 11.

**Each Defendant knew that the plan, if carried out, would result in increased rents while restricting demand, and with this knowledge, each Owner, Owner-Operator, and Managing Defendant participated in the plan.** The Owner, Owner-Operator, and Managing Defendants all shared an interest in seeing that their competitors subscribed to RealPage's RMS pricing.

ECF 31-1, pp 9-10 ¶ 12. (Emphasis added).

Rents continued to rise while at the same time Defendants reported unprecedented earnings.

ECF 31-1, p. 11 ¶ 15.

>  **Defendants' price fixing conspiracy is a *per se* unlawful restraint of trade under Section 1 of the Sherman Act**. The Owners, Owner-Operators and Managing Defendants are competitors at the same level of market structure -- providers of multifamily rental units and/or the decision maker behind whether those properties will utilize RealPage's RMS to price its units -- who have engaged in concerted action in furtherance of the conspiracy, which has resulted in artificially inflated rent prices and a diminished supply of multifamily rental units throughout the United States.

ECF 31-1, p. 30 ¶ 43. (Emphasis added).

>  Vacancy rates rose because each Owner, Owner-Operator, and Managing Director could (and did) allow a larger share of their units to remain vacant, thereby artificially restricting supply, while maintaining higher rental prices across their properties. This behavior is only rational if Defendants know that their competitors are setting rental prices using RealPage's RMS and thus would not attempt to undercut them.

ECF 31-1, p. 21 ¶ 31.

>  By agreeing to regularly share confidential, competitively sensitive pricing and lease information with horizontal competitors in order to allow them to adjust prices, Lincoln agreed to join a cartel with those horizontal competitors. The conspiracy resulted in higher prices for multifamily residential leases across the nation.

ECF 31-1, p. 66 ¶ 143.

15.    The CAPs explicitly assert that LPC's conduct in the price fixing conspiracy was a *per se* violation of Section 1 of the Sherman Act and state antitrust statutes. *See* ECF 31-1, pp. 276 - 278 ¶¶ 701 - 707; ECF 31-1, pp. 278 - 296  ¶¶ 708 - 757. The MDL is "based on violations of federal antitrust laws and state laws[.]" ECF 31-1, p. 2, preface.

**B.    The Policy**

16.    Arch issued policy number SPL0066403-01 to LPC Multifamily Holdco, LLC,

effective for the period from April 1, 2022 to April 1, 2023 (the "Policy"). *See* ECF 31-2.

17.     The Policy provides liability coverage, subject to terms, conditions, and exclusions, in the amount of $5,000,000 for each claim, $5,000,000 aggregate limit of liability for each policy period, and subject to a $50,000 retention for each claim. ECF 31-2, p. 303.

18.     The Policy contains the following pertinent insuring agreement (form 00 MP0318 00 01 18):

**1.     INSURING AGREEMENTS**

    **A.     REAL ESTATE DEVELOPER PROFESSIONAL LIABILITY**

        The **Insurer** shall pay **Loss**, in excess of the Retention, on behalf of any **Insured** resulting from a **Claim** first made against such **Insured** during the **Policy Period** or **Extended Reporting Period**, if applicable, for a **Wrongful Act** committed on or subsequent to the retroactive date.

ECF 31-2, p. 307.

    …

19.     The Policy contains the following provisions:

**7.     LIMIT OF LIABILITY AND RETENTION**

    **A**.     Subject to subparagraph B. below, the **Each Limit of Liability** specified in item 6.A of the Declarations shall be the maximum amount for each **Claim**.  . . .

    **B**.     The **Aggregate Limit of Liability** specified in Item 6.B of the Declarations is the maximum aggregate amount that the **Insurer** shall pay for all **Loss** . . . under this Policy regardless of the number of **Claims** made. If the **Limit of Liability** is exhausted, the premium shall be fully earned.

    **C**.     **Defense Costs** shall be part of, and not in addition to, each applicable **Limit of Liability**. Payment of **Defense Costs** by the **Insurer** shall reduce each applicable **Limit of Liability**.

    **D**.     The **Insurer** shall pay covered **Loss** . . . arising from each **Claim** covered under this Policy only to the extent that each **Loss** is in excess of the applicable Retention specified in Item 6.C of the Declarations. The Retention shall be paid by

the **Insured** and shall be applicable to each **Claim** and shall include all **Loss** . . . up to the Retention amount for each **Claim**. The **Insurer** may at its sole discretion advance the payment of **Loss** within the Retention. Any **Loss** . . . paid by the **Insurer** pursuant to a duty to defend or otherwise that is within any applicable Retention shall be reimbursed by any **Insured** upon the **Insurer's** written request within 30 days.

E.    The **Insurer** shall pay covered **Loss** . . . only to the extent such **Loss** . . . exceed the applicable Retention. The Retention shall be borne by the **Insureds** uninsured at the **Insureds'** own risk.

…

ECF 31-2, p. 316 ¶ 7.

20.    The Policy contains the following relevant definitions:

\*\*\*

C.    **"Claim"** means any:

1.    written demand for monetary damages or non-monetary relief commenced by the receipt of any **Insured** of such demand;
2.    civil proceeding against any **Insured** for monetary or non-monetary relief commenced by the receipt by, or the service upon, any **Insured** of a complaint or similar proceeding;
3.    written request to an **Insured** to toll or waive a period or statute of limitations regarding a potential **Claim** as described in 1 or 2 above commenced by the receipt by such **Insured** of such request;

All **Claims** arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the earliest date that:

1.    any of such **Claims** was commenced, even if such date is before the **Policy Period**;
2.    notice of such **Wrongful Act** or any **Interrelated Wrongful Act** was given to the **Insurer** pursuant to Section 9.B; or
3.    notice of any fact, circumstance, or situation including such **Wrongful Act** or any **Interrelated Wrongful Act** was given under any prior policy of which this Policy is a renewal or replacement.

No coverage is provided for any **Claim** made, or deemed first made,

before the **Policy Period**.

…

ECF 31-2, p. 337 (Endorsement 00 MPX0645 00 05 21).

    F.    **"Defense Costs"** means reasonable and necessary fees and expenses incurred in the defense or appeal of a **Claim**. **Defense Costs** shall include the premium for any appeal, attachment, or similar bond, provided that the **Insurer** shall have no obligation to furnish such bond. **Defense Costs** exclude any compensation, benefit, expenses or overhead of, or paid to, any Insured.

ECF 31-2, p. 309 ¶ 3.F.

    L.    **"Loss"** means **Defense Costs**, damages, settlements, judgments, pre- and post-judgment interest, and punitive, exemplary or multiple damages to the extent such damages are insurable under applicable law.

    **Loss**, other than **Defense Costs**, excludes any:

    1.    taxes, fines or penalties imposed by law;
    2.    amount for which the **Insureds** are not liable or for which the claimants are without legal recourse to the Insureds;
    3.    non-monetary or injunctive relief;
    4.    fees, deposits, commissions or charges; or
    5.    matters that are uninsurable pursuant to applicable law.

…

ECF 31-2, pp. 309 - 310 ¶¶ 3.L.

    X.    **"Real Estate Development Services"** means Property Management, Asset Management, Construction Management, Development Management, Real Estate Brokerage, Sales and Leasing Services, Real Estate Advisory Services, Facilities Manages and Interior Design performed by the **Insured** for others for a fee or for owned properties without a fee and any other services described by endorsement (if applicable).

…

ECF 31-2, p. 328 (Endorsement No. 2).

    AA.    **"Wrongful Act"** means any actual or alleged negligent act, error or

> omission, misstatement, misleading statement, breach of duty or neglect or **Personal Injury** committed by any Insured; or by any other person for whom the **Insured Organization** is legally responsible, solely in the performance of or failure to perform **Real Estate Development Services**.

ECF 31-2, p. 312 ¶ 3.AA.

21.    With respect to who is an insured, the Policy contains the following definitions:

> It is agreed that Section **3, DEFINITIONS, H.** Insured is amended to add:
>
> Lincoln Property Company
>
> …

ECF 31-2, p. 331 (Endorsement No. 5).

22.    The Policy contains the following pertinent exclusion:

**6.    EXCLUSIONS**

> The **Insurer** shall not pay **Loss** or **Non-Party Investigation Expenses**:
>
> …
>
> **X**.    in connection with any **Claim** for, based upon, arising from or in any way related to unfair trade practices or violation of consumer protection laws.

ECF 31-1, p. 315 (the "Consumer Protection Exclusion").

## IV.    <u>SUMMARY OF ARGUMENT</u>

23.    The first step of a coverage analysis is for the insured to establish that there is a claim potentially within the scope of coverage. In its PMSJ, LPC skips this step and entirely sidesteps its burden. It does not identify any claims in the MDL that may potentially be covered. It wholly fails to address, much less meet, its burden. On this basis, LPC's PMSJ should be denied.

24.    There are no claims that are potentially within the scope of coverage. The Policy covers **Loss . . .** resulting from a **Claim** . . . for a **Wrongful Act**.  In relevant part, **Wrongful Act**

means actual or alleged negligent acts, errors, or omissions. The CAPs do not allege that LPC engaged in any negligent acts, errors, or omissions. They allege LPC and others conspired to utilize a software platform to engage in a conspiracy to "fix and inflate the price of multifamily rental housing across the country." They claim LPC and the other defendants' conduct in price fixing and artificially inflating multi-family housing prices was anti-competitive, unlawful, a *per se* unlawful restraint of trade under Section 1 of the Sherman Act and state antitrust statutes. In other words, the CAPs allege LPC acted intentionally. The Policy's insuring agreement is not triggered.

25.     Insurers bear the burden to prove the applicability of exclusions only after the insured proves the existence of a potentially covered claim. As noted, LPC does not even attempt to meet its burden. Instead, it starts with the premise that the burden rests with Arch, and argues that the Consumer Protection Exclusion does not apply. But even if the Court begins with the exclusion, LPC cannot prevail. As discussed below, Arch can establish that the exclusion applies.

26.     Further, the reasons LPC claims the Consumer Protection Exclusion does not apply are meritless. LPC seeks the Court to find that the antitrust claims made the basis of the MDL fall outside the ambit of the Consumer Protection Exclusion either 1) because the exclusion is brief, or 2) because the exclusion does not use the word "antitrust." It provides no legal support for either proposition. Arch is aware of no such support. The Consumer Protection Exclusion broadly applies to violations of consumer protection laws and unfair trade practices. The Sherman Act is a consumer protection law. All conduction that violates the Sherman Act is an unfair trade practice. The Consumer Protection Exclusion unambiguously precludes coverage for all of the claims in the MDL. Thus, even if the MDL contained any allegations of Wrongful Acts, which it does not, the claims would be excluded.

27.     There is no genuine issue of material fact. Arch respectfully requests that the Court

deny LPC's PMSJ.

## V.    SUMMARY JUDGMENT EVIDENCE

28.    Arch relies upon the following summary judgment evidence, to which the parties

have stipulated:

| |
|---|
| Second Amended Consolidated Class Action Complaint in the lawsuit styled *Jason Goldman, et al. v. Realpage, Inc., et al.*, Case No. 3:23-md-03071, in the United States District Court, Middle District of Tennessee (ECF 31-1) |
| Arch policy number SPL0066403-01, issued to LPC Multifamily Holdco, LLC, effective for the period from April 1, 2022 to April 1, 2023 (ECF 31-2) |

## VI.    STANDARDS OF REVIEW

### A.    Summary Judgment

29.    Summary judgment is proper "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." FED R. CIV. P.

56(a); *Estate of Miranda v. Navistar, Inc.*, 23 F.4th 500, 503 (5th Cir. 2022). A fact is material if

it might affect the outcome of the suit, and a factual dispute is genuine if the evidence is such that

a reasonable jury could return a verdict for the nonmovant. *Id.*; *see also Harville v. City of Houston*,

945 F.3d 870, 874 (5th Cir. 2019).

30.    To demonstrate the absence of a genuine dispute of material fact, the movant must

point to competent evidence in the record, and "articulate precisely how this evidence supports his

claim." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). If the movant bears the

burden of proof on an issue, either because he is the plaintiff or because he is asserting an

affirmative defense, he must establish all of the essential elements of his claim or defense to

warrant judgment in his favor. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

### B.    Duty To Defend

31.    An insurer's duty to defend is generally governed by the eight-corners rule. *Heyden*

*Newport Chem. Corp. v. So. Gen. Ins. Co.*, 387 S.W.2d 22, 24 (Tex. 1965). Texas courts usually determine whether an insurer has a duty to defend by comparing the underlying petition to the insurance policy. *Loya Ins. Co. v. Avalos*, 610 S.W.3d 878, 879 (Tex. 2020). An insurer's duty to defend is determined without regard to the truth or falsity of the allegations, and without reference to facts either otherwise known or ultimately proven. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006).

C.    **General Principles Of Contract Interpretation**

32.    Under Texas law, insurance policies are construed in accordance with the rules and principles of contract law. *Richards v. State Farm Lloyds*, 597 S.W.3d 492, 497 (Tex. 2020). Courts "consider the entire agreement and, to the extent possible, resolve any conflicts by harmonizing the agreement's provisions, rather than by applying arbitrary or mechanical default rules." *Piranha Partners v. Joe Neuoff*, 596 S.W.3d 740, 744 (Tex. 2020) (citing *Wenske v. Ealy*, 521 S.W.3d 791, 792 (Tex. 2017)). The contract itself is the best representation of what the parties mutually intended. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010).

33.    If a contract is written so that it can be given definite or certain legal meaning, then it is unambiguous. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). It is only when language of a policy is subject to two or more reasonable interpretations that it is ambiguous. *Id.*; *see also Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 895 (Tex. 2017) (concluding there is no coverage based upon the plain language of a policy exclusion). Whether a contract is ambiguous is a question of law. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). Lack of clarity does not create an ambiguity, and "not every difference in the interpretation of a contract . . . amounts to ambiguity. *See Univ. Health Servs., Inc. v. Renaissance*

*Women's Grp., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003) (citing *Forbau v. Aetna Life Ins. Co.*, 876

S.W.2d 132, 134 (Tex. 1994)). An ambiguity arises *only* when an agreement is susceptible to more

than one reasonable meaning, after the application of established rules of contract construction.

*DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). **The court should adopt a**

**construction that favors the insured *only* where there is uncertainty**. *RSUI Indem. Co. v. The*

*Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015).

34.     The terms of a contract are given their plain, ordinary, generally accepted meaning

unless the contract itself redefines those terms or shows that they should be used in a technical or

different sense. *Valance Op. Co. v. Dorsett,* 164 S.W.3d 656, 662 (Tex. 2005). Courts are allowed

to use dictionaries in determining a word's plain, ordinary, and generally accepted meaning. *Fiess*

*v. State Farm Lloyds*, 202 S.W.3d 744, 746 n.8 (Tex. 2006).

## VII.     ARGUMENT AND AUTHORITY

### A.     It Is LPC's Burden To Prove There Is A Claim Within The Scope Of Coverage As A Threshold Matter

#### 1.     *LPC Does Not Argue That The MDL Triggers Coverage Under The Policy*

35.     Texas law is clear: it is the insured's initial burden to establish there is a claim

potentially within the scope of coverage. *Princeton Excess & Surplus Lines Ins. Co. v. A.H.D.*

*Houston, Inc.*, 84 F.4th 274, 281 (5th Cir. 2023); *State Farm Lloyds v. Richards*, 966 F.3d 389,

393 (5th Cir. 2020); *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 528 (5th Cir.

2004); *Shamoun & Norman, LLP v. Ironshore Indem., Inc.*, 56 F. Supp.3d 840 (N.D. Tex. 2014)

("The insured bears the initial burden to establish that its claim falls within the scope of coverage

provided by the policy. Should the insured establish a right to coverage, the burden then shifts to

the insurer to demonstrate that the claim is subject to a policy exclusion.") (citing *Burlington N. &*

*Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 394 S.W.3d 228, 232 (Tex. App.—El

Paso 2012, pet. denied)). Only after the insured establishes that there is a claim potentially within the scope of coverage does the burden shift to the insurer to show the applicability of an exclusion. *See Princeton*, 84 F.4th at 281; *Richards*, 966 F.3d at 393.

36.     In its PMSJ, LPC correctly notes that the Policy covers "Loss . . . resulting from a Claim first made . . . during the Policy Period . . . for a Wrongful Act[.]" ECF 35, p. 4 ¶ 10; *Id.* at p. 6; *see also* ECF 31-2, p. 307. LPC correctly cites the Policy's definition of **Wrongful Act**, as "any actual or alleged negligent act, error or omission, misstatement, misleading statement, breach of duty or neglect . . . solely in the performance of or failure to perform Real Estate Development Services." ECF 35, p. 4 ¶ 12; *see also* ECF 31-2, p. 312 ¶ 3.AA. LPC also correctly acknowledges a fundamental premise of Texas insurance law, which is that "[i]n determining whether an insurer has a duty to defend, Texas follows the 'eight corners' rule, under which the court looks only to the third-party plaintiff's pleading and the provisions of the insurance policy." (Citations omitted). *See* ECF 35, p. 5. Yet, despite its correct citations to the policy and the law, LPC offers no analysis. It does not argue that any allegation in the MDL could potentially fall within the scope of coverage under the Policy. LPC entirely skips the starting point for the analysis, writing only that the Consumer Protection Exclusion was the sole basis for Arch's denial of coverage. *See* ECF 35, p. 5 ¶ 13. LPC does not explain how a denial letter could create a potentially covered claim. And indeed, this is not the law. Arch's denial has no impact on the analysis.

37.     A party seeking summary judgment must articulate the precise manner in which evidence supports his or her claim. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). LPC does not. It appears to simply sidestep the elephant in the room, which is that there is no colorable way to turn allegations of an intentional conspiracy to fix prices and restrict demand into a negligent act, error, or omission.

38.     LPC fails to establish that there is a claim within the scope of the Policy's insuring agreement as a threshold matter. For this reason, it is not entitled to summary judgment.

### 2.     There Are No Allegations Of A Wrongful Act

39.     It is LPC's burden to prove there is a claim within the scope of coverage, and not Arch's burden to disprove such. Nonetheless, Arch has provided an analysis below to show why the Policy's Insuring Agreement is not triggered.

40.     A comparison of the allegations in the MDL with the coverage available under the Policy establishes that the Policy's insuring agreement is not triggered. The Policy provides that the "**Insurer** shall pay **Loss** . . . on behalf of any **Insured** resulting from a **Claim** first made against such **Insured** during the **Policy Period** or **Extended Reporting Period**, if applicable, for a **Wrongful Act[.]**" ECF 31-2, p. 307.

> **Wrongful Act** means any actual or alleged *negligent* act, error or omission, misstatement, misleading statement, breach of duty or neglect or **Personal Injury** committed by any Insured; or by any other person for whom the **Insured Organization** is legally responsible, solely in the performance of or failure to perform **Real Estate Development Services**.

ECF 31-2, p. 312 ¶ 3.AA (emphasis added).

41.     The CAPs do not allege that LPC made an actual or alleged *negligent* act, error or omission, misstatement, misleading statement, breach of duty or neglect or personal injury. Rather, they allege that LPC engaged in an *intentional* price fixing conspiracy with others, in violation of the Sherman Act and violation of state anti-trust statutes. *See, e.g.*, ECF 31-1, pp. 276 - 278 ¶¶ 701 - 707; ECF 31-1, pp. 278 - 296 ¶¶ 708 - 757; ECF 31-1, preface.

42.     Conspiracy is not a standalone claim. *Berry v. Indianapolis Life Ins. Co*., 2009 WL 424545, *5 (N.D. Tex. Feb. 19, 2009). Rather, it depends on participation in some underlying tort. *Id*. The Texas Supreme Court has held that "[t]he essential elements [of civil conspiracy] are: (1)

two or more persons; (2) an object to be accomplished; (3) **a meeting of the minds on the object or course of action**; (4) **one or more unlawful, overt acts**; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983) (emphasis added); *see also Brown v. Carlton*, No. 3:07-cv-1367, 2008 WL 11425361, at \*4 (N.D. Tex. Mar. 3, 2008) (applying the elements of conspiracy as outlined by the Texas Supreme Court in *Massey*).[2] "Civil conspiracy requires specific intent" to agree "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Massey,* 652 S.W.2d at 934. **Because negligence by definition is not an intentional wrong, one cannot agree or conspire to be negligent**. *Julh v. Airington*, 936 S.W.2d 640 (Tex. 1996); *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996) ("Because a conspiracy requires intent, parties cannot conspire to be negligent."); *Triplex Comms., Inc. v. Riley*, 900 S.W.2d 716, 719, n.2 (Tex. 1995) ("Given the requirement of specific intent, parties cannot engage in a civil conspiracy to be negligent."). This Court has held that "[f]or the alleged conspirators to have a meeting of the minds, there must be an agreement among them and each must have a **specific intent** to commit the act." *Cruden Bay Holdings, LLC v. Jezierski*, No. 3:21-cv-01170, 2022 WL 447080, at \*5 (N.D. Tex. Feb. 14, 2022) (emphasis added).

43.    In the MDL, the CAPs allege that LPC conspired with others to limit supply and raise multifamily housing prices, causing substantial damage to the CAPs and others. ECF 31-1, pp. 3-4 ¶ 1. They allege that all parties' "knowing cooperation" in the scheme was essential to its successful operation. ECF 31-1, p. 6 ¶ 6. The CAPs claim that each participant in the scheme knew their competitors had accepted an invitation to participate in the scheme, and accepted the

---

[2] Violations of Section 1 of the Sherman Act are civil, and not criminal, conspiracies. *See U.S. v. Nat'l Lead Co.*, 332 U.S. 319, 338, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947).

invitation to participate. ECF 31-1, p. 7 ¶ 8. They assert that LPC participated in the plan knowing that if the plan were carried out it would result in increased rents and restricted demands. ECF 31-1, pp. 9-10 ¶ 12. The CAPs claim that LPC shared an interest in seeing that its competitors also participated. *Id*. The CAPs explicitly assert that LPC's conduct in the price fixing conspiracy was a *per se* violation of Section 1 of the Sherman Act and state antitrust statutes. *See* ECF 31-1, pp. 276 - 278 ¶¶ 701 - 707; ECF 31-1, pp. 278 - 296 ¶¶ 708 - 757. The MDL is "based on violations of federal antitrust laws and state laws[.]" ECF 31-1, p. 2, preface. **In other words, the CAPs do not allege that LPC was negligent. They allege that LPC deliberately conspired with others**.

44.     The Texas Supreme Court holds that conspiracy cannot be negligent. *See Triplex*, 900 S.W.2d at n.2 ("Given the requirement of specific intent, parties cannot engage in a civil conspiracy to be negligent."). There are no alternative claims of negligence, or negligence-based conduct in the MDL. The Policy is not triggered as a threshold matter. The analysis should stop here, and the burden should never shift to Arch to establish the applicability of an exclusion. If the Policy would never cover a claim on LPC's best day, there is no need to consider whether the claim is excluded.

45.     The Court should deny LPC's PMSJ because the MDL contains no allegations of **Wrongful Acts**. Based upon the Policy and the allegations in the MDL, Arch could never potentially have a duty to defend the claims the CAPs made against LPC.

**B.     The Consumer Protection Exclusion Precludes Coverage**

*1.     The Consumer Protection Exclusion Is Unambiguous*

46.     Even if there were a claim within the scope of the Policy's insuring agreement, which there is not, Arch would have no duty to defend LPC in the MDL. According to the Policy, Arch shall not pay Loss or Non-Party Investigation Expense, "in connection with any **Claim** for,

based upon, arising from or in any way related to unfair trade practices or violation of consumer protection laws." ECF 31-1, p. 315. The CAPs explicitly assert that LPC's conduct in the price fixing conspiracy is a *per se* violation of Section 1 of the Sherman Act and state antitrust statutes. *See* ECF 31-1, pp. 276 - 278 ¶¶ 701 - 707; ECF 31-1, pp. 278 - 296 ¶¶ 708 - 757.

47.    Arch is unaware of any Texas court, or any court in any jurisdiction, that has construed the exact exclusion at issue. However, the phrases "consumer protection laws" and "unfair trade practices" are unambiguous.

48.    There is no straight-faced argument that the allegations in the MDL are not related to "consumer protection laws." **The purpose of the Sherman Act is to protect consumers**. *See, e.g., Standard Oil Co. of New Jersey v. U.S*., 221 U.S. 1, 78, 31 S.Ct. 502, 55 L.Ed. 619 (1911) ("In applying remedies . . . the fact must not be overlooked that injury to the public by the prevention of an undue restraint on, or the monopolization of, trade or commerce, is the foundation upon which the prohibitions of the [Sherman Act] rest, and moreover that one of the fundamental purposes of the statute is to protect, not to destroy, rights of property."); *Nat'l Collegiate Athletic Ass'n Board of Regents of University of Oklahoma*, 468 U.S. 85, 107, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("Congress designed the Sherman Act as a 'consumer welfare prescription'") (quoting *Reiter v. Sonotone Corp*., 442 U.S. 330, 343, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)); *see also Open Cheer & Dance Championship Series, LLC v. Varsity Spirit, LLC*, No. 2:23- cv-0155, 2024 WL 1218573, at *4 (N.D. Tex. Mar 21, 2024). The point it sends is that "a business must find new customers and higher profits through internal expansion — that is, by competing successfully rather than arranging treaties with its competitors. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585, 600 (1985).

49.    **All violations of the Sherman Act constitute unfair trade practices**. *Fed. Trade*

*Comm'n v. Cement Inst*., 333 U.S. 683, 694, 68 S.Ct. 793, 800, 92 L.Ed. 1010 (1948) ("[A]ll conduct violative of the Sherman Act may likewise come within the unfair trade practice prohibitions of the Trade Commission Act[.]"); *see also In re Pork Antitrust Litig*., 495 F. Supp.3d 753, 768 (D. Minn. 2020) ("To establish a claim under §1 [of the Sherman Act], a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule if illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce.'") (internal citations omitted); *Quality Auto Painting Center of Roselle, Inc. v. State Farm Indem. Co*., 917 F.3d 1249, 1260 (explaining that Sherman Act applies to only "unreasonable" restraints of trade).

50.    It cannot be any clearer that the allegations against LPC in the MDL constitute a **Claim** for, based upon, arising from or in any way related to unfair trade practices or violation of consumer protection laws. To the extent the Court determines the CAPs allege a **Wrongful Act** against LPC, the Consumer Protection Exclusion precludes Arch's duty to defend.

### 2.    *Language In Other Policies Does Not Control*

51    LPC acknowledges that the Consumer Protection Exclusion applies to "unfair trade practices or violation of consumer protection laws." ECF 5, p. 7. But then it entirely ignores "consumer protection." Instead, it focuses its attention on "unfair trade practices," and argues that these words are not analogous with "antitrust violations." ECF 35, p. 8-14. Equating the Consumer Protection Exclusion with an antitrust exclusion, LPC asserts: "The insurance industry has been inserting so-called 'Antitrust Exclusions' into their insurance policies for decades, and have done so using far more explicit and clear policy language than the language in Arch's policy." *Id*. In other words, LPC claims that (assuming the exclusion is solely an antitrust exclusion, which it is not), the Consumer Protection Exclusion in the Policy is not long enough to be effective.

52.     LPC contends that the Consumer Protection Exclusion does not apply to the claims made the basis of the MDL because it does not use specific names of antitrust statutes such as "Sherman Anti-Trust Act" or "Clayton Act," and does not "enumerate half a dozen anticompetitive behaviors expressly." *Id*. at pp. 7-8. LPC states: "Insurers that prevail in court regarding the applicability of their antirust [sic] exclusions have done so because (a) the policies expressly exclude "the Sherman Antitrust Act," or (b) because of the principle of *noscitur a sociis*, a canon of statutory and contract construction that instructs the meaning of an unclear word or phrase should be determined by the words immediately surrounding it." *Id*. at p. 8 (citations omitted). But how and when insurers prevail on antitrust exclusions is irrelevant in this case. The Consumer Protection Exclusion in the Policy is not interpreted based upon any of the example "robust" exclusions that LPC suggests pass muster. *See id*. at p. 7. The Consumer Protection Exclusion excludes violations of consumer protection laws, **or** unfair trade practices. Use of the word "or" denotes that the exclusion would preclude coverage for either a violation of a consumer protection law **or** an unfair trade practice. Violations of the Sherman Act unambiguously fall under both categories.

53.     In *Apex Hosiery Co. v. Leader*, the United States Supreme Court explained:

> It was another and quite different evil at which the Sherman Act was aimed. It was enacted in the era of 'trusts' and of 'combinations' of businesses and of capital organized and directed to control of the market buy suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern. **The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury**.

310 U.S. 469, 491, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) (emphasis added).

54.     Arch intentionally used the words "unfair trade practices **or consumer protection**

laws" in the Consumer Protection Exclusion. The exclusion is *broader* than an exclusion that only names specific statutes or enumerates a list. While the Consumer Protection Exclusion may operate to preclude coverage for violations of antitrust statutes, it is not merely an "Antitrust Exclusion."

### 3.    *Inapposite Cases From Other Jurisdictions Do Not Control*

55.    LPC asserts, based on distinguishable or inapposite cases from Oregon, California, Illinois, Minnesota, and Washington, that the phrase "unfair trade practices" does not include antitrust violations, and means only deceptive trade practices. ECF 35, p. 10. None of the exclusions at issue in those cases are identical or substantially similar to the Consumer Protection Exclusion. LPC's analysis with respect to each case is flawed.

56.    In *Integra Telecom, Inc. v. Twin City Fire Insurance Company*, the insured was sued for a violation of unfair and deceptive business practices after charging and collecting fees that were falsely denominated on customer bills. Civ. Acv. No. 08-906-AA, 2010 WL 1753210, at *1 (D. Or. April 29, 2010). Its policy excluded "unfair trade practices," and the insurer declined defense. *Id*. "The parties dispute[d] the meaning of the term 'unfair trade practices.'" *Id*. The court held: **"[I]n the context of the Policy, the term 'unfair trade practices' is ambiguous**." *Id*. at *4 (emphasis added). The court's holding in *Integra* was unquestionably limited to the facts and policy before it. *Integra* is inapposite to this case in any event. In *Integra*, there were no allegations of antitrust violations. The only claims at issue were for deceptive business practices. In other words, there were no analogous issues. The issue in this case is whether the broad Consumer Protection Exclusion precludes coverage for any Claim "in any way related to unfair trade practices" without limitation.

57.    *James River Insurance Company v. Rawlings Sporting Goods Company, Inc*. is similarly unavailing. No. CV-19-6658-GW-MAAx, 2021 WL 346418 (C.D. Cal. 2021). In that

case, a class action plaintiff asserted consumer protection, but no antitrust, claims against the insured. *Id*. at *1. In Rawlings, the exclusion at issue narrowly applied to "anti-trust, business competition, unfair trade practices, or tortious interference in another's business or contractual relationships." *Id*. at *4. The court considered whether the policy's anti-trust exclusion applied to false advertising targeted at consumers, rather than businesses. *Id*. at *3. It ultimately determined that the exclusion did not apply because the categories of conduct in the exclusion "all refer to conduct by businesses targeted at business competitors." *Id.* at *4; *see also id*. at *7. The court stated: **"The Anti-Trust Exclusion similarly fails to mention anything – other than "unfair trade practices" – that would suggest consumer protection claims."** *Id*. at *7 (emphasis added). To the extent *Rawlings* has any value, it supports Arch's position. The Consumer Protection Exclusion expressly references consumer protection, and unlike *Rawlings* or *Integra*, applies broadly without limitation.[3]

58.    Like *Rawlings*, *Big Bridge Holdings, Inc. v. Twin City Fire Insurance Company* demonstrates why Arch's position is correct. 132 F. Supp.3d 982 (N.D. Ill. 2015). In *Big Bridge*, the insured was sued eight times for enrolling customers in fee-based monthly membership programs without consent. *Id*. at 984. The claims were generally for unfair business practices, and did not include any antitrust claims. *Id*. at 984-85. The court considered whether claims of *unfair business practices* triggered an exclusion for *unfair trade practices*. *Id*. at 987. The court used the plain language of the exclusion to determine that the exclusion did not apply. *Id*. at 988 – 989. The exclusion in *Big Bridge* did not include the words "consumer protection," as does the exclusion in

---

[3] In California, courts strive to provide insureds with their reasonable expectation of coverage. *Reserve Ins. Co. v. Pisciotta*, 30 Cal.3d 800, 807 (1982). The reasonable expectations doctrine does not exist in Texas. Courts interpret contracts as they are written, and assume the parties mean what their contracts say.

the Policy, and the court recognized the "antitrust-nature" of the exclusion. *Id*. at 989. *Big Bridge* does not help LPC for the same reasons *Integra* does not. The language of the exclusion limited "unfair trade practices" to antitrust claims, and no antitrust claims were asserted in *Big Bridge*. In contrast, the Consumer Protection Exclusion broadly applies to any claim "in any way related to unfair trade practices" without limitation.

59.     Finally, LPC contends that the holding in a Washington Superior Court case, *Avenue5 Partners, LLC v. Endurance American Insurance Company*, Case No. 23-2-11110-9 SEA (Wash. Super. Ct. Feb. 12, 2024), lends credence to its position. It does not. In *Avenue5*, the court simply listed the evidence it considered and made a ruling. ECF 35-1, pp. 00130 – 00135. The court did not provide any basis for its decision. This case should be entirely disregarded, as there is no way to respond to an analysis that does not exist.

60.     In summary, LPC has presented no law standing for the proposition that "unfair trade practice" does not include a violation of the Sherman Act. Longstanding United States Supreme Court precedent is clear that the opposite is true. The "unfair trade practice" portion of the Consumer Protection Act also precludes coverage for the claims made the basis of the MDL.

### 4.     The Exclusion Is Not Ambiguous, But LPC Has Not Provided A Cogent Construction If It Claims Otherwise

61.     In the PMSJ, LPC suggests that the Consumer Protection Exclusion is ambiguous. *See* ECF 35, p. 10 ("Arch opted not to use the "plain language" – which did not even include the phrase "unfair trade practices – enforced [by another court]."); ("The ambiguity is even sharper in the context of Arch's exclusion, and that ambiguity must be construed in favor of LPC, the insured.")

62.     Oddly, LPC states: "Applied to the Arch policy, LPC's reading of the exclusionary

phrase 'unfair trade practices or violation of consumer protection laws' as a consumer protection exclusion, not an antitrust exclusion, is reasonable, and LPC's reasonable construction must prevail as a matter of law." *Id.* at p. 11. An ambiguity does not arise merely because the parties offer conflicting interpretations. *Lynd*, 466 S.W.3d at 130. But there is an obvious issue, which is whether there are conflicting interpretations at all. Arch has referred to Exclusion X throughout as the Consumer Protection Exclusion.

63.     Although LPC claims that the Consumer Protection Exclusion is ambiguous, it is not really clear if it complains that it is ambiguous or just does not want the exclusion to apply. It argues that Arch could have drafted the exclusion differently, lists cases with different language, and provides cases where courts reached conclusions about the issue of "unfair trade practices" when they were not confronted with antitrust claims. But it does not offer any opinion about what it believes the exclusion means that would not result in a complete preclusion of coverage.

64.     As discussed above, the Consumer Protection Exclusion is unambiguous. Arch has no duty to defend LPC against the claims made the basis of the MDL.

## VIII.   CONCLUSION

The CAPs sued LPC and a group of other defendants for allegedly utilizing a software platform to engage in a conspiracy to "fix and inflate the price of multifamily rental housing across the country." They claim that LPC and the other defendants' conduct in price fixing and artificially inflating multi-family housing prices was anti-competitive, unlawful, and a *per se* unlawful restraint of trade under Section 1 of the Sherman Act and state antitrust statutes.

The Policy covers **Wrongful Acts**, which means negligent acts. LPC has not met its burden to establish that there is a claim within the scope of coverage. Indeed, there is not. The CAPs do not allege LPC acted negligently.

Even if there were a claim within the scope of coverage, LPC has no duty to defend. Arch has established the applicability of the exclusion, which is unambiguous and enforceable. The Court should deny LPC's PMSJ.

**WHEREFORE, PREMISES CONSIDERED,** Arch respectfully requests that the court deny LPC's PMSJ, enter judgment that it has no duty to defend LPC, and for such other and further relief, in law and in equity, for which it shall be justly entitled and for which it shall ever pray.

Respectfully submitted,


By: */s/ Summer L. Frederick*
      **ROBERT J. WITMEYER**
      State Bar No. 24091174
      Rwitmeyer@mayerllp.com
      **SUMMER L. FREDERICK**
      State Bar No. 24067764
      Sfrederick@mayerllp.com

      **MAYER LLP**

      750 N. Saint Paul Street, Suite 700
      Dallas, Texas 75201
      Telephone: (214) 379-4763
      Telecopy: (214) 379-6939

      **ATTORNEYS FOR DEFENDANT,**
      **ARCH SPECIALTY INSURANCE COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of September 2024, I served a true and correct copy

of the foregoing document on counsel of record using the Court's ECF filing service:

J. Mark Chevallier
McGuire, Craddock & Strother, PC
500 N. Ackard Street, Suite 2200
Dallas, Texas 75201
Telephone:    214-954-6860
Facsimile:    214-954-6868
mchevallier@mcslaw.com

    -and-

Julie L. Hammerman
Thompson Hammerman Davis LLP
1717 K St., NW, Suite 900
Washington, DC 20006
Telephone:    202-536-7529
Facsimile:    202-318-5356
jhammerman@thompsonhd.com

***Counsel for Plaintiff***
***Willow Bridge Property Company LLC***

                                          /s/ Summer L. Frederick
                                          **SUMMER L. FREDERICK**